1    MARC MARMARO, SBN 85242
     mmarmaro@jmbm.com
2    AMY LERNER HILL, SBN, 216288
     akl@jmbm.com
3    JEFFER, MANGELS, BUTLER & MARMARO LLP
     1900 Avenue of the Stars, Seventh Floor
4    Los Angeles, California 90067-4308
     Telephone: (310) 203-8080
5    Facsimile: (310) 203-0567

6    Attorneys for Defendant Religious Technology Center

7    BERT H. DEIXLER, SBN 70614
     bdeixler@proskauer.com
8    HAROLD M. BRODY, SBN 84927
     hbrody@proskauer.com
9    G. SAMUEL CLEAVER, SBN 245717
     gcleaver@proskauer.com
10   PROSKAUER ROSE LLP
     2049 Century Park East, 32nd Floor
11   Los Angeles, CA 90067-3206
     Telephone: (310) 557-2900
12   Facsimile: (310) 557-2193

13   ERIC M. LIEBERMAN, admitted pro hac vice
     elieberman@rbskl.com
14   RABINOWITZ, BOUDIN, STANDARD,
       KRINSKY & LIEBERMAN, P.C.
15   111 Broadway, 11th Floor
     New York, NY 10006

16
17   Attorneys for Defendant Church of Scientology International

18                    UNITED STATES DISTRICT COURT

19                   CENTRAL DISTRICT OF CALIFORNIA

20

| | |
|---|---|
| 21  CLAIRE HEADLEY, | CASE NO. CV 09-3987 DSF (MANx) |
| 22          Plaintiff, | **RTC'S & CSI'S JOINT SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES FOR PROTECTIVE ORDER AND IN OPPOSITION TO MOTION TO COMPEL** |
| 23      v. | |
| 24  CHURCH OF SCIENTOLOGY INTERNATIONAL, a corporate entity; | |
| 25  RELIGIOUS TECHNOLOGY CENTER, a corporate entity, and | |
| 26  DOES 1 through 20, | |
| 27          Defendants. | |
| 28 | |

JMBM | Jeffer Mangels Butler & Marmaro LLP

1

**TABLE OF CONTENTS**

2

**Page**

3

INTRODUCTION ...................................................................................1

4

I.    THE MINISTERIAL EXCEPTION MANDATES THAT THE COURT

5        APPLY A SIGNIFICANTLY HEIGHTENED THRESHOLD OF

6        NECESSITY BEFORE ORDERING THE DEPOSITION OF THE
         ECCLESIASTICAL LEADER OF AN INTERNATIONAL CHURCH

7        TO TESTIFY ABOUT HIS INTERACTIONS AND

8        CONVERSATIONS WITH THE CHURCH'S MINISTERS ........................2

9    II.   CONSIDERATION OF WHETHER TO COMPEL THE DEPOSITION

10       SHOULD BE DEFERRED UNTIL JUDGE FISCHER HAS DECIDED
         WHETHER AND TO WHAT EXTENT, IF ANY, PLAINTIFFS HAVE

11       ESTABLISHED TRIABLE ISSUES ON THEIR CLAIMS, AND

12       UNTIL PLAINTIFFS HAVE EXHAUSTED ALL LESS INTRUSIVE
         MEANS OF DISCOVERY, LEST THE VERY PROCESS OF

13       INQUIRY FUNDAMENTALLY INTRUDES UPON DEFENDANTS'

14       FIRST AMENDMENT RIGHTS....................................................................6

15   III.  THE MINISTERIAL EXCEPTION AND THE FIRST AMENDMENT
         BAR PLAINTIFFS' CLAIMS, ESPECIALLY INSOFAR AS THOSE

16       CLAIMS REST ON PLAINTIFFS' ALLEGED INTERACTIONS

17       WITH THE PROPOSED DEPONENT .......................................................10

18       A.    The Ministerial Exception Applies to Marc Headley, and His

19             Minimum Wage Claims Must be Dismissed for the Same Reasons
               that Applied to Claire Headley's Claims ...........................................11

20
         B.    The Ministerial Exception Applies to Plaintiffs' Claims for Forced
21             Labor, and Bars Those Claims in Whole or Part ................................15

22
         C.    The Religious Freedom Restoration Act Applies to Plaintiffs'
23             Claims for Forced Labor, and Bars Those Claims in Whole or Part ..24

24   IV.   CONCLUSION.............................................................................................25

25

26

27

28

JMBM | Jeffer Mangels
       Butler & Marmaro LLP

0047/21051-004 Current/18714476v2

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alcazar v. Corp. of the Catholic Archbishop of Seattle,*
  598 F.3d 668 (9th Cir. 2010) ........................................................................passim

*Britt v. Superior Court,*
  20 Cal. 3d 844 (1978) ..............................................................................................5

*Bruno & Stillman, Inc. v. Globe Newspaper Co.,*
  633 F.2d 583 (1st Cir. 1980)..................................................................................9

*Cervantes v. Time, Inc.,*
  464 F.2d 986 (8th Cir. 1972) ................................................................................9

*Chavous v. Dist. of Columbia Fin. Responsibility & Mgmt. Assistance Auth.,*
  201 F.R.D. 1 (D.D.C. 2001) ..................................................................................8

*EEOC v. Catholic Univ. of Am.,*
  83 F.3d 455 (D.C. Cir. 1996)................................................................................25

*Employment Div. Dept. of Human Resources of Ore. v. Smith,*
  494 U.S. 872 (1990).............................................................................................3, 4

*Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal,*
  546 U.S. 418 (2006)..........................................................................................4, 25

*Gunn v. Mariners Church, Inc.,*
  167 Cal. App. 4th 206 (2008) ..............................................................................24

*Guru Nanak Sikh Soc'y of Yuba City v County of Sutter,*
  456 F.3d 978 (9th Cir 2006) ..................................................................................4

*Herbert v. Lando,*
  441 U.S. 153 (1979)...........................................................................................8, 9

*Higgins v. Maher,*
  210 Cal. App. 3d 1168 (1989) ..........................................................2, 3, 23, 24

*Hope Int'l Univ. v. Superior Court,*
  119 Cal. App. 4th 719 (2004) ......................................................................14, 15

0047/21051-004 Current/18714476v2

*May v. Collins,*
    122 F.R.D. 535 (S.D. Ind. 1988) .............................................................10

*Meroni v. Holy Spirit Ass'n,*
    506 N.Y.S.2d 174 (N.Y. App. Div. 1986).............................................24

*Mitchell v. Superior Court,*
    37 Cal. 3d 268 (1984) .............................................................................10

*Moldea v. New York Times Co.,*
    137 F.R.D. 1 (D.D.C. 1990) ......................................................................9

*Navajo Nation v. U.S. Forest Serv.,*
    535 F.3d 1058 (9th Cir. 2008) .................................................................25

*Pac. Lumber Co. v. Nat'l Union Fire Ins. Co.,*
    220 F.R.D. 349 (N.D. Cal. 2003).................................................................8

*Paul v. Watchtower Bible & Tract Soc'y of New York, Inc.,*
    819 F.2d 875 (9th Cir. 1987) ...................................................................20

*Rayburn v. Gen. Conference of Seventh-day Adventists,*
    772 F.2d 1164 (4th Cir. 1985) .................................................................14

*Serbian Eastern Orthodox Diocese for the U.S. & Canada v. Milivojevich,*
    426 U.S. 696 (1976)...................................................................................2

*Van Schaick v. Church of Scientology of California, Inc.,*
    535 F. Supp. 1125 (D. Mass. 1982)........................................................20

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton,*
    536 U.S. 150 (2002)................................................................................14

*Worldwide Church of God v. Philadelphia Church of God, Inc.,*
    227 F.3d 1110 (9th Cir. 2000) .................................................................25

- iii -

JMBM | Jeffer Mangels Butler & Marmaro LLP

**STATUTES**

18 U.S.C. § 1589 ............................................................................................ 15

42 U.S.C. § 2000bb-1(b) ............................................................................... 25

42 U.S.C. § 2000bb-3(a), (b) ....................................................................... 25

42 U.S.C. §§ 2000bb *et seq.* ..................................................................... 4, 25

JMBM | Jeffer Mangels
Butler & Marmaro LLP

0047/21051-004 Current/18714476v2

**INTRODUCTION**

Defendants submit this joint supplemental memorandum to address the points requested by the Court, showing the impact of the district court's Order of April 2, 2010, and the Ninth Circuit's *Alcazar* decision on the remaining claims in the case, including how the ministerial exception impacts the materiality and relevance of the alleged conversations and interactions Plaintiffs claim they had with Mr. Miscavige. As we show below, the two recent decisions mandate that the ministerial exception applies to both plaintiffs, that the exception forecloses judicial inquiry into *any* aspects of the so-called employment relationship between the Plaintiffs and the Defendants, that the alleged matters upon which the Plaintiffs interacted with Mr. Miscavige relate precisely to that relationship, including the terms and conditions of Plaintiffs' labor and commitment to Defendants, the carrying out of their jobs, and the consideration and implementation of ecclesiastical discipline and governance, all matters governed by the ministerial exception.

David Miscavige is the ecclesiastical leader of a growing international religion. His duties and responsibilities require him to communicate and interact with the religion's ministers as well as to conduct numerous critically important church functions around the world to further the evangelical goals of Scientology, one of his and RTC's fundamental duties. Indeed, Mr. Miscavige's international efforts to evangelize Scientology are unique to his role of ecclesiastical leader, and cannot be performed by anyone else. Plaintiffs, acting pursuant to a virulent campaign against Mr. Miscavige by themselves and others, seek both to interfere with Mr. Miscavige's performance of those duties and to conduct an inquiry into his interactions with ministers of the religion on matters concerning those ministers' job functions, performance, work schedule, and potential ecclesiastical discipline, without even having tried to obtain material information from others whose deposition would not so grossly intrude on religious functions.

0047/21051-004 Current/18714476v2

1       This case presents issues of a far greater and more fundamental nature than

2   those raised when a party seeks an apex deposition of a commercial corporate officer.

3   Religious Technology Center ("RTC") is seeking to prevent an unprecedented

4   intrusion into its ecclesiastical governance, discipline, and management of the senior

5   churches of a world-wide religion, despite judicial warnings that the courts must keep

6   away from such matters where at all possible.  It is precisely such intrusions into

7   church governance, administration, doctrine and discipline that the non-entanglement

8   principle of the Establishment Clause and the ministerial exception prohibit.

9   **I.   THE MINISTERIAL EXCEPTION MANDATES THAT THE COURT
10      APPLY A SIGNIFICANTLY HEIGHTENED THRESHOLD OF
        NECESSITY BEFORE ORDERING THE DEPOSITION OF THE
11      ECCLESIASTICAL LEADER OF AN INTERNATIONAL CHURCH TO
        TESTIFY ABOUT HIS INTERACTIONS AND CONVERSATIONS
12      WITH THE CHURCH'S MINISTERS**

13       The Ninth Circuit's decision in *Alcazar v. Corp. of the Catholic Archbishop of*

14   *Seattle*, 598 F.3d 668 (9th Cir. 2010), and Judge Fischer's April 2, 2010, Order in the

15   *Claire Headley* case emphasize that application of the ministerial exception is

16   mandated by the non-entanglement principle of the Establishment Clause, and by the

17   Free Exercise Clause.  The non-entanglement principle "recognize[s] that the First

18   Amendment strongly circumscribes legislative and *judicial* intrusion into the internal

19   affairs of a religious organization." *Alcazar*, 598 F.3d at 673 (emphasis added).

20   Under it, courts and civil authorities must avoid involvement in "matters of

21   discipline, faith, internal organization, or ecclesiastical rule, custom or law." *Serbian*

22   *Eastern Orthodox Diocese for the U.S. & Canada v. Milivojevich,* 426 U.S. 696, 713

23   (1976).  Most important, courts have been particularly deferential when questions of

24   church discipline are at issue. *Id.* at 717 ("questions of church discipline and the

25   composition of the church hierarchy are at the core of ecclesiastical concern.")  Quite

26   simply, "secular courts will not attempt to right wrongs related to the . . . discipline or

27   administration of clergy." *Higgins v. Maher*, 210 Cal. App. 3d 1168, 1175 (1989)

28   (applying ministerial exception).

0047/21051-004 Current/18714476v2

1    As explained by the Ninth Circuit in *Alcazar* and recognized by Judge

2    Fischer's decision, "[e]ntanglement has substantive and procedural components." *Id.*

3    at 672.  The substantive component implicates a "church's freedom to choose its

4    ministers," which applies "not only to the selection of ministers but more broadly to

5    employment decisions regarding ... ministers" and "encompasses *all tangible*

6    *employment actions*", including but not limited to "the determination of a minister's

7    salary, his place of assignment, and the duty he is to perform in the furtherance of the

8    religious mission of the church." *Id.* at 674 (emphasis added).  "As for the procedural

9    dimension, the very process of civil court inquiry into the clergy-church relationship

10   can be sufficient entanglement [to foreclose judicial interference]." *Id.* at 672-73.

11   The *Alcazar* Court emphasized:  "'It is not only the conclusions that may be reached

12   by [the court] which may impinge on rights guaranteed by the Religion Clauses, but

13   also the very process of inquiry leading to findings and conclusions.'" *Id.* at 673

14   (quoting *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 502 (1979)).  As Judge

15   Fischer noted, application of the ministerial exception "minimizes the procedural

16   entanglement of detailed factual determinations."  (Order Granting Mot. Partial

17   Summ. J. (4/2/10) at 4 [Dkt. # 100] ("Order").)

18   With respect to the Free Exercise clause, the Ninth Circuit recognized that the

19   ministerial exception requires a court to apply a strict scrutiny analysis to the

20   application of any law to the church/minister relationship, so that only laws that

21   further a compelling, as opposed to rational, state interest may be applied, and even

22   then, most critically, only by the means least intrusive and restrictive upon the free

23   exercise rights of a church.  *Alcazar*, 598 F.3d at 672.[1]  The court then concluded:

24

25   _____

      [1] Plaintiffs' discussion of the free exercise clause (Pls.' Supp. Mem. at 3-8) thus is

26   inapposite.  Cases such as *Employment Div. Dept. of Human Resources of Ore. v. Smith*,
      494 U.S. 872 (1990), which rejected application of the compelling interest/least restrictive

27   means "strict scrutiny" doctrine to criminal laws of general applicability, have never been
      applied to cases involving application of the ministerial exception, as is evident by the

28

JMBM | Jeffer Mangels Butler & Marmaro LLP

> The Religion Clauses thus compel a ministerial exception from neutral
> statutory regimes that interfere with the church-clergy employment
> relationship. Because the ministerial exception is constitutionally compelled, *it
> applies as a matter of law across statutes, both state and federal, that would
> interfere with the church-minister relationship.*

*Id.* at 673 (emphasis added).

These principles have obvious and compelling significance for these cases, not only with respect to the ultimate result (*i.e.,* what the Ninth Circuit identified as the "substantive" component of the non-entanglement principle and the ministerial exception), but also with respect to Plaintiffs' attempt to go directly to the top of Scientology's ecclesiastical hierarchy to depose the ecclesiastical leader about interactions and conversations he allegedly had with his ministers concerning their performance, responsibilities, and potential discipline in carrying out their ministerial functions (*i.e.,* the "procedural" component, protecting against "the very process of inquiry"). This case differs from the typical apex deposition case because of the constitutional significance of the intrusion. Abusive as the typical apex deposition may be, a significantly heightened threshold must be applied in this context to protect against the very inquiry which can infringe rights under the Religion Clauses. Indeed, as the California Supreme Court warned, "the threat to First Amendment rights may be more severe in a discovery context, since the party directing the inquiry

---

opinion in *Alcazar*, because *Smith* itself recognizes that the strict scrutiny standard still applies to cases where a court must make individualized determinations of applicability, 494 U.S. at 884, a process inherent in the ministerial exception. *See Guru Nanak Sikh Soc'y of Yuba City v County of Sutter*, 456 F.3d 978, 993 (9th Cir 2006) ("When such regulations involving individualized assessments impose substantial burdens on religious exercise, they are subject to strict scrutiny to protect and vindicate the right to free exercise of religion"). Moreover, *Smith* no longer is good law in the federal courts and with respect to federal law. Congress enacted the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*, for the specific purpose of overruling *Smith* and reinstating the strict scrutiny standard. *Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 424, 439 (2006) (holding, directly contrary to *Smith,* that under RFRA the United States cannot apply its criminal laws against importation of hoasca, a tea containing a controlled substance, to members of a religion who used the tea as a sacrament).

0047/21051-004 Current/18714476v2

JMBM | Jeffer Mangels
Butler & Marmarou

1    is a litigation adversary who may well attempt to harass his opponent. . . ." *Britt v.*
2    *Superior Court,* 20 Cal. 3d 844, 855 (1978).

3        The Court therefore must take extraordinary care that Plaintiffs are not
4    permitted to take a deposition to seek to inquire on subjects that are not material or
5    relevant.  Most critically, the questions of materiality and relevance must be judged in
6    light of the subject matter on which inquiry is sought, and *whether inquiry into that*
7    *subject matter itself is contrary to and therefore precluded by the substantive*
8    *component of the ministerial exception.*  As we show below, the subjects upon which
9    Plaintiffs propose to depose Mr. Miscavige fit precisely into that category: they
10   involve conversations or interactions between a religion's ecclesiastical leader and its
11   ministers concerning the ministers' job functions, responsibilities, compliance with
12   church ethical standards, or imposition of ecclesiastical discipline.  These are all
13   matters that lie at the core of the ministerial exception.

14       Second, the Court should insist that Plaintiffs exhaust all other avenues of
15   discovery and then show clearly that they still require Mr. Miscavige's deposition on
16   material subjects.  Thus, for example, Plaintiffs' repeated declaration references to
17   Scientology religious ethics and justice practices such as committees of evidence, the
18   Rehabilitation Project Force, Ethics Confessionals, suppressive person declarations,
19   etc., are not even in dispute.  Defendants have explained that such doctrines and
20   practices are part of the Scientology religion and are set forth in extensive written and
21   publicly available scripture written by L. Ron Hubbard.  These policies and practices
22   have been and can be fully explained and described by RTC's President, Warren
23   McShane.  No testimony is required from Mr. Miscavige on any of these subjects,
24   even aside from the fact that they are protected from judicial evaluation by the First
25   Amendment, the ministerial exception, and RFRA.

26       And finally, the Court must prohibit a deposition that is sought for improper
27   and collateral purposes.  Defendants have presented substantial evidence that Mr.
28   Miscavige's deposition is being sought to harass and for publicity.  This evidence

- 5 -

1   cannot be ignored or brushed away, as Plaintiffs seek to do.  Surely the fact that

2   Plaintiffs' counsel publicly stated that taking the deposition "is not a matter of

3   urgency or high priority," that Plaintiffs twice failed to include Mr. Miscavige on

4   their lists of persons who might be witnesses in these cases, and that Plaintiffs added

5   his name to that list by filing a belated second amended list only after Defendants

6   pointed out their two prior omissions in the course of opposing Plaintiffs' motion to

7   compel, should raise serious questions as to Plaintiffs' good faith, let alone the

8   necessity of the deposition.  So, too, should Plaintiffs' expedient and incredible

9   "explanation" that they changed their minds about listing Mr. Miscavige in light of

10  newly developed evidence, given that neither prior to amending their witness list nor

11  to date have Plaintiffs taken a single deposition of any of Defendants' officers or

12  staff.  And there can be no doubt that Mr. Headley has loudly proclaimed his animus

13  toward Scientology, and obsessive hatred of Mr. Miscavige in particular, including

14  Internet postings stating *inter alia* "they are probably wrapping Dave's shorts in duct

15  tape as you read this;" "I just sent Costco size tubes of lube and first aid/sewing kits

16  to…Dave Miscavige," and "Dave is most likely to take it in the asterisk."  Headley

17  has demonstrated his agreement not only with the opinions, but more importantly

18  with the disruptive tactics, of the group "Anonymous," including their exhortations

19  that he use these cases to harass Mr. Miscavige by taking his deposition.  (Moxon

20  Decl. ¶ 15.)

21  **II.  CONSIDERATION OF WHETHER TO COMPEL THE DEPOSITION
     SHOULD BE DEFERRED UNTIL JUDGE FISCHER HAS DECIDED**
22  **WHETHER AND TO WHAT EXTENT, IF ANY, PLAINTIFFS HAVE
     ESTABLISHED TRIABLE ISSUES ON THEIR CLAIMS, AND UNTIL**
23  **PLAINTIFFS HAVE EXHAUSTED ALL LESS INTRUSIVE MEANS OF
     DISCOVERY, LEST THE VERY PROCESS OF INQUIRY FUNDA-**
24  **MENTALLY INTRUDES UPON DEFENDANTS' FIRST AMENDMENT
     RIGHTS.**
25

26      Determination of the legal issues of whether and to what extent and effect the

27  ministerial exception and related First Amendment doctrines apply to Claire

28  Headley's forced labor claim or to Marc Headley's claims are, of course, questions

- 6 -

1   for Judge Fischer.  In light of *Alcazar* and Judge Fischer's April 2, 2010, Order,

2   Defendants are preparing motions for summary judgment and/or summary

3   adjudication in both cases.  Those motions necessarily will assume as true the various

4   allegations Plaintiffs have made, except to the extent refuted by their own testimony

5   or writings, and argue that any disputes of fact are immaterial and irrelevant, as the

6   Court already has found with respect to Claire Headley's minimum wage claim.  The

7   parties already have conferred about the motions, and they will be filed imminently,

8   as completed, with a return date of June 21, 2010.

9        The proper action in this circumstance is to defer determination of the motion

10  for protective order regarding Mr. Miscavige's deposition until after those summary

11  judgment motions are submitted and decided.  If Defendants prevail completely (as

12  they expect to do), by definition there will be no need for the deposition.  If

13  Defendants prevail in part, but the District Judge determines that an issue of material

14  fact persists with respect to part of a claim, this Court can then revisit the deposition

15  issue to determine if that issue of fact requires Mr. Miscavige's deposition.  The

16  Court will also be able to make that determination in light of the completion of all

17  other discovery Plaintiffs undertake, or fail to undertake, including Mr. McShane's

18  deposition, and in light of the First Amendment and other limitations upon the taking

19  of the deposition of the Church's ecclesiastical leader, as discussed above.

20       The above procedure will protect against the very procedural entanglement evil

21  about which the Supreme Court in *Catholic Bishop*, the Ninth Circuit in *Alcazar*, and

22  Judge Fischer in her April 2, 2010, Order warned, that "[i]t is not only the

23  conclusions that may be reached . . . which may impinge on rights guaranteed by the

24  Religion Clauses, but the very process of inquiry leading to findings and

25  conclusions."  *Alcazar*, 598 F.3d at 673 (quotation marks and citation omitted).

26       Courts have "broad discretion to stay discovery pending decisions on

27  dispositive motions, including motions for summary judgment." *Pac. Lumber Co. v.*

28  *Nat'l Union Fire Ins. Co.,* 220 F.R.D. 349, 351-52 (N.D. Cal. 2003) (discovery

JMBM | Jeffer Mangels
Butler & Marmaro LLP

- 7 -

0047/21051-004 Current/18714476v2

1   should be stayed where a summary judgment motion is "potentially dispositive of the

2   entire case, or at least dispositive on the issue at which discovery is directed"); *see*

3   *also Chavous v. Dist. of Columbia Fin. Responsibility & Mgmt. Assistance Auth.,* 201

4   F.R.D. 1, 2 (D.D.C. 2001) ("A stay of discovery pending the determination of a

5   dispositive motion, is an eminently logical means to prevent wasting the time and

6   effort of all concerned, and to make the most efficient use of judicial resources").

7        Such limits on discovery are necessary in First Amendment cases, such as in

8   defamation actions where the First Amendment compels courts to limit intrusion or

9   "entanglement" in the investigation, reporting and editing processes.  In *Herbert v.*

10  *Lando,* 441 U.S. 153 (1979), the Court, while rejecting an *absolute* First Amendment

11  privilege against disclosure including by deposition of the editorial process of a

12  media defendant, emphasized that "judges should not hesitate to exercise appropriate

13  control over the discovery process" in defamation cases.  *Id.* at 176-177.  In his

14  concurring opinion (which supplied the majority), Justice Powell emphasized that a

15  court supervising discovery in a libel suit "has a duty to consider First Amendment

16  interests as well as the private interests of the plaintiff."  *Id.* at 178, 179 ("when a

17  discovery demand arguably impinges on First Amendment rights a district court

18  should measure the degree of relevance required in light of both the private needs of

19  the parties and the public concerns implicated").  In particular, Justice Powell

20  suggested that:

21        In some instances, it might be appropriate for the district court to delay
          enforcing a discovery demand, in the hope that resolution of issues through
22        summary judgment or other developments in discovery might reduce the need
          for the [discovery] demanded.
23

24  *Id.* at 180 n.4.  Lower courts have followed just such a procedure, recognizing "that

25  the threat to the First Amendment is sufficient good cause to stay the discovery

26  process pending resolution of a dispositive motion."  *Moldea v. New York Times Co.,*

27  137 F.R.D. 1, 1 (D.D.C. 1990) (staying discovery pending motion for summary

28  judgment); *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 597 (1st

- 8 -

JMBM | Jeffer Mangels
      | Butler & Marmaro LLP

1  Cir. 1980) ("In this [defamation] case, plaintiff should show that it can establish jury

2  issues on the essential issues of its case not the subject of contested discovery. Here,

3  the falsity of the Globe's charges, for example, should be drawn into question and

4  established as a jury issue before discovery is compelled"); *Cervantes v. Time, Inc.,*

5  464 F.2d 986, 993 (8th Cir. 1972) (to "routinely grant motions seeking compulsory

6  disclosure . . . without first inquiring into the substance" of the allegations "would

7  utterly emasculate fundamental principles" of the First Amendment").

8      Deferral of determination of the question also is necessary because Plaintiffs

9  have yet to take a deposition of Defendants. Indeed, in no reported case dealing even

10  with ordinary apex depositions has a court ordered the deposition of a senior official

11  until after the depositions of lower officials, and only after a subsequent showing of

12  the need for the apex deposition. It would be highly unprecedented to merge that

13  process, especially in this ecclesiastical context which mandates heightened

14  protection against improper intrusion, by simultaneously ordering that the deposition

15  of the lower-level official take place first, while also ordering that the deposition of a

16  religion's ecclesiastical leader take place in any event. The entire point of requiring

17  that a party first take lower-level depositions is to determine whether there indeed is a

18  need for the apex deposition. That requirement is all the more true in highly sensitive

19  areas where the deposition may intrude on First Amendment interests.

20      For instance, when the plaintiff in a defamation case seeks to depose a

21  journalist's confidential source, "virtually all cases agree that discovery should be

22  denied unless the plaintiff has exhausted all alternative sources of obtaining the

23  needed information." *Mitchell v. Superior Court,* 37 Cal. 3d 268, 282 (1984). Such a

24  deposition would be "permissible only when the party seeking disclosure has no other

25  practical means of obtaining the information." *Id.* In *Mitchell*, there was since "the

26  absence of a showing that alternative sources had been exhausted," the California

27  Supreme Court refused to permit the contested deposition to go forward. *Id.* at 284.

28  *See also May v. Collins,* 122 F.R.D. 535, 541 (S.D. Ind. 1988) (where "questions

- 9 -

1    could easily be established in a less intrusive manner than by deposition, the Court,

2    with respect for the First Amendment, stays the deposition…to give the parties an

3    opportunity to discover this information by other means").

4    　　　There is yet another reason why this Court should defer the deposition.

5    Incredibly, Plaintiffs are now attempting to change the very theory and focus of the

6    case. Up to now, Plaintiffs have claimed that they physically were held prisoner. As

7    we show below, the facts, including Plaintiffs' own testimony and writings, refute

8    that proposition. Now, confronted by those facts, Claire Headley is seeking leave to

9    amend her complaint to allege that the reason she remained at her positions for so

10   many years was that she was "brainwashed" into wanting to stay. Ms. Headley even

11   proposes to drop her federal human trafficking claim altogether, and to proceed

12   mainly on state law tort claims. This proposed third amended complaint (if

13   permitted) likely will require a new round of discovery and motion practice, making

14   it all the more inappropriate for the Court to take the extreme step of ordering the

15   deposition of a church ecclesiastical leader at this time, if ever. Indeed, the proposed

16   third amended complaint contains only two mentions of Mr. Miscavige, both of

17   which are stated in classical apex terms: that he "is responsible for setting and

18   enforcing the significant business [sic] practices of both Defendants" (Brody Decl.,

19   Ex. E (Proposed 3d Am. Compl. ¶ 3)), and that "these Defendants are under the

20   control of David Miscavige." (Id. ¶ 8.) There is no allegation that Mr. Miscavige

21   undertook a single act against Ms. Headley. Clearly, Ms. Headley seeks Mr.

22   Miscavige's deposition purely as an apex witness.

23   **III.  THE MINISTERIAL EXCEPTION AND THE FIRST AMENDMENT
         BAR PLAINTIFFS' CLAIMS, ESPECIALLY INSOFAR AS THOSE**
24       **CLAIMS REST ON PLAINTIFFS' ALLEGED INTERACTIONS WITH
         THE PROPOSED DEPONENT**
25

26   　　　Defendants recognize that these issues are for the District Judge to decide, and

27   Defendants are preparing to file motions for summary judgment and summary

28   adjudication addressed to them. We discuss these issues here to demonstrate the

- 10 -

JMBM | Jeffer Mangels
Butler & Marmaro LLP

1  compelling meritorious nature of Defendants' position, to assure this Court that it

2  would be appropriate to defer consideration of the motion for protective order on the

3  deposition until the District Judge has the opportunity to consider those motions.

4          A.      The Ministerial Exception Applies to Marc Headley, and His Minimum
                   Wage Claims Must be Dismissed for the Same Reasons that Applied to
5                  Claire Headley's Claims

6          The *Alcazar* Court rejected arguments that the ministerial exception applies

7  only in cases of formal "ordination or 'categorical notions of who is or is not a

8  'minister'", but held that it applies more broadly to those who perform services for a

9  religious institution, were chosen for their position based upon some "religious

10  criteria" and who "perform []some religious duties and responsibilities." 598 F.3d at

11  675-76. Indeed, even the performance of secular functions does not detract from

12  application of the ministerial exception, *id.* at 676 ("secular duties are often important

13  to a ministry"), so long as the "spiritual worker," in the court's term, performs

14  "some" religious responsibilities and the other two criteria are met. *Id.* Thus, in

15  rejecting the plaintiff's argument that under his ministry training program he was

16  hired to work as a "maintenance" employee doing such chores as "cleaning sinks",

17  the court held: "the Catholic Church [could] require its candidate for the priesthood to

18  spend a year 'mostly clean[ing] sinks' without overtime pay." *Id.* at 675.

19          Applying these principles to the *Claire Headley* case, Judge Fischer held that

20  the ministerial exception bars her claims for the same reasons that it barred those of

21  Rosas. Applying the Ninth Circuit's definition of a minister, Judge Fischer held:

22          [Claire Headley] worked for Defendants [CSI and RTC], which both are
            institutions within the Church of Scientology. She also was able to hold the
23          positions she had with Defendants based largely on religious criteria, namely
            her commitment to 1,000,000,000 years of service to Scientology and the
24          lifestyle constraints that come with being a member of the Sea Org. *See*
            [*Alcazar*] 2010 WL 917200, *6 [now paginated as 598 F.3d at 676] (deciding
25          this factor was met where plaintiff was in a job available only to seminarians of
            the Catholic Church). Finally, as part of her duties, she performed various
26          religious duties and responsibilities, most notably 'auditing' and 'cramming.'
            For these reasons, the Court finds that the undisputed material facts show that
27          . . . the ministerial exception would apply.

28  (Order at 4-5.)

- 11 -

JMBM | Jeffer Mangels Butler & Marmarour

1    The same analysis mandates application of the ministerial privilege to Marc

2    Headley. First, for over 15 years, Headley, as his wife did for 4 years, worked for a

3    religious institution, CSI, that is the "Mother Church" of the Scientology religion, and

4    for its division, Golden Era Productions, which is, in the words of Claire Headley,

5    "the dissemination organization of Scientology." (Declaration of Amy Lerner Hill

6    ("Hill Decl."), Ex. A at 888:8-18.)

7    Second, as a religious prerequisite to work for CSI and to hold and carry out

8    his positions and responsibilities at Golden Era, Headley, like his wife, underwent

9    extensive training to join the Sea Org, which admits to its membership only those

10   who, like Headley, have expressed and demonstrated an abiding commitment to the

11   Scientology religion and a sincere desire to devote their lives to its service for one

12   billion (1,000,000,000) years. As is common for members of religious orders of

13   other denominations, Sea Org members volunteer their service to whatever tasks the

14   Church believes will best serve its mission with no expectation of compensation. The

15   Church provides them with food, lodging, uniforms and small stipends for

16   necessities.[2]

17   Third, for all of those 15 years, Headley performed religious duties and

18   responsibilities for Golden Era, where he created and produced religious films

19   scripted by L. Ron Hubbard for training Scientology ministers, and public films,

20

21       [2] Like his wife, in addition to his Sea Org training, for each position that Marc
     Headley held at Golden Era, he was required to undergo training in the religious principles
22   of Scientology, by studying and applying to his post functions scriptural writings by L. Ron
     Hubbard such as HCO Policy Letter *Keeping Scientology Working*, HCO Policy Letter *The
23   Theory of Scientology Organizations*, HCO Policy Letter *Third Dynamic Tech*, HCO Policy
     Letter *Code of a Scientologist*, *Introduction to Scientology Ethics*, Article "Disclosing
24   Overts and Withholds," HCO Bulletin *Auditors*, *Dianetics '55*, E-meter Instruction Film #2
25   "The Tone Scale," Training Routine Instruction Film #4, "The Professional TR Course,"
     HCO Bulletin *Training Drills Re-modernized*, The Hubbard Life Orientation Course,
26   chapter, "The [Eight] Dynamics of Existence," HCO Bulletin *Scientology: Current State of
27   the Subject, and Materials* and others. (McShane Decl., ¶ 27.)

28

1   videos and other media that furthered the Church's efforts to teach and spread its

2   faith. The production of the religious films was an urgent and critical function in the

3   very practice of Scientology. As Headley testified:

4       L. Ron Hubbard had the concept that certain of his materials could not be
5       duplicated by someone reading it off of a piece of paper or another person
        interpreting ... what was on the paper and then training that person how to do
6       [it]. So he wanted to produce these films to make it so people could see how
7       he intended it.... (Declaration of Harold M. Brody ("Brody Decl."), Ex. A at
        692:19-693:7.)

8

9   Headley described his position and function as both urgent and important: "It

10  was still urgent and important because it hadn't been done in 30 years and it was, the

11  intention was yes, we need to get this done. L. Ron Hubbard said to do it 30 years

12  ago and it's still not done. So yeah, we need to get it done." (*Id.* at 742:6-743:1.)

13  The production of public films to further the evangelization of Scientology was

14  of no less religious moment. Headley explained, "[t]hey're called public films

15  because they're for the broad public. They're meant to basically convince or

16  enlighten somebody . . . so that they can participate in Scientology activities." (*Id.* at

17  747:11-748:23.) As Headley stated, they were intended to "forward swiftly the

18  dissemination of Dianetics and Scientology." (*Id.* at 659:9-20.)

19  The performance of such functions and responsibilities of spreading the

20  religion and its message are of a fundamental religious nature. As the Supreme Court

21  explicitly has held, in words of definitive significance to the application of the

22  ministerial exception in this case:

23      [H]and distribution of religious tracts is an age-old form of missionary
        evangelism — as old as the history of printing presses. It has been a potent
24      force in various religious movements down through the years. . . . This form of
        religious activity occupies the same high estate under the First Amendment as
25      do worship in the churches and *preaching from the pulpits.* It has the same
        claim to protection as the more orthodox and conventional exercises of
26      religion.

27  *Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton,* 536 U.S.

28  150, 161 (2002) (emphasis added) (quoting *Murdock v. Pennsylvania,* 319 U.S. 105,

JMBM | Jeffer Mangels
       Butler & Marmaro LLP

- 13 -

1  108-09 (1943)).  In recognition of this principle, the federal and California courts

2  repeatedly have recognized that church workers whose functions encompass

3  evangelizing, teaching, or spreading of church doctrine and who attempt to bring new

4  converts into the religion are engaged in religious functions and responsibilities

5  within the meaning of the ministerial exception.  Thus, the exception applies to

6  "individuals whose duties for a church not only involve traditional public relations,

7  but who are also, functionally, paid to actively proselytize on a church's behalf."

8  *Hope Int'l Univ. v. Superior Court*, 119 Cal. App. 4th 719, 736 (2004) (citing *Alicea-*

9  *Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 703 (7th Cir. 2003)) (non-

10  ordained press secretary whose duties included outreach to local community found

11  within the ministerial exception).  In terms repeatedly invoked *in haec verba* by

12  numerous courts, the ministerial exception encompasses the functions, *inter alia,* "of

13  *teaching, spreading the faith, . . .*," or that are "*important to the spiritual and pastoral*

14  *mission of the church.*"  *Rayburn v. Gen. Conference of Seventh-day Adventists*, 772

15  F.2d 1164, 1168-69 (4th Cir. 1985) (emphasis added).  *Accord, Hope Int'l Univ.*, 119

16  Cal. App. 4th at 734 (same language) (quoting *Rayburn*).

17      Thus, it is beyond peradventure that Marc Headley was a minister within the

18  meaning of the ministerial exception.  Headley, as a member of a religious order, the

19  Sea Org, performed functions whose purposes included "teaching" Scientology

20  practices to auditors and course supervisors by the creation of religious training films,

21  furthering the dissemination of the Scientology religion ("spreading the faith") both

22  to existing Scientologists and to non-Scientologists, pursuant to the Scientology

23  religion's evangelical goal to "Clear the Planet" ("important to the spiritual and

24  pastoral mission of the church").  The functions of Headley's positions and

25  responsibilities thus fit precisely within the contours of the ministerial exception, as

26  elucidated by the Ninth Circuit and by Judge Fischer.  Accordingly, his wage and

27  hour claims will be dismissed.

28

JMBM | Jeffer Mangels Butler & Marmaro LLP

0047/21051-004 Current/18714476v2

B.    The Ministerial Exception Applies to Plaintiffs' Claims for Forced Labor, and Bars Those Claims in Whole or Part

The essence of a claim for "forced labor" under 18 U.S.C. § 1589 is that the plaintiff is held in some form of captivity and forced to perform labor against his or her will. Victim of Trafficking and Violence Protection Act of 2000 ("TVPA"), 18 U.S.C. § 1589 (defining "forced labor"). The statute "is intended to address the increasingly subtle methods of human traffickers who place their victims in modern-day slavery." H.R. Conf. Rep. 106-939 (October, 2000) at 116.

The Headleys' own testimony and writings establish that they cannot make out a claim that they physically were held captive and forced to work as ministers. Marc Headley testified that he never considered that "I'm being held against my will . . . whether or not I was being held against my will, I don't think I thought those thoughts." (Brody Decl., Ex. A at 999:18-25.) He confirmed as true the statements in his recently self-published book that while he often considered leaving Golden Era, he stayed to remain with his wife, Claire,[3] whom he assumed would choose to keep her position as a high ranking RTC official, and divorce him if he left on his own without following Sea Org procedures for voluntarily departing, known as "routing out."[4]  (*Id.* at 441:1-4; 441:17-442:5; 894:21-895:12; 895:4-12.)

_____

[3] Headley writes, "She is the only reason I stayed there on a number of occasions. If I had not married her, I figure that I would have left at least 4 or 5 times earlier . . ." (Brody Decl., Ex. B (*Blown for Good* at 312).)

[4] "Routing Out" is the Scientology procedure by which a Sea Org member may withdraw his vows of eternal service and leave the Sea Org, while still maintaining his or her relationship with the Scientology churches and religion. A person who has routed out becomes a "public" Scientology parishioner. The process involves submission of a "leaving staff" routing form, participation in ethics and justice procedures, including ethics confessionals, and can take several weeks or even months. While participating in the process, a Sea Org member is relieved of any formal posting, but is expected to continue to contribute by performing chores, such as gardening, cooking, cleaning, painting, etc. Hundreds of Sea Org members have chosen to route out due to changes in their life or commitment, while remaining Scientologists in good standing. (McShane Decl., ¶ 26.)

JMBM | Jeffer Mangels Butler & Marmaro LLP

1    Claire Headley acknowledged that she remained a committed Sea Org member

2    for many years, eventually had doubts and lost her commitment, and left the first and

3    only time she attempted to do so.  In fact, she believed in Scientology until she left in

4    January 2005. (Hill Decl., Ex. A at 20:17-25.)  During that time, she served the

5    religion and believed that she was furthering its goals.  (*Id.* at 51:16-24.)  She had

6    been raised to believe "that it was wrong not to be in the Sea Org and that people that

7    left were out-ethics criminals and various other things along the same line of

8    thought…. That's how I was raised, and I was doing what I was raised to believe was

9    right," specifically, "that joining the Sea Org and being a Sea Org member is the

10   correct thing to do."  (*Id.* at 38:6-20.)  She had been "firmly raised in that for [her]

11   whole life…"  As her husband describes her, Claire Headley "was a real strait-laced

12   Sea Org member."  (Brody Decl., Ex. B at 164-65.)  And therefore, "it took a fair bit

13   to make me actually get to the point of leaving because I was very firmly connected,

14   and I knew absolutely nothing else."  (Hill Decl., Ex. A at 21:5-12 (Claire Headley's

15   deposition testimony).)  It was not one event, but "many events over a course of

16   several years" that led her to depart.  (*Id.* at 22:1-10.)

17   While in her declaration submitted for purposes of this motion, Claire Headley

18   states that a series of alleged abuses at the International Base "caused me to believe

19   that I could not leave Defendants' properties," her deposition testimony was exactly

20   the opposite: that is precisely what caused her to decide to leave and to leave.  Thus,

21   she testified, she left "because I absolutely could not take witnessing the abuses

22   anymore.  I couldn't take the working conditions…."  (*Id.* at 278:21-24.)  In addition,

23   "[m]y husband had left. I knew that if I didn't leave, I would never see him again."

24

25   These procedures are part of "the lifestyle constraints that come with being a member of the
     Sea Org."  (Order at 4-5.)  A Sea Org member who chooses to leave without routing out
26   may be subject to ecclesiastical discipline, including, but not necessarily, being declared a
     "suppressive person", which is the functional equivalent of being shunned or
27   excommunicated. (McShane Decl., ¶ 26.)

28

- 16 -

JMBM | Jeffer Mangels
      Butler & Marmaro LLP

1   (*Id.* at 279:3-5.) "And ultimately, I saw that there was absolutely nothing positive

2   being accomplished by my remaining there." (*Id.* at 279:22-24.)

3          Whatever their mental attitude toward their Sea Org careers, the facts are

4   uncontroverted that the Headleys had numerous, indeed almost daily, opportunities to

5   leave if they wanted to do so.[5]  The Headleys lived off the premises of the

6   International Base in public apartments (one with a swimming pool and lawn chairs

7   where Marc got "a serious tan" (Brody Decl., Ex. B at 110)) several miles away

8   (fifteen minute drive) or in houses on public roads (Brody Decl., Ex. A at 310:23-

9   311:2, 311:13-25; Hill Decl., Ex. A at 128:24-129:18; 161:2-6); often left the Base

10  and returned during the day to shop, go to restaurants, take care of their dog or make

11  and eat dinner; (Brody Decl., Ex. A at 314:7-315:16; Hill Decl., Ex. A at 172:25-

12  173:8; 188:3-20; 190:23-191:10); had the combination to the security lock on the gate

13  at the International Base and opened the gate themselves when they passed through it

14  (Brody Decl., Ex. A at 308:14-23; Hill Decl., Ex. A at 202:22-203:9); owned and

15  drove motorcycles and a jeep (for one year) and had access to and used automobiles

16  (Brody Decl. Ex. A at 290:23-291:10; 314:16-315:1; 497:20-498:1); attended church

17  functions together (*id.* at 317:6-318:8; Hill Decl., Ex. A at 179:2-13;182:11-17;

18  183:6-19); visited family (including non-Scientologists) and friends not only in Los

19  Angeles but in Kansas City (Marc's non-Scientologist father) and South Carolina

20  (Claire's non-Scientologist grandmother) (Brody Decl., Ex. C (Life History Update)

21

22          [5] Marc Headley actually enjoyed significant aspects of his alleged "forced labor", and
    he and his wife took pride in his work.  Thus, when he was offered his promotion to Quality
23  Control Gold, in charge of insuring the quality and integrity of all Golden Era materials, he
    "loved the idea." (Brody Decl., Ex. B at 164.)  Indeed, his "wife was very proud of [him].
24  She was a real strait-laced Sea Org member" who was "happier" that he "had a respectable
    position." (*Id.* at 164-65.)  Later, when he assumed his positions, in the last two years of his
25  Sea Org career, working on design and installation of audio visual systems, he "truly loved
    and had fun while doing it." (*Id.* at 265.)  Mr. Headley's love for his fun work certainly
26  distinguished him from any other known "victim" of forced labor and human trafficking.
27

28

JMBM | Jeffer Mangels
Butler & Marmaro LLP

1   at 4; Hill Decl., Ex. A at 798:22-799:7); had bank accounts and a PayPal account; had

2   cell phones and a laptop with Internet accessibility (Brody Decl., Ex. A at 112:2-5;

3   276:3-11; Hill Decl. Ex. A at 135:3-7; 136:13-15); Marc traveled to and around Los

4   Angeles and to Arizona, New York and Europe in carrying out his post positions,

5   including living in Copenhagen for three months (Brody Decl., Ex. A at 354:10-15;

6   355:4-12; 513:6-14; 581:16-582:3; 582:24-583:7); visited about a hundred different

7   Scientology churches around the world in doing so (*id.* at 805:20-806:11); and visited

8   and maintained a relationship with his father and other non-Scientologist relatives

9   who lived out of state.  (Brody Decl., Ex. C at 4.)  On several occasions, Claire drove

10  from the International Base to Los Angeles for meetings (Hill Decl., Ex. A at 170:18-

11  171:12); while in Clearwater, Florida worked in a building on a public street, lived in

12  an apartment complex that was a ten minute drive from her office, drove a van, flew

13  back and forth to Los Angeles on commercial jets, and went to movies (*id.* at 145:11-

14  24; 387:2-18; 390:6-18; 804:12-15); and, after a serious motorcycle accident, made

15  over thirty trips to a physical therapist in Hemet.  (*Id.* at 649:17-21; 651:20-652:20;

16  657:24-658:11.)

17       Given the above facts, the Headleys' forced labor claims cannot be based upon

18  claims of physical restraint.  Indeed, what is particularly relevant for this motion is

19  that the Headleys make no claim that Mr. Miscavige physically restrained them from

20  leaving or had any interaction with them about leaving; not a single statement in

21  Plaintiffs' declarations says any such thing.  Rather, the Headleys' forced labor

22  claims are based upon their alleged beliefs that if they left unilaterally without

23  participating in the "routing out" process designed for Sea Org members who wished

24  to withdraw their vows and eternal commitment to work for their religion but remain

25  in good standing as Scientologists,[6] they would be subject to a church "declare", in

26

27       [6] McShane Decl., ¶ 26. Such a process is typical of religious orders. As described by

28  Dr. Frank Flinn, a well recognized scholar and expert on comparative religion whose

0047/21051-004 Current/18714476v2

1    essence an order of excommunication, and would not be able to communicate with

2    one or another and other Scientologists who were their friends or family; and that

3    they were subject to what they considered to be arbitrary and harsh church control

4    and discipline.  (Brody Decl., Ex. A at 232:14-233:2, 584:22-587:13; Hill Decl., Ex.

5    A at 282:14-21, 531:16-23.)  As noted, it is exclusively to the latter category that all

6    of the interactions with Mr. Miscavige upon which Plaintiffs rely in this motion

7    relate.  Neither category of harm, however, may be the basis of a forced labor claim

8    because of the application of the ministerial exception.

9    First, as the Ninth Circuit has held, a church's implementation of a policy requiring

10   its members to "shun" an excised former member or excommunicating that member

11   from the religious community may not be a basis to impose civil liability upon the

12   church or its officials.  *Paul v. Watchtower Bible & Tract Soc'y of New York, Inc.*,

13   819 F.2d 875, 883 (9th Cir. 1987).  There, the court rejected emotional distress claims

14   resulting from the Jehovah's Witnesses' shunning of a former parishioner, because

15   the First Amendment "permits them to engage in the practice of shunning pursuant to

16   their religious beliefs without incurring tort liability," 819 F.2d at 879, even if the

17   practice in fact caused emotional distress.  Indeed, the court went further and held

18

19   declaration was submitted to the District Court in support of the now-granted motion for

20   partial summary judgment in the Claire Headley case:

21        As Roman Catholic monks and friars take solemn, as opposed to regular or
              temporary vows, they must first obtain what is called a dispensation (from their
22        vows) from the Vatican itself.  They maintain their good relation with the official
              church provided that they observe proper procedures in exiting, wait until the
23        dispensation is finalized according to canonical regulations, and do not heap scorn on
              their mother church.  If they fail to fulfill these precepts they are liable to censure,
24        interdict (an exclusion from all sacraments such as Marriage, Reconciliation
              (Confession), the Eucharist and Anointing) and/or excommunication, a total
25        separation from the church and its fellowship.
26

27   (Brody Decl., Ex. D (Flinn Decl. ¶ 29).)

28

- 19 -

1    that claims for emotional distress arising out of participation in a church are not

2    actionable:

> Intangible or emotional harms cannot ordinarily serve as a basis for
> maintaining a tort cause of action against a church for its practices — or
> against its members....Offense to someone's sensibilities resulting from
> religious conduct is simply not actionable in tort....Without society's
> tolerance of offenses to sensibility, the protection of religious differences
> mandated by the first amendment would be meaningless.

7    *Id.* at 883 (citations and footnote omitted, emphasis added). *Accord, Van Schaick v.*

8    *Church of Scientology of California, Inc.*, 535 F. Supp. 1125, 1139 (D. Mass. 1982).

9        Second, Plaintiffs' assertions that Defendants imposed psychological and

10    emotional barriers that prevented them from leaving also must be rejected as a basis

11    for liability under the forced labor statute.  While that statute provides that labor can

12    be "forced" by the use of certain forms of psychological or emotional coercion as

13    well as by physical force, such an application of the statute in a non-secular context to

14    the "lifestyle constraints that come with being a member of [a religious order such as]

15    the Sea Org" (Order at 4-5) and the religious discipline of ministers, cannot be made

16    under the First Amendment and the ministerial exception.  Indeed, such matters relate

17    to the Headleys' labor with Defendants, and constitute precisely the kind of "tangible

18    employment actions" covered by the ministerial exception.

19        As noted above, all the interactions and conversations that Plaintiffs allege they

20    had with Mr. Miscavige, even with the exaggerated rhetoric and spin Plaintiffs use,

21    fall into the category of the ecclesiastical leader of the church speaking to and

22    directing the activities of the ministers of CSI and RTC.  A full explanation and

23    description of how and why this is so, including an explication of the theory and

24    practice of the Scientology religion, Scientology management policies that are

25    dictated by scripture, and Scientology ethics and justice systems, requires the much

26    fuller record appropriate to the summary judgment motions Defendants already have

27    and will soon file, and for that reason must be left to the District Judge for ultimate

28    consideration.  But even a brief review of those allegations highlights the point.

- 20 -

1    Claire Headley claims, *inter alia*, that she attended a "muster", *i.e.,* a group

2    meeting of Sea Org staff, at which Mr. Miscavige "screamed at" staff members about

3    matters relating to their job positions; that Mr. Miscavige ordered that she and others

4    practice Scientology "communication drills because he felt that [they] were not

5    effectively training other staff members"; that as a result she had to work long hours

6    with short meal breaks; that her husband was once assigned "heavy labor'; that at a

7    meeting with RTC staff, Mr. Miscavige discussed a project to build housing for staff

8    members; that in 2005 Mr. Miscavige ordered all staff members to work extended

9    hours; that she transcribed hundreds of hours of meeting notes issued by Mr.

10   Miscavige; that she was required to retire for the night only after Mr. Miscavige did;

11   and that Mr. Miscavige issued an order that RTC staff members could only be

12   married to other RTC staff members, or they would have to transfer to positions at

13   CSI. (Claire Headley Decl., ¶¶ 4-18 [Dkt. # 109].)

14   Similarly, Marc Headley elaborates on the alleged muster, extended work

15   assignments, penalties for missing musters, working on assignments from Mr.

16   Miscavige, and a meeting at which Mr. Miscavige complained that Golden Era staff

17   members were not properly performing their jobs (referred to as their "hats"). Each

18   of these interactions involved "tangible employment actions" regarding ministers and

19   are encompassed within the ministerial exception. *Alcazar*, 598 F.3d at 674.

20   The Headleys also purport to testify to various interactions with Mr. Miscavige

21   relating to ecclesiastical rules, management and discipline, such as the Rehabilitation

22   Project Force (a program for rehabilitation of errant Sea Org members, to which she

23   never was assigned); "Committees of Evidence", which are part of the Scientology

24   ethics and justice system; imposition of disciplinary punishments, such as additional

25   work assignments, physical labor, and Scientology justice confessionals.[7]  Each of

26

27    [7] Marc Headley also alleges that he once was assaulted by Mr. Miscavige. But

28   even if this claim were true, at deposition Headley conceded that this incident did not

these subjects has been, can be and will be described fully by other witnesses, primarily Mr. McShane; in fact, they are set forth in great detail in the Church's published scripture, including policies on confessionals, committees of evidence, the RPF, disciplinary procedures and punishments, etc. (McShane Decl., ¶¶ 25a.-25s.) Such lifestyle restrictions and ecclesiastical discipline are part of every religious order, as set forth in the Declaration of Dr. Frank Flinn, in particular ¶¶ 11-15, 17, 19, 28, and 39. (*See also ante* at 18 & n.6.)[8]

---

cause him to remain at the Base, but, in fact, made him consider leaving, which he chose not to do at the time. (Brody Decl., Ex. A at 916:9-917:7)

[8] We submit Dr. Flinn's declaration with this memorandum, and highlight the most relevant paragraphs. Among his observations, Dr. Flinn notes that "The rules of the [Buddhist monk's] monastic life are all encompassing. They govern . . . what punishments are to be meted out for breaking the rule"; that for most rules infractions "the community sits in judgment on the offender and, depending on the case, either imposes a penance for improvement or expels a repeating offender. The procedural regulations are very elaborate. . . ."; "As with Christian monks and nuns, a member must seek a superior's permission to leave the monastery and is obliged to report in on returning. . . . [E]very aspect of the member's life — dwelling, periods of study and meditation, food, clothing, manner of begging, contact with nuns and lay people, food, medicines, etc. — is closely supervised and monitored;" "Even humble tasks — such as weeding the garden, baking bread, sweeping the monastery paths, cleaning the latrines — are understood in a religious way. These ordinary duties contribute to the monastic's developing attitudes of humility, modesty, and obedience, without which their progress in the stages of meditation leading to enlightenment and the spread of the Buddhist ideal would be impaired or thwarted . . . ."; [The Catholic] Rule of St. Benedict has detailed steps for disciplining and excommunicating or readmitting erring monks and nuns who have fallen away from the rules of the order. . . . . The punishments include kneeling with outstretched arms for long periods, silencing, mortification by self-flagellation with a whip or wearing a hairshirt, solitary meals, physical discipline, and, as a last resort, outright expulsion . . . . An excommunicated member is understood to be one who foregoes salvation and risks the fires of an everlasting hell. Members who associate with an excommunicated member without direction of the abbot or abbess are liable to receive the same punishment."; "The monks or nuns settle the affairs of the daily life in the monastery, including the public confession of sins and infractions against the rule. Sinning members are usually sent before special supervisory committees of other monks or nuns who determine what sort of discipline or punishment befits the offense. . . . (Brody Decl., Ex. D.)

*Higgins v. Maher, supra*, dramatically demonstrates the limitations the First Amendment and the ministerial exception place upon application of civil tort law to such "inherent lifestyle restrictions" and discipline imposed in a religious order or ministerial context. In that case, a Roman Catholic priest brought tort claims against his Bishop and the Church for his removal from his position for alleged misconduct, subsequently mandated psychiatric treatment, which included drugs and shock therapy, and public revelation of alleged private defamatory information. The court found that the complaint adequately alleged "torts of invasion of privacy, defamation, and the intentional and negligent infliction of emotional distress," and therefore would be actionable in a secular context. 210 Cal. App. 3d at 1175. The court, however, dismissed the complaint because, even if defendants had engaged in the alleged tortious conduct, "the acts so taken were part and parcel of the Bishop's administration of his ecclesiastical functions," and thus were protected activity under the ministerial exception. *Id*. at 1175-76. As the court stated:

> the torts recited are simply too close to the peculiarly religious aspects of the transaction to be segregated and treated separately — as simple civil wrongs. The making of accusations of misconduct; the discussion of same within the order; the recommendation of psychological or medical treatment; the infliction, whether *intentionally* or negligently, of emotional distress — these are all activities and results which will often, if not usually, attend the difficult process by which priestly faculties are terminated.

*Id*. at 1176 *Accord Gunn v. Mariners Church, Inc.,* 167 Cal. App. 4th 206, 217 (2008) (following *Higgins* and affirming summary judgment dismissing claims of dismissed church musical director for defamation and invasion of privacy against church: "the ministerial exception applies to preclude further judicial review *regardless of the otherwise tortious nature of the statements*") (emphasis added).

Here, it is equally impossible to separate out any claim that the Headleys were subjected to forced labor by psychological or emotional distress from the Headleys' commitment to the Sea Org over a fifteen year period. The allegations of forced labor here are simply an effort to obtain civil adjudication of the Headleys' decision

- 23 -

to adhere to Church lifestyle and discipline at a time when remaining within the Church was of paramount importance to them. The Headleys, it must be emphasized, were not mere parishioners. They were members of the Sea Org and ministers within Scientology's ecclesiastical leadership who had vowed to dedicate their lives to help advance Scientology's goals. Now that the Headleys' priorities have changed, they ask this court and a jury to review the propriety of "the lifestyle constraints that come with being a member of the Sea Org" and the Church's imposition of discipline and their obedience to it. As made clear in *Serbian Orthodox Diocese*, *Paul*, and *Higgins,* however, this is an inquiry that secular courts cannot undertake. *See also Meroni v. Holy Spirit Ass'n*, 506 N.Y.S.2d 174, 176-77 (N.Y. App. Div. 1986) (church's alleged "brainwashing" by imposition of "highly programmed behavioral control techniques in a controlled environment" "constitutes common and accepted religious proselytizing practices, *e.g.*, fasting, chanting, physical exercises, cloistered living, confessions, lectures, and a highly structured work and study schedule, . . . *i.e.*, as a method of religious indoctrination that is neither extreme nor outrageous.")

     C.    The Religious Freedom Restoration Act Applies to Plaintiffs' Claims for Forced Labor, and Bars Those Claims in Whole or Part

     The Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb et seq., reinforces the arguments made above that this Court cannot impose forced labor sanctions on defendants based on their religious practices. RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless an enumerated exception applies. *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000). The exceptions to that rule provide that "substantial burden" of "a person's exercise of religion" is permissible only if "application of the burden to the person...(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

- 24 -

JMBM | Jeffer Mangels Butler & Marmaro LLP

1     RFRA precludes government authorities from coercing religious adherents "to

2     act contrary to their religious beliefs by the threat of civil or criminal sanctions."

3     *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008). RFRA

4     amends *all* federal law, whether enacted before or after RFRA itself, *see* 42 U.S.C.

5     § 2000bb-3(a), (b), unless a statute specifically excludes its application, which the

6     TVPA notably does not do. A person whose religious practices are burdened in

7     violation of RFRA "may assert that violation as a claim or defense in a judicial

8     proceeding[.]" *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546

9     U.S. at 424 (quoting 42 U.S.C. § 2000bb-1(c)); *see, e.g.*, *EEOC v. Catholic Univ. of*

10    *Am.*, 83 F.3d 455, 470 (D.C. Cir. 1996) (RFRA precluded application of Title VII to

11    plaintiff whose position was the functional equivalent of a minister).

12    Application of TVPA to Defendants' management of their ministers and the

13    Sea Org and the imposition of ecclesiastical rules and discipline with respect to that

14    management would unquestionably burden free exercise. Given that neither Marc

15    nor Claire Headley was physically kidnapped or imprisoned and had numerous and

16    ongoing opportunities to leave, no such showing has or could be made of a

17    compelling state interest to impose such a burden. If the "serious harm" prong of the

18    statute is interpreted to include "religious" harm (of the doctrinal or psychological

19    variety) to ministers like the Headleys, then the statute clearly is not restricted as

20    narrowly as possible to achieve Congress's compelling interest without impinging

21    upon protected religious conduct.

22    **IV.    CONCLUSION**

23    As Plaintiffs' counsel has stated, Mr. Miscavige's deposition is "not a matter of

24    urgency or high priority." But it is intended to harass. In each of Plaintiffs'

25    complaints, including their newly-proposed Third Amended Complaint, they cannot

26    name or describe Mr. Miscavige in any way except as a remote apex deponent. They

27    failed to list him in their initial and amended disclosures and belatedly added him to a

28    second amended disclosure only after Defendants expressly noted their failure to

1    have listed him.  At a minimum, Plaintiffs should proceed first with other discovery.

2    The motion for a protective order should be granted.

3    DATED:  April 23, 2010          JEFFER, MANGELS, BUTLER & MARMARO LLP

4                                    By:_____/s/Marc Marmaro_____
                                              MARC MARMARO
5                                    Attorneys for Defendant
6                                    RELIGIOUS TECHNOLOGY CENTER

7    DATED:  April 23, 2010          PROSKAUER ROSE LLP

8                                    By:_____/s/Bert H. Deixler_____
                                              BERT H. DEIXLER
9

10                                   RABINOWITZ, BOUDIN, STANDARD,
                                     KRINSKY & LIEBERMAN, P.C.
11                                   Eric M. Lieberman
                                     111 Broadway, 11th Floor
12                                   New York, NY  10006

13                                   Attorneys for Defendant
14                                   CHURCH OF SCIENTOLOGY INTERNATIONAL

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 26 -