1  BERT H. DEIXLER, SBN 70614
   bdeixler@proskauer.com
2  HAROLD M. BRODY, SBN 84927
   hbrody@proskauer.com
3  PROSKAUER ROSE LLP
   2049 Century Park East, 32nd Floor
4  Los Angeles, CA  90067-3206
   Telephone:  (310) 557-2900
5  Facsimile:   (310) 557-2193

6  ERIC M. LIEBERMAN, admitted pro hac vice
   elieberman@rbskl.com
7  RABINOWITZ, BOUDIN, STANDARD,
     KRINSKY & LIEBERMAN, P.C.
8  111 Broadway, 11th Floor
   New York, NY  10006
9  Telephone:  (212) 254-1111

10  *Attorneys for Defendant, Church of Scientology International*

11

12                  UNITED STATES DISTRICT COURT

13                  CENTRAL DISTRICT OF CALIFORNIA

14

15  MARC HEADLEY,                      ) Case No. CV 09-3986 DSF (MANx)
                                       )
16              Plaintiff,             ) **DEFENDANT CHURCH OF**
                                       ) **SCIENTOLOGY**
17       v.                            ) **INTERNATIONAL'S**
                                       ) **MEMORANDUM OF POINTS**
18  CHURCH OF SCIENTOLOGY              ) **AND AUTHORITIES IN**
    INTERNATIONAL, a corporate entity, ) **SUPPORT OF ITS MOTION FOR**
19  and DOES 1 - 20,                   ) **SUMMARY JUDGMENT AND**
                                       ) **SUMMARY ADJUDICATION OF**
20              Defendants.            ) **ISSUES**
                                       )
21                                     ) Hon. Dale S. Fischer
                                       )
22  _____) Date:  June 21, 2010
                                       ) Time:  1:30 p.m.
23                                     ) Courtroom:  840

24

25

26

27

28

1

TABLE OF CONTENTS

2

**Page**

3    INTRODUCTION ......................................................................... 1

4    FACTS ......................................................................................... 2

5    ARGUMENT ............................................................................... 15

6    I.    THE MINISTERIAL EXCEPTION BARS HEADLEY'S MINIMUM

7          WAGE CLAIMS ............................................................................... 15

8    II.   HEADLEY WAS NOT COVERED BY THE MINIMUM WAGE
           LAWS BECAUSE HE DID NOT WORK FOR ORDINARY
           COMMERCIAL BUSINESS VENTURES IN COMPETITION IN

9          THE COMMERCIAL MARKETPLACE ....................................... 20

10         A.    The FLSA Does Not Apply ......................................... 20

11         B.    The California Minimum Wage Laws Also Do Not Apply ................. 21

12         C.    Headley Was Not Covered by the Minimum Wage Laws ................. 22

13               1.    Golden Era Did Not Engage in Ordinary Commercial

14                     Competition with Businesses........................................... 22

15               2.    As a Member of a Religious Order, Headley Was Not a
                       Covered Employee Under the Minimum Wage Laws ............... 25

16   III.  HEADLEY WAS NOT SUBJECT TO "FORCED LABOR"

17         BECAUSE HE WAS NOT HELD AGAINST HIS WILL ............................ 26

18         A.    The Ministerial Exception Precludes Application of the TVPA to
                 the "Employment" Relationship Between a Church and its

19               Ministers, and In Particular Between Headley and CSI ..................... 28

20         B.    Even if TVPA Could Be Applied to Narrow Circumstances of
                 Actual or Threatened Physical Restraint or Harm, Headley's

21               Alleged Fear That He Would Be Subject to Excommunication If
                 He Left Golden Era Cannot Be the Basis of a Forced Labor

22               Claim ................................................................................. 31

23         C.    Even if TVPA Could Be Applied to Narrow Circumstances of
                 Actual or Threatened Imminent Physical Restraint or Harm,
                 CSI's Imposition or Threatened Imposition of a Restricted

24               Lifestyle and of Church Discipline Upon a Sea Org Member

25               Cannot Be the Basis of a Forced Labor Claim ...................... 32

26         D.    The Religious Freedom Restoration Act Bars Plaintiff's TVPA
                 Claim ................................................................................. 36

27

28

i

E.    The Court Should Summarily Adjudicate That Headley's Participation In The Lifestyle Of The Sea Org And CSI's Implementation Of Ecclesiastical Discipline Cannot Support A TVPA Claim Against A Church Involving Its Ministers ..................... 37

F.    The Actions of Security Guards on the Day Headley Left Golden Era Cannot Convert Headley's Prior Fifteen Years of Service to Golden Era Into "Forced Labor".................................................................. 39

CONCLUSION ................................................................................................. 40

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

*Alcazar v. Corp. of the Catholic Archbishop of Seattle,*
   598 F.3d 668 (9th Cir. 2010) ......................................1, 15, 16, 20, 28, 30, 38, 39

5

*Ashwander v. Tenn. Valley Auth.,*
   297 U.S. 288 (1936) (Brandeis, J. concurring) ................................................22

6

7

*Bushnell v. VisCorp.,*
   1996 WL 506914 (N.D. Cal. Aug. 29, 1996)...................................................38

8

*Claire Headley v. Church of Scientology International and Religious
   Technology Center,*
   CV 09-3987 DSF (Docket No. 100)...................1, 2, 3, 6, 15, 16, 18, 20, 21, 32

9

10

*DiSandro v. Makahuena Corp.,*
   588 F. Supp. 889 (D. Haw. 1984) ...................................................................38

11

*Dole v. Shenandoah Baptist Church,*
   899 F.2d 1389 (4th Cir. 1990)........................................................................25

12

13

*EEOC v. Catholic Univ. of Am.,*
   83 F.3d 455 (D.C. Cir. 1996) .........................................................................37

14

*First Nat'l Ins. Co. v. FDIC,*
   977 F. Supp. 1051 (S.D. Cal. 1997) ...............................................................38

15

16

*Gitlow v. New York,*
   268 U.S. 652 (1925) (Holmes, J., dissenting) ................................................30

17

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
   546 U.S. 418 (2006) .......................................................................................37

18

19

*Gunn v. Mariners Church,*
   167 Cal. App. 4th 206 (2008)..........................................................................34

20

*Higgins v. Maher,*
   210 Cal. App. 3d 1168 (1989).............................................................30, 33, 34

21

22

*Hope Int'l Univ. v. Superior Court,*
   119 Cal. App. 4th 719 (2004) .........................................................................18

23

*Isaacson v. Penn Cmty. Servs.,*
   1970 WL 794 (D.S.C. Oct. 19, 1970)..............................................................24

24

25

*Lies v. Farrell Lines, Inc.,*
   641 F.2d 765 (9th Cir. 1981) ..........................................................................38

26

*Meroni v. Holy Spirit Ass'n,*
   506 N.Y.S.2d 174 (N.Y. App. Div. 1986) ..................................................35, 36

27

28

iii

*Murdock v. Pennsylvania,*
  *supra,* 343 U.S. ...................................................................... 22, 23

*Murray v. The Charming Betsy,*
  6 U.S. (2 Cranch) 64 (1804) ................................................. 21

*NAACP v. Claiborne Hardware Co.,*
  458 U.S. 886 (1982) ........................................................... 30, 39

*Navajo Nation v. U.S. Forest Serv.,*
  535 F.3d 1058 (9th Cir. 2008) ................................................ 36

*NLRB v. Catholic Bishop of Chicago,*
  440 U.S. 490 (1979) ................................................... 15, 22, 29

*Orlando v. Alamo,*
  646 F.2d 1288 (8th Cir. 1981) ............................................ 31, 36

*Paul v. Watchtower Bible & Tract Soc'y of New York, Inc.,*
  819 F. 2d 875 (9th Cir. 1987) ....................................... 31, 33, 36

*Rayburn v. Gen. Conference of Seventh-day Adventists,*
  772 F.2d 1164 (4th Cir. 1985) ............................................ 18, 19

*Remmers v. Egor,*
  332 F.2d 103 (2d Cir. 1964) ................................................. 24

*Schleicher v. Salvation Army,*
  518 F.3d 472 (7th Cir. 2008) ................................................. 25

*Schmoll v. Chapman Univ.,*
  70 Cal. App. 4th 1434 (1999) ............................................... 20

*Serbian Eastern Orthodox Diocese v. Milivojevich,*
  426 U.S. 696 (1976) ........................................................ 33, 39

*Shaliehsabou v. Hebrew Home of Greater Washington,*
  363 F.3d 299 (4th Cir. 2004) ................................................. 25

*Smith v. Raleigh Dist. of the North Carolina Conference of the United
  Methodist Church,*
  63 F. Supp. 2d 694 (E.D.N.C. 1999) ....................................... 19

*Tony and Susan Alamo Foundation v. Secretary of Labor,*
  471 U.S. 290 (1985) ........................................................ 21, 24

*United States v. Bradley,*
  390 F.3d 145 (1st Cir. 2004) ................................................. 33

*United States v. Calimlim,*
  538 F.3d 706 (7th Cir. 2008) ................................................. 33

*United States v. Kaufman,*
  546 F.3d 1242 (10th Cir. 2008) .............................................. 33

*United States v. Marcus,*
  487 F. Supp. 2d 289 (E.D.N.Y. 2007), *vacated on other grounds*, 538 F.3d 97 (2d Cir. 2008) ................................................................................. 33

*United States v. Sabhnani,*
  599 F.3d 215 (2d Cir. 2010) ........................................................................ 33

*Van Schaick v. Church of Scientology of Cal.,*
  535 F. Supp. 1125 (D. Mass. 1982) ................................................. 21, 31, 36

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton,*
  536 U.S. 150 (2002) ..................................................................................... 19

*Weishuhn v. Catholic Diocese of Lansing,*
  756 N.W.2d 483 (Mich. Ct. App. 2008) ....................................................... 19

*Worldwide Church of God v. Philadelphia Church of God, Inc.,*
  227 F.3d 1110 (9th Cir. 2000) ...................................................................... 36


**STATUTES**

29 C.F.R. § 779.214 ............................................................................... 21, 24

18 U.S.C. § 1589 ............................................................................... 26, 28, 29

18 U.S.C. § 1593 ........................................................................................... 29

18 U.S.C. § 1593(b)(3) .................................................................................. 29

18 U.S.C. § 1595 ............................................................................... 26, 28, 29

26 U.S.C. § 501(c)(3) ...................................................................................... 3

29 U.S.C. §§ 201, et seq. ................................................................................. 1

42 U.S.C. § 2000bb-1(b) .............................................................................. 36

42 U.S.C. § 2000bb-3(a) .............................................................................. 36

42 U.S.C. § 2000bb-3(b) .............................................................................. 36

42 U.S.C. §§ 2000bb et seq. ......................................................................... 36

California Business & Professions Code
  § 17200 .......................................................................................................... 2

California Labor Code
  § 3352(i) ....................................................................................................... 22
  § 3352(b) ...................................................................................................... 22

**RULES**

Federal Rules of Civil Procedure
    Rule 56 ................................................................................................ 38
    Rule 56(b) .......................................................................................... 38

**OTHER AUTHORITIES**

70A Am. Jur. 2d *Social Security and Medicare* § 613 (2009) ................................ 26

**INTRODUCTION**

On April 2, 2010, this Court granted Defendants' joint motion for partial summary judgment on the minimum wage/maximum hour claim of Plaintiff's wife. *Claire Headley v. Church of Scientology International and Religious Technology Center*, CV 09-3987 DSF (Docket No. 100).  Relying on *Alcazar v. Corp. of the Catholic Archbishop of Seattle,* 598 F.3d 668 (9th Cir. 2010), this Court held that Claire Headley was a "minister" within the meaning of the "ministerial exception" and the First Amendment, and that therefore her labor on behalf of CSI and RTC was not covered employment under federal and state wage and hour laws.

In an earlier decision in *this* case on September 22, 2009, this Court denied plaintiff Marc Headley's Motion for Summary Adjudication on his minimum wage claims.  (Case CV 09-3986, Docket No. 50).  In so ruling, the Court recognized that the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq., "reaches only the commercial activities of religious organizations . . . and only those who engage in such activities in expectation of compensation."  (*Id.* at 2.)  The Court found that Plaintiff had not shown "that any other business enterprise competes with Golden Era in the marketplace," and that "there is no evidence that Golden Era competes with other entities in disseminating multimedia products about the CSI."  (*Id.* at 3.)

CSI now moves for summary judgment dismissing plaintiff Marc Headley's complaint in its entirety, and for summary adjudication of issues.  As demonstrated below, Marc Headley, like his wife, clearly comes within the three criteria of the ministerial exception as defined in *Alcazar*.  In addition and even aside from the clear application of the ministerial exception, Marc Headley's work as a Sea Org member on behalf of Golden Era is not covered by the minimum wage laws because Golden Era does not engage in ordinary commercial activities in competition with other business enterprises.

Accordingly, Plaintiff's first two causes of action, based upon his minimum wage claims, are barred for the reasons suggested by this Court in its September 22,

1

2009, Order in this case and its April 5, 2010, Order in the *Claire Headley* case.[1]

Likewise, summary judgment should be granted dismissing Plaintiff's third cause of action for "forced labor." As he admits, Marc Headley never considered that "[he] was being held against [his] will." Headley had ongoing, numerous and lengthy opportunities to leave during the time he performed his religious duties and responsibilities for Golden Era, including living in his own apartments and houses, having access to transportation and cell phones, and engaging in extensive domestic and international travel. As he has written in his newly published book, he chose not to leave because he did not wish to be separated from his wife, whom he has described as a "real strait-laced Sea Org member" and a high level executive at Religious Technology Center located on the same International Base as Golden Era, or to suffer religious discipline in the form of dis-fellowship from other Scientologists, including other members of his family. Plaintiff's attempt to assert a cause of action under the federal forced labor statute based upon the facts and circumstances of his participation in the religious life and commitment of the Sea Org, including "the lifestyle constraints that come with being a member of the Sea Org" (*Claire Headley* Order at 4-5), must be rejected under the ministerial exception, the First Amendment, and the Religious Freedom Restoration Act.

**FACTS**

The facts concerning the Scientology religion, CSI and Golden Era are set forth in the declarations of Warren McShane ("McShane Decl."), Allan Cartwright ("Cartwright Decl.") and Catherine Fraser ("Fraser Decl."); the Declaration of Dr. Frank Flinn ("Flinn Decl."), a recognized expert on comparative religions; and in CSI's Separate Statement.

---

[1] While it is unclear, given the rambling nature of the Second Amended Complaint, Headley's First Claim for unfair competition under California Business & Professions Code § 17200 *et. seq.*, may allege additional claims arising from Headley's performance of his functions at Golden Era. If so, these allegations, which seek restitution for wages, also must be dismissed because of the ministerial exception.

1        1.      **The Scientology Religion**.  Scientology posits that humans are

2  spiritual beings, called "thetans," with a continuous and eternal life, manifested in a

3  series of corporeal lifetimes in different bodies.  (SUF 5.)  Thetans are unable to

4  reach their true spiritual potential and enlightenment because they are burdened with

5  negative experiences throughout their history.  These burdens not only limit the

6  spiritual existence of individuals but also condemn the world to injustice, war and

7  conflict.  (SUF 6.)  Scientology endeavors to lift those burdens, including from past

8  physical lifetimes, principally through its central practices of auditing and training.

9  Only by "clearing" such burdens from individuals can humankind reach the goals of

10  a world of peace and freedom.  Thus, Scientology is fundamentally an evangelical

11  religion that seeks to reach all humankind: to "clear the planet."  (SUF 11-13.)

12        2.      **Church of Scientology International**.  As this Court recognized

13  (*Claire Headley* Order at 2 & n.3), CSI is the "Mother Church" of the Scientology

14  religion, and is dedicated to the advancement and dissemination of the religion.

15  CSI's ecclesiastical authority extends to overseeing the proper administration of all

16  Scientology churches and missions worldwide, disseminating the beliefs and

17  practices of Scientology and providing religious services and training to its own

18  staff members.  The United States Internal Revenue Service recognizes CSI as a tax-

19  exempt "church" under 26 U.S.C. § 501(c)(3).  (SUF 21-23.)

20        3.      **The Sea Org.**  All CSI staff belongs to the Sea Org.  (SUF 24.)  To

21  qualify to join the Sea Org, a Scientologist must undertake extensive training and

22  study, pass a fitness examination, and receive certification that he or she is qualified

23  for the rigors of Sea Org life.  (SUF 25.)  Sea Org members sign a symbolic

24  commitment of 1,000,000,000 years, reflecting their dedication to service in the

25  Scientology religion and their awareness of themselves as immortal spiritual beings.

26  Because of this commitment, it is exclusively from the Sea Org that the senior

27  leadership of Scientology is drawn, including the entire staff of CSI and Golden Era.

28  (SUF 26.)  Sea Org members are assigned by Scientology ecclesiastical leadership

to positions with Scientology churches throughout the world, and may be and often are re-assigned to different positions, varying duties and responsibilities, and different churches throughout their service. (SUF 28.) They subscribe to *The Code of the Sea Org Member*, which contains vows that are repeated at Sea Org ceremonies that take place annually. (SUF 27.)

Sea Org members serve without expectation that they will receive material compensation, a fact they acknowledge in writing before becoming members and when they periodically repeat their vows. (SUF 29.) They share tradition and lifestyle. They wear uniforms when on duty and have a merit-based maritime rank and rating system and etiquette. Sea Org members live communally and eat in common dining halls. All living necessities are provided. They are expected to devote at least two and one-half hours each day to religious study or participation in ritual. (SUF 30.)

Sea Org members are expected to study and comply strictly with Scientology's system of ethics and justice. (SUF 30, 34.) Scientology posits that only individuals who are acting according to proper ethical precepts can advance spiritually, and, indeed, unethical behavior can impede the spiritual progress not only of the individual but also, if the individual is a church staff member, of the church itself. (SUF 33.) If a Sea Org member acts outside the ethical principles, he/she may be subject to ecclesiastical discipline. The form of discipline varies on a gradient in proportion to the seriousness of the offense, from a verbal warning or rebuke, to temporary loss of privileges, removal from post and assignment to a post with less responsibility, manual labor such as kitchen duty, gardening, etc., to expulsion from the group. (SUF 34.) Serious offenses are brought before a committee of evidence consisting of other Sea Org members in good standing. (SUF 35.) If a Sea Org member is found to have committed serious ethical violations that justify expulsion, he/she may be offered the option of participation in a program of spiritual rehabilitation, called the Rehabilitation Project Force ("RPF"). (SUF 36.) (Neither Marc nor Claire Headley ever participated in the RPF. (SUF 37.)) RPF members engage in religious study and auditing and physical labor. After one

1    "graduates" from the RPF, he/she will resume a Sea Org position.  No one is forced to

2    participate in the RPF; if one refuses, he/she simply will be expelled from the Sea Org

3    and from all staff positions, and, depending on the nature of the ethical violation,

4    perhaps the church.  (SUF 36.)  Such lifestyle restrictions and ecclesiastical

5    discipline, about which every Sea Org members knows, are common to religious

6    orders. as set forth in the Flinn Decl., in particular ¶¶ 11-15, 17, 19, 28, and 39.[2]

7         Scientology Scriptures provide an accepted procedure, called "Routing Out," by

8    which a Sea Org member may withdraw his/her vows and leave the Sea Org, while

9    still maintaining a relationship with Scientology churches and religion.  A person

10   who has routed out becomes a "public" Scientology parishioner.  The process

11   involves submission of a "leaving staff" routing form, participation in ethics and

12   justice procedures, including confessionals, and can take several weeks or even

13   months.  (SUF 38.)  While participating in the process, a Sea Org member is

14   _____

15   [2] We submit Dr. Flinn's declaration with this motion.  Among his observations, Dr. Flinn
     notes that "The rules of [Buddhist] monastic life are all encompassing.  They govern ...
16   what punishments are to be meted out for breaking the rule"; that for most rules infractions
     "the community sits in judgment on the offender and, depending on the case, either
17   imposes a penance for improvement or expels a repeating offender.  The procedural
     regulations are very elaborate. ..."; "As with Christian monks and nuns, a member must
18   seek a superior's permission to leave the monastery and is obliged to report in on
     returning.  ... [E]very aspect of the member's life — dwelling, periods of study and
19   meditation, food, clothing, manner of begging, contact with nuns and lay people, food,
     medicines, etc. — is closely supervised and monitored;"  "Even humble tasks — such as
20   weeding the garden, baking bread, sweeping the monastery paths, cleaning the latrines —
     are understood in a religious way.  These ordinary duties contribute to the monastic's
21   developing attitudes of humility, modesty, and obedience, without which their progress in
     the stages of meditation leading to enlightenment and the spread of the Buddhist ideal
22   would be impaired or thwarted….";  [The Catholic] Rule of St. Benedict has detailed steps
     for disciplining and excommunicating or readmitting erring monks and nuns who have
23   fallen away from the rules of the order....  The punishments include kneeling with
     outstretched arms for long periods, silencing, mortification by self-flagellation with a whip
24   or wearing a hairshirt, solitary meals, physical discipline, and, as a last resort, outright
     expulsion ....  An excommunicated member is understood to be one who foregoes salvation
25   and risks the fires of an everlasting hell.  Members who associate with an excommunicated
     member without direction of the abbot or abbess are liable to receive the same
26   punishment.";  "The monks or nuns settle the affairs of the daily life in the monastery,
     including the public confession of sins and infractions against the rule.  Sinning members
27   are usually sent before special supervisory committees of other monks or nuns who
     determine what sort of discipline or punishment befits the offense."  (Flinn Decl., ¶¶ 13,
     15, 17, 19, 28.)
28

1    excused from his post, but is expected to continue to contribute by performing

2    chores, such as gardening, cooking, cleaning, etc.  Numerous Sea Org members

3    have chosen to route out due to changes in their lives, while remaining

4    Scientologists in good standing.  (SUF 39.)  These procedures are part of "the

5    lifestyle constraints that come with being a member of the Sea Org."  (*Claire*

6    *Headley* Order at 4-5.)

7         If a Sea Org member chooses to leave without routing out, other Sea Org

8    members may attempt to convince or persuade him/her to stay or to return; such

9    efforts are a natural and inevitable outgrowth of the belief among Sea Org members

10   that they are attempting to achieve the salvation of the individual and the clearing of

11   the planet.  Such efforts sometimes have included locating the person who left, and

12   attempting to meet and/or discuss with him/her the reasons for leaving and to

13   convince the person to return.  If the person insists on leaving or refuses to return,

14   without routing out, he/she may be subject to ecclesiastical discipline, including, but

15   not necessarily, being declared a "suppressive person", which is the functional

16   equivalent of being shunned or excommunicated.[3]  (SUF 40.)  After summarizing

17   these attributes of the Sea Org, Dr. Flinn concludes that "[t]his level of commitment

---

[3] Such practices are also typical of religious orders.  As described by Dr. Frank Flinn:

> As Roman Catholic monks and friars take solemn, as opposed to regular or
> temporary vows, they must first obtain what is called a dispensation (from their
> vows) from the Vatican itself.  They maintain their good relation with the official
> church provided that they observe proper procedures in exiting, wait until the
> dispensation is finalized according to canonical regulations, and do not heap scorn
> on their mother church.  If they fail to fulfill these precepts they are liable to
> censure, interdict (an exclusion from all sacraments such as Marriage,
> Reconciliation (Confession), the Eucharist and Anointing) and/or
> excommunication, a total separation from the church and its fellowship.

(Flinn Decl., ¶ 29.)

> Should a member [of a Buddhist religious order] take flight in untoward
> circumstances — whether having committed a serious infraction ...  or simply
> depart in an unvetted manner — their fellow monks and nuns would seek to bring
> them back to straighten matters out in a canonical manner.  The reason is simple to
> the believer:  to simply "cut and run" would be to expose oneself to the frightful
> condition of foregoing *moksha* in this lifetime.  (*Id.,* ¶ 17.)

is typical of religious orders throughout history" and that the Sea Org has all the
attributes of religious orders around the world (SUF 31):

> All of these types of religious activities Scientology shares with
> members of religious orders around the world.  This spiritual
> communal life allows the Sea Organization to fulfill its high religious
> mission, the preservation and transmission of the teachings of L. Ron
> Hubbard and the careful and exact preservation and delivery of the
> training and auditing technology.

The United States Department of Homeland Security has found "that the Sea
Org qualifies as a religious order, and that its members practice a religious
vocation," thereby permitting Sea Org members to enter the country under that
rubric.  The Inland Revenue Department of the United Kingdom likewise has found
that the Sea Org is a religious order and that "members of the Sea Organization are
not workers as defined by [applicable British statutes] and that the National
Minimum Wage Act does not appear to apply" to Sea Org members.  (SUF 41.)

4.    **Golden Era Productions.**  Golden Era plays a vital role in the teaching
and dissemination of Scientology.  Scientology's Founder, L. Ron Hubbard,
established and directly worked with Golden Era with the express purpose of
making his films and lectures about Scientology broadly available to Scientology
churches, ministers, parishioners and the public while maintaining a strict
orthodoxy.  (SUF No. 42.)  Golden Era also endeavors to evangelize the religion to
the world.  It accomplishes its purpose as established by Mr. Hubbard in several
ways:

> • Golden Era creates and produces "religious films" and videos that are
> vital to the training of Scientology "auditors," who administer the
> central religious practice of "auditing," and "course supervisors," who
> supervise the conduct of the other central religious practice of
> Scientology, "training," provided through Scientology "courses."  (SUF
> 43.)  These films are distributed solely to Scientology churches for
> training of auditors and supervisors.  (*Id.*)  In creating such films,
> Golden Era does more than merely reproduce or illuminate scripture,
> in a fashion analogous to the work of Christian monks who reproduced,

illustrated and bound bibles for broader dissemination.[4]  Rather, Golden Era's film production mission is more analogous to the activities of a Christian (or Buddhist) apostle who, having received the word of revelation from the Holy Spirit (or the enlightened Buddha), formulates a gospel, which is then recognized as scripture by church authorities. Golden Era produces films that were originally scripted by Mr. Hubbard who, to the devout Scientologist, is the original revealer or source of truth.  After the films are produced to Mr. Hubbard's exact directions, they are formally approved by RTC and disseminated as canonical scripture-on-film.  They hold equal status to Mr. Hubbard's written words.  (*See* Flinn Decl. ¶ 46 (SUF 44).)

- Golden Era creates and produces so-called "public films" and videos that are used to introduce the religion's basic concepts to the general public and to explain and depict different aspects of the Scientology religion.  As Headley concedes, such materials are "meant to get people into Scientology.  It's meant to get new members, turn people into Scientologists . . . ."  (SUF 46-47.)

- Golden Era restores, translates into numerous languages, and reproduces Mr. Hubbard's 3,000 recorded Scriptural lectures about Scientology, first recorded forty to sixty years ago.  (SUF 48.)

- Golden Era also designs, creates and installs in Scientology churches audio visual systems to present to Scientology staff members, parishioners, and possible interested public the various audio and visual materials about Scientology that Golden Era produces.  (SUF 51-52.)

- Golden Era produces films and videos of Scientology meetings, and "events," which take place several times a year around the world. These convocations provide an opportunity for Church leaders to share with parishioners news and developments concerning the Church and the religion.  The videos are then shown in local Scientology churches to parishioners who were unable to attend in person.  (SUF 53.)

---

[4] See Dr. Flinn's discussion of his experiences in the Franciscan Order:  "I worked in the monastery book bindery, binding new and rebinding old editions of the Bible and theological treatises.  I produced holy cards and publications to advertise the work of the monastery.  There was one difference:  Scientology and the Sea Organization avail themselves of the latest forms of technology in carrying out their religious mission.  We forget that when the monasteries first arose they did the same thing."  (Flinn Decl., ¶ 60.)

5.    **Marc Headley:  Joining the Sea Org and Positions at Golden Era.**

Marc Headley was raised as a Scientologist.  (SUF 57.)  In 1985, he began religious training at several Scientology churches, in the evenings, weekends and vacations.  (SUF 58.)  He also received religious counseling ("auditing") in these churches.  (SUF 59.)  In 1989, Headley applied to join the Sea Org and signed a billion year contract.  (SUF 60.)  The procedure required firm representations regarding his qualifications and history, parental approval, but most of all his own personal commitment.  (SUF 61.)  In his application, Headley represented that he had participated in auditing on his own initiative; received spiritual benefits from Scientology training and auditing; that none of his family members objected to his decision to join the Sea Org; and that he was joining , "[b]ecause [I] want to clear the planet."  Headley testified he was sincere when answering these questions.  (SUF 62.)

In May 1990, Headley was assigned a position at Golden Era.  (SUF 63.)  At the time he wrote, "I joined the Sea Org because I know that this would be the only way that I would be able to fully contribute to clearing this planet...."  (SUF 64.)  He understood that he would be paid a stipend of $50 a week, plus room and board and incidentals.  (SUF 68.)  On May 31, 1990, and again in 2002, he executed the Sea Org's covenant of religious commitment, which stated, *inter alia:* "I am joining staff and becoming a member of a religious order, of my own free will, solely to help forward the religious goals and tenets of the Scientology religion and the Church and not for monetary gain, auditing or training."  (SUF 67, 69.)  According to Headley, the covenant "says you were affirming your vows in the Church to help forward the religious goals and tenets of Scientology religion."  (SUF 69.)

Headley held several positions while in Golden Era's service, all of which furthered Golden Era's central purposes of teaching Scientology practices to auditors and other Scientologists and disseminating the Scientology religion. (SUF 72-113.)  As Headley testified, at one time or another he was involved in almost every facet of Golden Era's operations.  (SUF 70.)  His greatest involvement,

1   however, was in the creation and production of the religious and public films:

2       Q.  And during the time that you worked in Cine [Film and Video Creation]
            from like '95 to 2002, is that about the right time period?

3

4       A.  That sounds about right, yeah.

5       Q.  The primary work you were doing though was
            making tech[5] films, right?

6       A.  Well, we made — it was pretty 50/50.  We
            did videos and we did films.

7

8   (SUF 71, 91.)

9       Q.  So let me get the main categories, tell me if I'm wrong.  You worked on
            creating films, on copying and production of lectures by L. Ron Hubbard,
            and packaging lectures by L. Ron Hubbard, and then overseeing as a
            producer the creation of films, technical [i.e., religious] films, event films,
            event videos, lectures, and E-meters, is that pretty much the gamut of
            what you did at Gold?

10

11

12      A.      Yeah, that pretty much sums it up.  (SUF 70.)

13          Headley became responsible for the production of training films for auditors,[6]

14  public films about the nature and content of the Scientology religion, including the

15  restoration of a 1965 film of an interview with L. Ron Hubbard about Scientology

16  entitled "Introduction to Scientology"[7] (SUF 104), as well as a slide show entitled

17  "The History of the Sea Org."[8]  (SUF 106.)  In November 2003, Headley was

18  promoted to the position of Producer.  (SUF 109.)

19          Headley's second area of major responsibility at Golden Era was on design,

20

21  [5] In Scientology, the religious practices of auditing and training are often referred to as the
    "technology" or "tech" of Scientology.  (SUF 91.)

22  [6] Among the religious or "tech" films Headley helped produce were "The History of the E-
    Meter"; "Ultimate TRs-Beingness" (TRs stands for Training Routines, which is a drill for

23  auditors); "Why TRs?"; "The Auditor's Code" (A code of conduct for auditors); "The Solo
    Auditor's Course"; "TRs in Life"; "The Session" (about an auditing session); and "Man

24  the Unfathomable."  (SUF 101, 105.)

25  [7] Among the other public films Headley helped produce were "The Married Couple";
    "Orientation" (per Headley, "its main use is to get people into Scientology and tell them

26  what Scientology is about" (SUF103)); and "Dianetics: The Original Thesis."

27  [8] According to Headley, "The purpose of the slide show was to get people to join the Sea
    Org.… It basically says…that the only thing that can save the entire universe is the Sea

28  Organization."  (SUF 106.)

1   creation, and installation of audio visual systems and film rooms to be used in

2   Scientology churches that play or show Mr. Hubbard's lectures and other materials

3   produced by Golden Era, that enable a parishioner to listen to a sample of a lecture,

4   and that are used in the public divisions of churches where people can learn about

5   the religion (as Headley put it, "to get people into Scientology").  (SUF 112.)

6       Earlier in his career at Golden Era, Headley worked on quality control in the

7   creation of all of Golden Era's audio/visual creations, including videos and audio-

8   books, principally of Mr. Hubbard's lectures.  (SUF 72-73, 84-85.)

9       6.  **Marc Headley: Living Arrangements, Travel, Freedom, and Leaving.**

10      After Headley arrived at Golden Era, he lived in an apartment complex on a

11  public street in Hemet, California, 15 minutes by car from Golden Era.  (The

12  building had a swimming pool and lawn chairs where Headley said he got "a serious

13  tan.")  (SUF 116-17.)  Thereafter, he moved to an apartment complex in San Jacinto,

14  California, also about 15 minutes from Golden Era.  He travelled to Golden Era on a

15  Church bus or by driving his own or a church vehicle.  (SUF 118.)  He often left

16  Golden Era to go into Hemet to shop, go to restaurants and do errands.  (SUF 119.)

17  He traveled to and around Los Angeles and to Arizona, New York and Europe; lived

18  in Copenhagen for three months (SUF 120); visited about a hundred Scientology

19  churches around the world (*id.*); visited friends and family in the Los Angeles area

20  (SUF 121); and attended public church functions with his wife in Los Angeles.  (*Id.*)

21      In 2000, Headley and his wife (Claire) moved into one of several houses

22  owned by the Church on a public street adjacent to Golden Era, Sublette Road.

23  (SUF 123.)  Headley owned three or four different motorcycles while he lived on

24  Sublette Road.  (SUF 124.)  At the west end of Sublette there was a locked gate onto

25  Golden Era's property.  Headley and his wife had the combination to the lock, as did

26  the several other Golden Era staff who also lived in houses on Sublette Road.

27  Headley typically came and went onto the property through that gate.  (SUF 123.)

28      Headley had two bank accounts and a PayPal account (SUF 127); a cell phone

11

1    and access to his wife's cell phone (*id.*); "a laptop that [he] always used that had

2    Internet access if [he] needed it" (*id.*); and visited and maintained a relationship with

3    his father, who was not a Scientologist and lived in Kansas City.  (SUF 122.)

4         The one and only time Headley told Golden Era officers he wanted to leave

5    was in 1990, shortly after his arrival, because he was having difficulty with his

6    work.  As he describes it, he spoke to the person in charge of personnel and ethics:

7    "She said what do you want to do?  I said I want to leave.  She gave me —— gave

8    me a staff member, leaving staff member, leaving staff routing form.  She went to

9    the desk, gave me the form."  The routing form set forth the procedure for Sea Org

10   members to terminate their vows.  Headley testified, "There was a whole list of all

11   these things that I would have to do in order to be able to leave.  And I said no,

12   that's it, I'm leaving, I'm not doing all this."  Headley stated that Gold's security

13   chief told him that if he left without routing out, he risked being "declared" and

14   losing contact with family members who were Scientologists.  (SUF 128.)

15        In his book, Headley described what happened next.  He took a walk around

16   the Base and debated to himself whether to route out, leave without routing out, or

17   stay.  A senior ecclesiastical official approached him and suggested his problems at

18   work might be related to poor vision, and that he see an eye doctor.  Headley took

19   the suggestion and drove a moped into Hemet to do so.  He was alone.  He stopped

20   at a gas station.  He writes, "I pumped the gas.  Decisions.  Decisions.  I had made it

21   this far.  Should I go to the optometrist?  Should I make a run for it?  Should I just

22   drive back? …. I decided to get the eye exam."  Headley concluded, "I had managed

23   not only to weasel out of getting in trouble, but had also made a few friends in high

24   places …. I could get away with a bit more if I played my cards right."  (SUF 129.)

25        Never again did Headley tell anyone he wanted to route out or leave, nor did

26   he try to do so, until the day he left.  (SUF 130.)  While he claims that several events

27   made him think about leaving, including an alleged incident in which RTC

28   Chairman David Miscavige struck him, he made no effort to do so.  As he states in

12

1   his book, "[s]he [his wife Claire] is the only reason I had stayed there on a number

2   of occasions.  If I had not married her, I figure that I would have left at least 4 or 5

3   times earlier." (SUF 115.)  Claire acknowledged that, after he left, Marc told her

4   several times that "the only reason he didn't do it was because of me." (SUF 139.)

5        When Headley finally left on January 4, 2005, he chose to do so without

6   following the "routing out" procedure, but rather just left.  (*See* Point III(F), *post.*)

7   He did not leave to "escape" captivity, however, but rather because of a culmination

8   of an ongoing series of problems he had encountered and disagreements with his

9   superiors, and his wife, about the quality of his job performance, including

10  allegations he had engaged in financial improprieties.  As Claire Headley

11  acknowledged, Marc had run into problems about job performance on and off over

12  the years.  (SUF 131.)  In late 2000, Marc was criticized for perceived errors and

13  negligence in shooting a film.  (*Id.*)  Claire, the "strait-laced Sea Org member", sent

14  him a letter stating that he had been "involved in out-ethics and non-production on

15  the 3rd dynamic [the group, in context, the Sea Org and Golden Era], [and had]

16  become a distraction" both to Golden Era and to her, and demanded that he "once

17  and for all change [his] ways…."  Marc wrote back: "I agree!"  (*Id.*)

18       Marc heeded Claire's advice for a while.  He was promoted to Assistant Film

19  Producer in August 2002 (SUF 97) and to Producer in November 2003.  (SUF 109.)

20  In March 2004, however, he was demoted for poor job performance and "financial

21  irregularities", and subjected to disciplinary action (manual labor).  After two days,

22  "I was basically given a second chance to redeem myself." (SUF 132.)  Headley

23  was demoted for several months to a lower level position, but in October 2004 was

24  promoted again to the post of A/V Systems Officer, where he believed he was doing

25  "very well" and "getting stuff done." (SUF 133.)

26       In November 2004, however, Headley received a Fitness Board review of his

27  performance.  (SUF 134.)  This Board found that, "Marc has repeated non-

28  compliances to get [sic] systems properly planned, designed, manufactured and

approved for international export to orgs.…" (*Id.*)  Reciting several examples, the Fitness Board found Headley to have an ethics record that was "unacceptable," with a history of "being irresponsible in other executive positions."  The Fitness Board took Headley's past production of Tech and Public films into account and issued him a three-month probational fitness certificate.  One condition of the "probation" was for Headley to "handle the planning and production of all org systems."  (*Id.*)

Headley continued to work on these systems.  Ironically, this was the final series of events that led to his departure.  Headley sold off surplus Golden Era equipment on eBay, claiming it was to fund new purchases, but used his personal PayPal account to collect the receipts, resulting in accusations that he had engaged in peculations.  (SUF 135.)  Immediately before being informed of the allegations, on December 28, 2004, Marc and Claire went to the Scientology New Year's event at the Shrine Auditorium.  (SUF 136.)  After the event, they posed for photos, left by themselves to see Claire's family in La Crescenta, and then drove back alone for several hours to their house on Sublette Road, just in time to catch a movie.  (*Id.*)

After the New Year, Headley's superior told him he was being investigated for possible embezzlement, but asked him first to fix a few points on the Systems plan.  Headley writes, "[h]alf of me wanted to tell her to go fly a kite, but the other half of me had a plan [to leave]."  (SUF 137.)  That plan did not involve "routing out" according to policy; rather, he *chose* to leave unilaterally, thereby subjecting himself to being expelled from the Church.  Thus, on January 4, 2005, Headley left "for good," after walking off the Base through the gate the night before.  (SUF 138.)

After he left, he acknowledged to Claire that it was the above series of events that caused him to leave.  Claire spoke to him on the phone and tried to convince him to return.  According to her, he stated "[h]e couldn't take being a shit-head any more."  "He has constantly been fighting to get the [A/V] systems done with no finance and no personnel."  And yet, as the one responsible, he believed he was being made the fall guy when the systems did not get done.  To this, his wife

14

1   responded that "he was doing something of value and ... needed to come back and

2   complete the project he was working on."[9]  (SUF 139-40.)

3                                 **ARGUMENT**

4   **I.    THE MINISTERIAL EXCEPTION BARS HEADLEY'S MINIMUM
        WAGE CLAIMS**

5

6          This Court's Order of April 2, 2010, in the *Claire Headley* case and the Ninth

7   Circuit's decision in *Alcazar* compel the conclusion that Marc Headley's work for

8   Golden Era comes within the ministerial exception, and that, therefore, his minimum

9   wage claims must be dismissed.  The ministerial exception is derived from both the

10  Establishment and Free Exercise clauses.  With respect to the Establishment clause,

11  the *Alcazar* Court explained that it "is the third factor, entanglement, that is at issue

12  here", noting that entanglement "has substantive and procedural components."  598

13  F.3d at 672.  The substantive component implicates a "church's freedom to choose

14  its ministers," which applies "not only to the selection of ministers but more broadly

15  to employment decisions regarding ... ministers" and "encompasses *all tangible*

16  *employment actions*", including but not limited to "the determination of a minister's

17  salary, his place of assignment, and the duty he is to perform in the furtherance of

18  the religious mission of the church."  *Id.* at 672, 674 (emphasis added).  "As for the

19  procedural dimension, the very process of civil court inquiry into the clergy-church

20  relationship can be sufficient entanglement [to foreclose judicial interference]."  *Id.*

21  at 672-73.  "It is not only the conclusions that may be reached by [the court] which

22  may impinge on rights guaranteed by the Religion Clauses, but also the very process

23  of inquiry leading to findings and conclusions."  *Id.* at 673 (quoting *NLRB v.*

24  _____

25  [9] What is material and relevant on this motion is not the truth or falsity of the various
    allegations about the quality of Headley's performance on his various post positions, or
26  even the validity of the allegations of financial irregularities.  What is material and relevant
    is that these are the events that led to Headley's departure and that he described to his wife
27  as the reasons he left.  And what is legally important, as discussed *infra*, is that all these
    events concerned Headley's performance as a church minister, and thus, under the
28  ministerial exception, cannot be the subject of judicial inquiry or conclusions.

1   *Catholic Bishop of Chicago,* 440 U.S. 490, 502 (1979)).

2        The *Alcazar* court held that both Religion Clauses compel application of the

3   ministerial exception to minimum wage laws.  The court stated that a church need

4   not show that the statute would impose an *actual* burden on its free exercise rights or

5   cause an actual entanglement: "The exception was created because government

6   interference with the church-minister relationship *inherently* burdens religion."  *Id.*

7   at 673 (court's emphasis).  Most importantly, the court rejected arguments that the

8   exception applies only in cases of formal "ordination or 'categorical notions of who

9   is or is not a 'minister'", holding that it applies broadly to those who perform

10  services for a religious institution, were chosen for their position based upon some

11  "religious criteria" and who "perform[] some religious duties and responsibilities."

12  598 F.3d at 675-76 (citation omitted).[10]

13       Applying these principles and the Ninth Circuit's definition of a minister to

14  the *Claire Headley* case, this Court (at 4-5) held that the ministerial exception bars

15  her claims for the same reasons that it barred those in *Alcazar*.

16       [Claire Headley] worked for Defendants [CSI and Religious

17       Technology Center], which both are institutions within the Church of

18       Scientology.  She also was able to hold the positions she had with

19       Defendants based largely on religious criteria, namely her commitment
to 1,000,000,000 years of service to Scientology and the lifestyle
constraints that come with being a member of the Sea Org.  See

20       [*Alcazar,* 598 F.3d at 676] (deciding this factor was met where plaintiff

21       was in a job available only to seminarians of the Catholic Church).

22       Finally, as part of her duties, she performed various religious duties and
responsibilities, most notably "auditing" and "cramming."  For these

23       reasons, the Court finds that the undisputed material facts show that ...

---

24  [10] Indeed, even the performance of secular functions does not detract from application of

25  the ministerial exception, *id.* at 676 ("secular duties are often important to a ministry"), so
long as the "spiritual employee" performs "some" religious responsibilities and the other

26  two criteria are met.  *Id.*  Thus, in rejecting the plaintiff's argument that under his ministry
training program he was hired to work as a "maintenance" employee doing such chores as

27  "cleaning sinks", the court held: "the Catholic Church [could] require its candidate for the
priesthood to spend a year 'mostly clean[ing] sinks' without overtime pay."  *Id.* at 675-76.

28

the ministerial exception would apply.

The same analysis mandates application of the ministerial exception to Marc Headley. First, for over 15 years, Headley, as his wife did for 4 years, worked for a religious institution, CSI, that is the "Mother Church" of the Scientology religion, and for its division, Golden Era Productions, which is, in the words of Claire Headley, "the dissemination organization of Scientology."

Second, as a religious *prerequisite* to his work for CSI and Golden Era, Headley, just like his wife, underwent extensive training to become a member of the Sea Org, which admits to its membership only those who, like Headley, have expressed and demonstrated an abiding commitment to the Scientology religion and a sincere desire to devote their lives to its service.[11]

Third, for all of those 15 years, Headley performed religious duties and responsibilities for Golden Era, where he created and produced religious films scripted by L. Ron Hubbard for the training of Scientology ministers, and public films, videos and other media that furthered the Church's efforts to teach and spread its faith. *See ante* at 8-11. The production of the religious films was a critical function in the very practice of Scientology. As Headley testified:

> L. Ron Hubbard had the concept that certain of his materials could not be duplicated by someone reading it off of a piece of paper or another person interpreting … what was on the paper and then training that

---

[11] In addition to his Sea Org training, for each and every of the positions that Marc Headley held at Golden Era, he was required to undergo further training in the religious principles of Scientology, by studying, mastering and applying to his post functions scriptural writings by L. Ron Hubbard such as HCO Policy Letter *Keeping Scientology Working*, HCO Policy Letter *The Theory of Scientology Organizations*, HCO Policy Letter *Third Dynamic Tech*, HCO Policy Letter *Code of a Scientologist, Introduction to Scientology Ethics*, Article "Disclosing Overts and Withholds," HCO Bulletin *Auditors, Dianetics '55*, E-Meter Instruction Film #2 "The Tone Scale," Training Routine Instruction Film #4, "The Professional TR Course," HCO Bulletin *Training Drills Re-modernized*, The Hubbard Life Orientation Course, chapter "The [Eight] Dynamics of Existence," HCO Bulletin *Scientology: Current State of the Subject, and Materials* and numerous others. (SUF 77-83, 88, 111.) And in creating the religious training films for the training of Scientology auditors, Headley was required to read and comprehend the scripts for such films written by Mr. Hubbard. (SUF 92.)

17

person how to do [it].  So he wanted to produce these films to make it so people could see how he intended it.…  (SUF 45.)

Indeed, the films themselves and the scripts they are based on are part of the Scientology Scripture (SUF 44). Their production was a function that Mr. Hubbard himself performed, working with the staff of Golden Era and its predecessors, for several years in the 1970's and 80's.  (*Id*.)  The continued creation of these films was and remains an urgent and important program.  In Headley's words, "It was still urgent and important because it hadn't been done in 30 years and it was, the intention was yes, we need to get this done.  L. Ron Hubbard said to do it 30 years ago and it's still not done.  So yeah, we need to get it done." (SUF 99.)  Just as the performance of "auditing" is a religious duty and responsibility (*Claire Headley* Order at 5), *a fortiori* so is the creation of films and materials that are part of the religion's scriptures and that are used to "teach[]" auditors how to perform those religious duties.  *Rayburn v. Gen. Conference of Seventh-day Adventists*, 772 F.2d 1164, 1168-69 (4th Cir. 1985) ("teaching" the religion is a religious function covered by the ministerial exception).  *Accord*, *Hope Int'l Univ. v. Superior Court*, 119 Cal. App. 4th 719, 734 (2004).

The production of the public films and videos to further the missionary evangelization of the Scientology religion was of no less religious moment. Headley explained, "They're called public films because they're for the broad public.  They're meant to basically convince or enlighten somebody ... so that they can participate in Scientology activities." (SUF 47.)[12]  As Headley stated, everything created or produced by Golden Era was intended to "forward swiftly the dissemination of Dianetics and Scientology."  (SUF 42.)

The performance of such functions of spreading the religion and its message

---

[12] Headley also acknowledged that his work in creating and installing audio/visual rooms and systems for Scientology churches was for the same purpose: "They have rooms in every single organization, which I designed, that have the purpose of recruiting new members into Scientology, and they show them those films."  (SUF 52.)

18

are of a fundamental religious nature.  As the Supreme Court held, in words of definitive significance to the application of the ministerial exception in this case:

> '[H]and distribution of religious tracts is an age-old form of missionary evangelism — as old as the history of printing presses.  It has been a potent force in various religious movements down through the years.... This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and *preaching from the pulpits*.  It has the same claim to protection as the more orthodox and conventional exercises of religion.'

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton,* 536 U.S. 150, 161 (2002) (emphasis added) (quoting *Murdock v. Pennsylvania,* 319 U.S. 105, 108-09 (1943)).  In recognition of this essential principle, the courts repeatedly have held that church workers whose functions encompass evangelizing, teaching, or spreading of church doctrine and who attempt to bring new converts into the religion are engaged in religious functions and responsibilities within the meaning of the ministerial exception.  Thus, the exception applies to "individuals whose duties for a church not only involve traditional public relations, but who are also, functionally, paid to actively proselytize on a church's behalf."  *Hope Int'l Univ.*, 119 Cal. App. 4th at 736 (citing *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 703 (7th Cir. 2003)) (non-ordained press secretary whose duties included outreach to local community found within the ministerial exception).  In terms repeatedly invoked *in haec verba* by numerous courts, the ministerial exception encompasses the functions, *inter alia*, "of *teaching*, *spreading the faith*, ...," or that are "*important to the spiritual and pastoral mission of the church.*" *Rayburn*, 772 F.2d at 1168-69 (emphasis added).  *Accord*, *Hope Int'l Univ.*, 119 Cal. App. 4th at 734 (same language) (quoting *Rayburn*).

"The applicability of the ministerial exception is a question of law for the court."  *Smith v. Raleigh Dist. of the North Carolina Conference of the United Methodist Church*, 63 F. Supp. 2d 694, 706 (E.D.N.C. 1999);*Weishuhn v. Catholic Diocese of Lansing*, 756 N.W.2d 483, 498-500 (Mich. Ct. App. 2008) (application

of ministerial exception is a "question of law for the judge, not a question of fact for
the jury").  Applying the above principles here, summary judgment or adjudication
is warranted.  *See Schmoll v. Chapman Univ.*, 70 Cal. App. 4th 1434, 1444 (1999)
(applying ministerial exception upon summary judgment); *Alcazar*, 598 F.3d at 676
("The district court correctly dismissed this case on the pleadings under" its
announced ministerial exception test)  Headley, as a member of a religious order,
performed functions whose purpose was to "teach" Scientology practices to auditors
and course supervisors by creation of religious training films, and to further the
dissemination of the Scientology religion ("spreading the faith") pursuant to the
Scientology religion's evangelical goal to "Clear the Planet" ("important to the
spiritual and pastoral mission of the church").  The functions of Headley's positions
and responsibilities thus fit precisely within the contours of the ministerial
exception, as elucidated by the Ninth Circuit and by this Court.

## II. HEADLEY WAS NOT COVERED BY THE MINIMUM WAGE LAWS BECAUSE HE DID NOT WORK FOR ORDINARY COMMERCIAL BUSINESS VENTURES IN COMPETITION IN THE COMMERCIAL MARKETPLACE

Independently of the application of the ministerial exception, Headley cannot
establish a valid claim under the minimum wage statutes because his labor for
Golden Era was not on behalf of an ordinary commercial business in competition
with other businesses, as suggested in the Court's Order of September 22, 2009.[13]

### A. The FLSA Does Not Apply

As shown in the Joint Brief in the Claire Headley case at 16-25, the FLSA's
legislative history shows that Congress did not intend the Act to apply to the
religious activities of churches; only if a church engaged in commercial activities in
competition with ordinary businesses would it or its workers be subject to coverage,

---

[13] This discussion follows the more lengthy argument set forth in the Defendants' Joint
Memorandum in Support of Motion for Partial Summary Judgment ("Joint Brief") in the
*Claire Headley* case.  The Court need not review the discussion in this Point if it agrees
that Marc Headley comes within the ministerial exception.

1   and only with respect to those commercial, competitive activities.  After enactment

2   of the 1961 amendment to FLSA, the Department of Labor issued regulations,

3   consistent with congressional debates and committee reports, that made clear that

4   *only* the commercial activities of a non-profit or church would be considered to be

5   an "enterprise" subject to the Act; such activities, to the extent a non-profit carried

6   them on, would not subject the other activities or acts of the non-profit to enterprise

7   coverage:  "[T]he nonprofit, educational, religious and eleemosynary activities *will*

8   *not be included in the enterprise*….  Such activities were not regarded as performed

9   for a business purpose under the prior Act and are not considered under the Act as it

10  was amended…."  29 C.F.R. § 779.214 (emphasis added).  *See Van Schaick v.*

11  *Church of Scientology of Cal.,* 535 F. Supp. 1125, 1140 (D. Mass. 1982).

12       In *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290

13  (1985), the Court, following closely arguments made by the Solicitor General on

14  behalf of the Department of Labor, after a careful analysis consistent with the

15  history and congressional intent, recognized that commercial business activities of

16  churches, if any, were quite different from their *religious* activities, and that the

17  latter were not covered by the FLSA, even though the statute contained no explicit

18  religious exemption.  The *Alamo* Court therefore made clear that "[t]he Act reaches

19  only the 'ordinary commercial activities' of religious organizations [citation], *and*

20  *only those who engage in those activities . . . ." id.* at 302 (emphasis added), words

21  clearly foreclosing not only "enterprise coverage" but also "individual coverage."

   **B.    The California Minimum Wage Laws Also Do Not Apply**

23       As stated in our discussion of this point in the *Claire Headley* case, Joint

24  Brief at 25-26, California's minimum wage law must be construed narrowly with

25  respect to church religious workers because such an application of the law would

26  raise serious questions under the First Amendment.  *See, e.g.*, Point I, *post,*

27  discussing the ministerial exception.  In such contexts, courts must, if possible,

28  interpret a statute to avoid constitutional infirmity.  *Murray v. The Charming Betsy,*

21

6 U.S. (2 Cranch) 64, 118 (1804); *Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 341 (1936) (Brandeis, J. concurring). Where, as here, there is significant risk of infringement on First Amendment rights, courts will require a clear expression of legislative intent to regulate religious activities. *NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 500, 507. Research discloses no clearly expressed intention by the California Legislature that the Labor Code, and in particular its wage-hour provisions, are to apply to religious workers.[14] And, as this Court noted in its September 22, 2009, Order in this case, "Plaintiff does not cite to any authority suggesting that the scope of California's labor laws is greater than federal law for people who are similarly situated." (Order at 2, n.1.)

### C. Headley Was Not Covered by the Minimum Wage Laws

#### 1. Golden Era Did Not Engage in Ordinary Commercial Competition with Businesses

The fact that Golden Era receives payments to permit it to continue to produce such religious materials in no way converts the acts of Golden Era into ordinary commercial activity, let alone in direct competition with commercial businesses. "[A] religious organization needs funds to remain a going concern." *Murdock v. Pennsylvania*, *supra*, 343 U.S. at 111. As long as the activity by which the funds are raised consists precisely of the provision or promotion of the religion itself, it furthers the exclusive religious purpose of the church and is therefore itself a religious activity. As the Court pointedly observed in *Murdock* with respect to the sale of religious literature by Jehovah's Witnesses solicitors:

---

[14] Indeed, the only analogous provisions of the California Labor Code do not cover individuals who agree to engage in religious work on behalf of churches or religious organizations without meaningful compensation. Labor Code § 3352(b) excludes from the definition of "employee" anyone performing services for a religious organization "for aid or sustenance only." Section 3352(i) excludes anyone performing "voluntary service" for a nonprofit organization who "receives no remuneration for the services other than meals, transportation, lodging, or reimbursement for incidental expenses." These provisions parallel the non-applicability of the FLSA to volunteer religious workers and members of religious orders.

The mere fact that the religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise. If it did, then the passing of the collection plate in church would make the church service a commercial product. *Id.*

Moreover, Golden Era in no way competes with other entities in creating and distributing materials about and for the Scientology religion. (SUF 56.) Indeed, no such competition is possible since the films and other media products about the religion are created by the Church to insure the requisite doctrinal knowledge and control. (*Id.*)[15] In short, no other entity can enter the "market" of creating such religious materials because there is and can be no such "market."

Headley claims that, in addition to the religious media he helped create at Golden Era, in the early 1990s he worked on the creation of audio-books based upon works of fiction written by L. Ron Hubbard, although he states that such activity ceased after that. (SUF 142.) As is set forth in Catherine Fraser's Declaration, the creation of such materials was limited to a small portion of Golden Era's production of audio cassettes, and did not extend to Golden Era's other activities. (SUF 143.) During the years that Headley was on staff, between 3 and 7 religious workers — on average, less than 1.5% of Golden Era's total staff — were involved in the creation of audio cassettes of any kind, and only about 3.65% of the audio cassettes consisted

---

[15] Similar control over the production of scriptural materials is exercised by other churches. For example, "The Vatican has its own official ecclesiastical press which oversees and produces all official documents coming from the papacy and its offices. Catholic religious orders also have presses both in Rome and in monasteries and institutions around the world for publication of the teachings and rule of the respective order." (Flinn Decl., ¶ 44.) "A celebrated monastic press which prints the religious treatises of the Benedictine Order today is St. Meinrad Abbey Press, a subsidiary institution of St. Meinrad Abbey in St. Meinrad, Indiana." (*Id.*, ¶ 24.) The monks who work for the Press are not paid, while outside technical consultants who are not part of the Order, are allowing the order "to keep tight controls over all publications that deal with [its] rule, theology and other teachings." (*Id.*) "Like the Scientologists, Catholics are very particular about orthodox doctrine and its public statement. Therefore both religions control their publications thoroughly and painstakingly." (*Id.*, ¶ 44.)

23

1   of fictional works.[16]  (SUF 145.)  Moreover, the amount of work Headley himself

2   performed on fiction works was *de minimus*, limited to a small proportion of his

3   responsibilities to insure quality control of all of Golden Era's creation of audio and

4   visual materials (not just audio cassettes) from late 1993 until early 1995, and about

5   1.3% of his activities from July to November, 1995.  (SUF 146-48.)  In December

6   1995 Headley transferred to Golden Era's film division; never again did his

7   positions involve creation of fictional materials.  (SUF 149.)

8        The reason for producing these audio-books was that by promoting

9   Mr. Hubbard's fictional works (without profit, on a cost-plus overhead basis),

10  listeners and viewers would become interested in exploring his writings about

11  Scientology.  (SUF 151.)  There certainly was a rational basis for Golden Era to

12  reach such a determination, especially because Mr. Hubbard's prior renown as a

13  fiction writer had helped significantly in the early dissemination of Dianetics and

14  Scientology.  Indeed, Headley acknowledges that such materials were produced to

15  "forward swiftly the dissemination of Dianetics and Scientology", emphasizing that

16  "that includes fiction books, that includes radio advertisements, that includes

17  promotional videos."  (SUF 152.)  Thus, Golden Era's *de minimus* production of

18  fictional audio-books[17] in the early 1990s did not constitute a commercial

19  enterprise.[18]

20  _____

21  [16] The remaining 96.35% of the cassettes consisted of religious materials, primarily
    Scientology lectures by L. Ron Hubbard, including translations of these lectures in up to
    16 languages.  (SUF 145.)

22  [17] *Remmers v. Egor,* 332 F.2d 103, 104 (2d Cir. 1964); *Isaacson v. Penn Cmty. Servs.,*
23  1970 WL 794, at *4 (D.S.C. Oct. 19, 1970) (discussing doctrine of *de minimus*).

24  [18] Even if it did, only those "commercial" activities would be subject to coverage; the rest
    of Golden Era's activities, including Headley's labor in support of them, would remain
25  outside the scope of coverage.  As we have shown, the Supreme Court's opinion in *Alamo*
    adopted the Labor Department's position that a church need not even keep records with
26  respect to the activities of its workers that were not directed at ordinary commercial
    activities.  *Alamo,* 471 U.S. at 305.  Accordingly, the Department of Labor regulations
27  explicitly provide that even where a non-profit engages in commercial activity that is
    covered as an enterprise, "the nonprofit, educational religious and eleemosynary activities
    will not be included in the enterprise."  29 C.F.R. § 779.214.

28

As Golden Era was not engaged in ordinary commercial activities that competed with business enterprises, it was not an "enterprise" or an "employer" in whole or in part, and hence Headley was not subject to minimum wage.

## 2.  As a Member of a Religious Order, Headley Was Not a Covered Employee Under the Minimum Wage Laws

Independently, Headley was not a covered employee subject to minimum wage laws because he was a member of a religious order, the Sea Org.  Congress, the Department of Labor and the federal courts agree that members of religious orders are not considered covered employees under the FLSA.  *See* Wage and Hour Division, U.S. Dep't of Labor, *Field Operations Handbook* § 10b03(b) ("Persons such as nuns, monks, priests, lay brothers, ministers, deacons and other members of religious orders who serve pursuant to their religious obligations … shall not be considered to be 'employees'"); *Shaliehsabou v. Hebrew Home of Greater Washington*, 363 F.3d 299, 305 (4th Cir. 2004) (religious order exception mandated by statute); *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1395 (4th Cir. 1990) (same) (quoting 112 Cong. Rec. 11371 (1966));[19] *Schleicher v. Salvation Army*, 518 F.3d 472, 476 (7th Cir. 2008) (members of religious orders not covered).

There can be no question that the Sea Org is a religious order, as found by the U.S. Department of Homeland Security and the United Kingdom Department of Inland Revenue, and as set forth in the expert declaration of Dr. Flinn.  (SUF 41.) The most complete definition of a religious order that Defendant has found is stated

---

[19] The Congressional Record reference was to the legislative debates over the 1966 amendments to FLSA, which extended enterprise coverage to certain limited non-profits, including educational institutions, but continued to exclude members of religious orders:

> Mr. Pucinski.  Let us consider a parochial elementary school, in which the nuns do the work in the cafeteria.  Would they have to be paid a minimum wage?
> Mr. Collier.  No, they would not be covered. …
> Mr. Burton.  As I understand, it is not the gentleman's intention to include members of a religious order under the definition of an employee, and therefore a nun would not be considered an employee.  Therefore, a minimum wage would not be required to be paid a nun.  Am I correct in my understanding of the gentleman's intention?
> Mr. Collier. That is correct. I did not intend to cover them.

1    in IRS Rev. Proc. 91-20, 1991-10 IRB 26, which sets forth the following criteria: (1)

2    members live under strict set of rules requiring self-sacrifice and commitment to the

3    goals of the organization at the expense of their material well-being; (2) members

4    undergo training program and make a long-term commitment; (3) organization is

5    under control or supervision of a church or association of churches; (4) members

6    live communally and are held to strict level of moral and religious discipline: (5)

7    members work full time on behalf of goals of the organization; (6) members engage

8    in activities such as prayer, religious study, teaching, missionary work, or church

9    reform or renewal; (7) the organization meets the requirements for tax exemption.

10   *See* 70A Am. Jur. 2d *Social Security and Medicare* § 613 (2009) (adopting IRS

11   definition).  It is clear that the Sea Org meets all the criteria.  (SUF 25-31.)

12   **III.    HEADLEY WAS NOT SUBJECT TO "FORCED LABOR" BECAUSE**
13   **HE WAS NOT HELD AGAINST HIS WILL**

14         The essence of a claim for "forced labor" under 18 U.S.C. § 1595 is that the

15   plaintiff is held in some form of captivity and forced to perform labor against his or

16   her will.  Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), 18

17   U.S.C. § 1589 (defining "forced labor').  Headley's own statements, testimony and

18   writings establish that he cannot make out such a claim.  Headley testified that he

19   never considered that "I'm being held against my will … whether or not I was being

20   held against my will, I don't think I thought those thoughts."  (SUF 114.)  He

21   confirmed statements in his recently self-published book that while he often

22   considered leaving Golden Era and abandoning his position in the Sea Org, the

23   "*only*" reason he stayed was to remain with his wife Claire, whom he assumed

24   would choose to keep her position as a high-ranking official in RTC.  (SUF 115.)

25         Moreover, not only was Headley's labor at Golden Era not "forced," he

26   enjoyed significant aspects of it, and he and his wife took pride in his work.  Thus,

27   when he was offered his promotion to Quality Control Gold, in charge of insuring

28   the quality and integrity of all Golden Era materials, he "loved the idea."  (SUF 84.)

26

1  Indeed, his "wife was very proud of [him]."  She was a "real strait-laced Sea Org

2  member" who was "happier" that he "had a respectable position."  (*Id.* )  Later,

3  when he assumed his position working on design and installation of audio visual

4  systems, he "truly loved [it] and had fun while doing it."  (SUF 113.)  Not only that,

5  but while on that position, Headley believed that, "It was actually going very

6  well...."  (*Id.*)  "I had more cumulative experience than anyone at the Base . . . I was

7  doing well.  I was getting stuff done, I was producing high quality systems that were

8  being installed all over the world."  (*Id.*)  Headley's "respectable position" and love

9  for his fun work at which he was "doing well" certainly distinguished him from any

10  other known or perceived "victim" of forced labor and human trafficking.

11       So, too, did his mobility.  As set forth in the Statement of Facts and the

12  Separate Statement, Headley lived off the International Base's (the "Base") premises

13  in public apartments several miles away (15-minutes drive) or in houses on public

14  roads; often left the Base and returned during the day to shop, go to restaurants, take

15  care of his dog or make and eat dinner; had the combination to the security lock on

16  the gate at the Base and opened the gate himself when he passed through it; owned

17  and drove motorcycles and a jeep and had access to and used automobiles; traveled

18  to and around Los Angeles and to Arizona, New York and Europe in carrying out his

19  post positions, including living in Copenhagen for three months; visited about a

20  hundred different Scientology churches around the world in doing so; visited friends

21  and family in the Los Angeles area; attended public church functions with his wife;

22  had two bank accounts and a PayPal account; had a cell phone and access to his

23  wife's cell phone; "had a laptop that had Internet access"; and visited and maintained

24  a relationship with his father, who was not a Scientologist and lived in Kansas City.

25       Having conceded, as he must given the above facts, that he did not consider

26  himself held against his will, Headley's forced labor claim is founded not upon

27  physical restraint prohibiting him from leaving, but rather upon his choice not to

28  route out; his belief that if he left unilaterally without participating in the "routing

27

1    out" process, he would be subject to a church "declare" and would not be able to

2    communicate with his wife and other Scientologist friends or family; that he was

3    subject to what he considered to be arbitrary and harsh church discipline; and upon

4    the events surrounding his actual departure from the Base on January 4, 2005.  As

5    shown below, each of these grounds must be rejected as a matter of law.

### A.    The Ministerial Exception Precludes Application of the TVPA to the "Employment" Relationship Between a Church and its Ministers, and In Particular Between Headley and CSI

8         Headley has brought a civil claim under 18 U.S.C. § 1595, a civil labor

9    statute.  Section 1595 provides that "an individual who is a victim of a violation" of

10   the forced labor statutes "may bring a civil action" against someone who has

11   "obtain[ed] the labor or services of [that] person by any one of, or by any

12   combination of," designated means set forth in the section.  18 U.S.C. § 1589.  Thus,

13   to determine whether Headley can maintain his claim, the Court must inquire into

14   the means by which CSI acquired and kept Headley's services, one of its ministers.

15   That, however, is precisely what the Court *cannot* do under the ministerial exception

16   and the First Amendment.  *See, e.g.*, *Alcazar*, 598 F.3d at 671-72 ("The Religion

17   Clauses . . . require a 'ministerial exception' to employment statutes if the statute's

18   application would interfere with a religious institution's employment decisions

19   concerning its ministers.")  "Because the ministerial exception is constitutionally

20   compelled, it applies as a matter of law *across* statutes, both state and federal, that

21   would interfere with the church-minister relationship."  598 F.3d at 673 (emphasis

22   added).  Thus, while government certainly may criminalize or create civil remedies

23   for kidnapping, aggravated battery, or false imprisonment even by churches of their

24   ministers, it may not do so by means of a broad statute whose primary purpose and

25   focus is to regulate labor, that reaches conduct not constituting forcible restraint or

26   violence, and by applying it to the labor relationship between a church and its

27   ministers.  "The exception was created because government interference with the

28   church-minister relationship *inherently* burdens religion."  *Id.* (court's emphasis).

1    The statutory remedies for a § 1595 violation demonstrate why the statute

2  must be construed as subject to and limited by the ministerial exception.  18 U.S.C.

3  § 1593 states that a person who proves a § 1595 claim will be entitled to restitution

4  and "the greater of the gross income or value to the defendant of the victim's

5  services or labor or the value of the victim's labor as guaranteed under the minimum

6  wage and overtime guarantees of the Fair Labor Standards Act."  18 U.S.C.

7  § 1593(b)(3).  The ministerial exception makes Defendants immune from exactly

8  this kind of judicial interference with ministerial relations, however.  The courts

9  cannot dictate to churches what they should pay their ministers, under § 1593, the

10  FLSA, or otherwise.  Headley is simply trying to impose an unconstitutional wage

11  regulation on CSI through the "back door" of the TVPA.

12    To interpret the TVPA constitutionally, it must be construed not to apply when

13  the "labor or services" in question are comprised of ministerial activities for a church.[20]

14  Otherwise, courts will be in the untenable, and unconstitutional, position of constantly

15  questioning the means by which religious institutions acquire and keep their ministers'

16  services.  Religious practices which, as we show *infra* are protected from state

17  interference — such as requiring that monks, priests, or other ministers live in

18  seclusion, take vows of poverty, engage in humble labor, not interact with those of

19  other persuasions, give up worldly possessions such as televisions and computers, and

20  refrain from sex — would become the subject of judicial inquiry to determine if they

21  were improper "means" of acquiring "labor or services," 18 U.S.C. § 1589, directly

22  contrary to the law of this circuit (and every other circuit).  Such judicial interference

23  would require both substantive and procedural entanglement in churches' affairs,

24
_____

25  [20] Courts should not interpret a statute in a manner that raises serious constitutional
questions unless such an interpretation is compelled by an "affirmative intention of the
Congress clearly expressed."  *NLRB v. Catholic Bishop of Chicago*, 440 U.S. at 506

26  (interpreting labor statute so as to avoid conflict with Free Exercise and Establishment
clauses).  Here, in the absence of any indication that Congress intended to criminalize and

27  sanction common and long-established religious practices by passing the TVPA, the Court
should follow this basic rule of construction and hold the statute inapplicable.

28

29

1    contrary to the Establishment Clause.  *See, e.g., Alcazar*, 598 F.3d at 672-73.

2         Indeed, that very danger is demonstrated by this case.  As we have shown, by

3    his own words and actions, Marc Headley's reasons for leaving Golden Era at the

4    time he did were closely related and entwined with ongoing disputes between

5    Golden Era and him concerning his performance of his ministerial duties and his

6    ethical behavior, including allegations of financial peculations.  If the Court were to

7    attempt to apply TVPA to the process by which Headley's relationship to Golden

8    Era was terminated, it inevitably would become entangled in matters of religious

9    practice, in violation of the ministerial exception.  *Higgins v. Maher*, 210 Cal. App.

10   3d 1168, 1170 (1989) (discussed more fully *post* at 34-35).

11        At a minimum, TVPA cannot be applied to a church's relationship with its

12   ministers in the absence of actual physical force or restraint or the threat of the

13   imminent use of such force.  A compelling analogy is to the realm of political

14   speech, also protected by the First Amendment.  The Supreme Court has recognized

15   that speech (like religious doctrine and practice) can and often is intended to have a

16   psychologically coercive effect.  *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886,

17   911 (1982) ("'The claim that the expressions were intended to exercise a coercive

18   impact on respondent does not remove them from the reach of the First

19   Amendment'") (quoting *Org. for a Better Austin v. Keefe,* 402 U.S. 415, 419

20   (1971)).  *See Gitlow v. New York*, 268 U.S. 652, 673 (1925) ("Every idea is an

21   incitement") (Holmes, J., dissenting).  Nevertheless, such speech, even "advocacy of

22   the use of force or of law violation," is protected except and only to the extent that it

23   "'is directed to inciting or producing imminent lawless action and is likely to incite

24   or produce such action.'"  *Claiborne Hardware,* 458 U.S. at 927-28 (quoting

25   *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1968)).  So, too, a church's application of

26   religious doctrine and practice to its ministers must be protected in the absence of

27   actual physical restraint or the threat of imminent restraint.  Defendants' actions

28   with respect to Headley cannot meet that constitutionally mandated standard.

**B.**   **Even if TVPA Could Be Applied to Narrow Circumstances of Actual or Threatened Physical Restraint or Harm, Headley's Alleged Fear That He Would Be Subject to Excommunication If He Left Golden Era Cannot Be the Basis of a Forced Labor Claim**

A church's implementation of a policy requiring its members to "shun" an excised former member or excommunicating that member from the religious community may not be a basis to impose civil liability upon the church or its officials. *Paul v. Watchtower Bible & Tract Soc'y of New York, Inc.*, 819 F. 2d 875 (9th Cir. 1987). In *Paul*, the court rejected emotional distress claims resulting from the Jehovah's Witnesses' shunning of a former parishioner, because the First Amendment "permits them to engage in the practice of shunning pursuant to their religious beliefs without incurring tort liability," *id.* at 879, even if the practice in fact caused emotional distress. Indeed, the court went further and held that claims for emotional distress arising out of participation in a church are not actionable:

> Intangible or emotional harms cannot ordinarily serve as a basis for maintaining a tort cause of action against a church for its practices — or against its members….Offense to someone' sensibilities resulting from religious conduct is simply not actionable in tort….Without society's tolerance of offenses to sensibility, the protection of religious differences mandated by the first amendment would be meaningless.

*Id.* at 883 (citations and footnote omitted). *Accord, Van Schaick*, 535 F. Supp. at 1139; *Orlando v. Alamo*, 646 F.2d 1288, 1290 (8th Cir. 1981).

Fear of being declared a "suppressive person" thus cannot constitute an actionable basis for a forced labor claim. To be declared a suppressive person is in effect to be excommunicated from the Scientology religion. It is inconceivable that a Catholic Bishop could succeed in an emotional distress claim against his Church, claiming that he remained a Bishop or engaged in Catholic religious practices only out of fear of being excommunicated. Such a claim should be no more conceivable against a newer, minority religion.

### C. Even if TVPA Could Be Applied to Narrow Circumstances of Actual or Threatened Imminent Physical Restraint or Harm, CSI's Imposition or Threatened Imposition of a Restricted Lifestyle and of Church Discipline Upon a Sea Org Member Cannot Be the Basis of a Forced Labor Claim

Headley's claim that he was coerced to remain at Golden Era because of fear that he would be "declared" is but a more specific example of his claim that he did not leave because of the restricted lifestyle of Sea Org members, including imposition or threatened imposition of discipline by CSI. Headley asserts, *inter alia,* that his access to the outside world was restricted (despite the fact that much of his work was performed off the Base and his frequent travels); that the Base was subject to strict security with limits upon access and the ability to leave (despite the facts that he had the combination to the pedestrian gate, came and left on his own, and lived in apartments and houses off the Base); that he performed lowly tasks and physical labor (despite the fact that his principal duties involved acting as producer of films and videos about Scientology or creating AV systems in churches around the world, which he "loved" doing because it was "fun"); that he was subjected to a highly structured work environment and had insufficient sleep; and that he underwent confessions of transgressions for which he was subject to disciplinary action. All this, Headley apparently claims, imposed psychological and emotional barriers that prevented him from leaving his allegedly forced labor.

These latter claims also must be rejected as a basis for liability under the forced labor statute. While TVPA's provision that labor can be "forced" by the use of certain forms of psychological or emotion coercion as well as by physical force is perfectly rational and constitutional in a secular contest, such an application of the statute in a religious context to the "lifestyle constraints that come with being a member of [a religious order such as] the Sea Org" (*Claire Headley* Order at 4-5) and the religious discipline of ministers, cannot be made under the First Amendment

1   and the ministerial exception.[21]  Indeed, such matters relate to Headley's labor with

2   Defendant, and constitute precisely the kind of "tangible employment actions"

3   covered by the ministerial exception.

4        The appropriateness of a hierarchical church's disciplinary actions taken

5   against a member, especially a minister, has consistently been held to be beyond the

6   cognizance of the civil courts.  Indeed, the courts have been particularly deferential

7   when questions of church discipline are at issue.  *See, e.g., Serbian Eastern*

8   *Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 717 (1976) ("questions of church

9   discipline and the composition of the church hierarchy are at the core of

10  ecclesiastical concern").  Even if an ecclesiastical decision appears harsh, unfair, or

11  irrational from a secular viewpoint, civil courts have no role to play: "Constitutional

12  concepts of due process, involving secular notions of fundamental fairness or

13  impermissible objectives, are therefore hardly relevant to such matters of

14  ecclesiastical cognizance."  *Id.* at 714-15 (footnote omitted).  "Secular courts will

15  not attempt to right wrongs related to the ... discipline or administration of clergy."

16  *Higgins v. Maher*, 210 Cal. App. 3d at 1175.

17       In *Paul,* 819 F.2d at 883, the Ninth Circuit reaffirmed these principles of

18  judicial deference even to harsh ecclesiastical disciplinary decisions that inflict

19  severe emotional distress on members or former members, let alone ministers,

20  recognizing that acts short of physical force that would be subject to tort liability in

21  a secular context are protected when undertaken in an ecclesiastical context:

22       Churches are afforded great latitude when they impose discipline on

23

24  [21] The Court merely need compare the "harms" alleged by Headley from participation in
    the life of a Sea Org member to the harms proven in the criminal prosecutions brought
25  under the TVPA.  *See, e.g., United States v. Sabhnani*, 599 F.3d 215 (2d Cir. 2010)
    (violent threats against trafficked immigrants); *United States v. Calimlim*, 538 F.3d 706
26  (7th Cir. 2008) (Wood, J.) (same); *United States v. Kaufman*, 546 F.3d 1242 (10th Cir.
    2008) (threats and physical force used to coerce mentally ill residents to perform manual
27  labor in the nude); *United States v. Dann*, 2009 WL 5062345 (N.D. Cal. Dec. 23, 2009)
    (trafficking immigrants); *United States v. Marcus*, 487 F. Supp. 2d 289 (E.D.N.Y. 2007)
28  (BDSM and sexual abuse), *vacated on other grounds*, 538 F.3d 97 (2d Cir. 2008).

members or former members.  We agree with Justice Jackson's view
that '[r]eligious activities which concern only members of the faith are
and ought to be free — as nearly absolutely free as anything can be.'
*Prince v. Massachusetts*, 321 U.S. 158, 177 (1944) (concurring).

*Higgins v. Maher*, *supra*, dramatically demonstrates the limitations the First
Amendment and the ministerial exception placed upon application of civil tort law
to discipline imposed in an ecclesiastical context.  In *Higgins*, a Catholic priest
brought numerous tort claims against his Bishop and the Church for his removal
from his position, subsequent mandated psychiatric treatment, which included drugs
and shock therapy,[22] and public revelation of alleged private defamatory
information.  The court found that the complaint adequately alleged "torts of
invasion of privacy, defamation, and the intentional and negligent infliction of
emotional distress," and therefore would be actionable in a secular context.  210 Cal.
App. 3d at 1175.  The court, however, dismissed the complaint because, even if
defendants had engaged in the alleged tortious conduct, "the acts so taken were part
and parcel of the Bishop's administration of his ecclesiastical functions," and thus
were protected activity under the ministerial exception.  *Id*. at 1175-76.  Further:

> the torts recited are simply too close to the peculiarly religious aspects
> of the transaction to be segregated and treated separately — as simple
> civil wrongs.  The making of accusations of misconduct; the discussion
> of same within the order; the recommendation of psychological or
> medical treatment; the infliction, whether *intentionally* or negligently,
> of emotional distress — these are all activities and results which will
> often, if not usually, attend the difficult process by which priestly
> faculties are terminated.

*Id*. at 1176 (emphasis added).  *Accord, Gunn v. Mariners Church,* 167 Cal. App. 4th
206, 217 (2008) (following *Higgins* and holding that "the ministerial exception
applies to preclude further judicial review *regardless of the otherwise tortious*

---

[22] Higgins averred that "upon persuasion from the Church," he "underwent a program of
rehabilitation with a therapy-oriented organization within the church," was "given various
drugs which caused him to become nervous and lose much of his reasoning ability" and
that he was "treated with electroshock therapy."  210 Cal. App. 3d at 1172.

1  *nature of the statements*") (emphasis added).

2         Here, it is equally impossible to separate out any claim that Headley was

3  subjected to forced labor by psychological or emotional distress from Headley's

4  commitment to the Sea Org over a fifteen year period, and "the difficult process by

5  which" Headley relinquished his important position within the Church.  The allegations

6  of forced labor here are simply an effort to obtain civil adjudication of Headley's

7  decision to adhere to Church discipline at a time when remaining within the Church

8  was of paramount importance to him, at the least because he wanted to remain with his

9  wife.  The Headleys, it must be emphasized, were not mere parishioners.  They were, as

10  members of the Sea Organization, ministers within the ecclesiastical leadership of

11  Scientology, who had vowed to dedicate their lives to help advance Scientology's

12  goals.  Now that Headley's priorities have changed, he asks this Court and a jury to

13  review the propriety of the Sea Org's lifestyle and the Church's imposition of discipline

14  and his obedience to it.  As made clear in *Serbian Orthodox Diocese*, *Paul*, and

15  *Higgins,* however, this is an inquiry that secular courts cannot undertake.  *See also*

16  *Meroni v. Holy Spirit Ass'n*, 506 N.Y.S.2d 174, 176-77 (N.Y. App. Div. 1986)

17  (church's alleged "brainwashing" by imposition of "highly programmed behavioral

18  control techniques in a controlled environment" "constitutes common and accepted

19  religious proselytizing practices, *e.g.*, fasting, chanting, physical exercises, cloistered

20  living, confessions, lectures, and a highly structured work and study schedule, . . . *i.e.*,

21  as a method of religious indoctrination that is neither extreme nor outrageous.")

22         Thus, Headley's claim that Sea Org members on the Base are isolated from

23  other friends, family and the outside world, an allegation that in any event rings

24  hollow in Headley's mouth given his extensive work assignments and domestic and

25  international travel, cannot be the basis of a forced labor claim.  Many religious

26  organizations encourage or even require that adherents, particularly those who join

27  religious orders or achieve high ecclesiastical authority, abandon secular ties and

28  depend on their Church for all social and emotional contact, maintaining themselves

as insular communities open only to co-religionists.  (*See* Flinn Decl., ¶ 33.)  Such requirements often go far beyond any restrictions experienced by the Headleys, who lived together off the Base, had access to transportation and telecommunications, visited, spoke and corresponded with their families and frequently traveled around the United States and to Europe.  Courts have frequently held, as a matter of law, that religious practices of encouraging isolation from the secular world, or other similar religious beliefs and practices, are not tortious.[23]  *Van Schaick*, 535 F. Supp. at 1139; *Paul*, 819 F.2d at 883; *Orlando,* 646 F.2d at 1290.

### D.    The Religious Freedom Restoration Act Bars Plaintiff's TVPA Claim

The Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb et seq., reinforces the arguments made above that this Court cannot impose forced labor sanctions on Defendant based on its religious practices.  RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" except "in furtherance of a compelling governmental interest," and then only by "the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b).  *See Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000).

RFRA precludes state action coercing religious adherents "to act contrary to their religious beliefs by the threat of civil or criminal sanctions."  *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008).  RFRA amends *all* federal law, whether enacted before or after RFRA itself, *see* 42 U.S.C. § 2000bb-3(a), (b),

---

[23] As can be seen from cases such as *Meroni*, Headley's complaint that he engaged in humbling physical labor is a common practice among religious orders.  Members of Christian religious orders are required to take vows of obedience and humility, which frequently entail performing lowly tasks that might appear degrading and demeaning to outsiders.  (Flinn Decl., ¶¶ 23, 26, 53.)  Zen Buddhists may be required to perform repetitive and apparently meaningless tasks as a means toward enlightenment.  (*Id.*)  Likewise, Headley's claim of insufficient sleep hardly constitutes an unusual practice among religious orders.  Franciscan friars, Cistercians and Trappists all engage in practices that Headley would undoubtedly characterize as "sleep deprivation."  (*Id.*, ¶ 54.)

36

1  unless a statute specifically excludes its application, which the TVPA notably does

2  not do.  A person whose religious practices are burdened in violation of RFRA "may

3  assert that violation as a claim or defense in a judicial proceeding[.]"  *Gonzales v. O*

4  *Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (quoting

5  42 U.S.C. § 2000bb-1(c)); *see, e.g.*, *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455,

6  470 (D.C. Cir. 1996) (RFRA provided defense to Title VII action brought by

7  plaintiff whose position was the functional equivalent of a minister).

8      Application of TVPA to CSI's imposition of ecclesiastical rules and

9  discipline with respect to its ministers and the Sea Org would unquestionably burden

10  free exercise.  Given that Headley was not physically restrained or imprisoned and

11  had numerous and ongoing opportunities to leave, no such showing can be made of

12  a compelling state interest to impose such a burden.

13  **E.   The Court Should Summarily Adjudicate That Headley's Participation In The Lifestyle Of The Sea Org And CSI's**

14  **Implementation Of Ecclesiastical Discipline Cannot Support A TVPA Claim Against A Church Involving Its Ministers**

15

16      The Court also, or alternatively, should summarily adjudicate that the acts of

17  CSI with respect to the lifestyle restrictions of the Sea Org. or Defendants'

18  ecclesiastical rule governance or discipline of its ministers, including Headley,

19  cannot be applied to support a TVPA claim against a church with respect to its

20  ministers.  In particular, Plaintiff's claims that the defendant churches imposed

21  psychological and emotional barriers that prevented him from leaving his allegedly

22  forced labor, by, *inter alia,* requiring him to perform lowly tasks and physical labor;

23  subjecting him to a highly structured work environment; depriving him of sufficient

24  sleep; requiring he undergo confessions of transgressions for which he was subject

25  to disciplinary action; mandating a formal procedure, called "routing out" for Sea

26  Org members who wish to revoke their vows of service and leave the Sea Org;

27  imposing disciplinary penalties, including the equivalent of excommunication, upon

28  Sea Org members who unilaterally leave their positions without participating in the

1    routing out process, all "encompass[] *tangible employment actions*", including but

2    not limited to "the determination of a minister's salary, his place of assignment, and

3    the duty he is to perform in the furtherance of the religious mission of the church"

4    *Alcazar,* 598 F.3d at 672, 674 (emphasis added), and may not be the basis of a

5    TVPA, or any other claim, against Defendants.  Only acts by which a minister is

6    subjected to physical force and restraint, or the threat of imminent and likely use of

7    such restraint, can be the subject of state interference, through a forced labor statute

8    or otherwise.

9         As amended in December 2008, Rule 56 permits "[a] party against whom

10   relief is sought [to] move . . . for summary judgment on all *or part* of the claim."

11   Fed. R. Civ. P. 56(b) (emphasis added).  The amendment codified the rule long

12   applied in this Circuit.  *See Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th

13   Cir. 1981) (Rule 56 permits "a determination before the trial that certain issues shall

14   be determined established in advance of the trial").  For example, in *DiSandro v.*

15   *Makahuena Corp.*, 588 F. Supp. 889, 891 (D. Haw. 1984), the court rejected an

16   argument "that summary judgment is available only where it will dispose entirely of

17   at least one of plaintiffs' claims."  The court held that "[s]ummary judgment is

18   available to decide purely legal issues….[Thus,] it is appropriate to decide a few

19   limited issues by summary judgment*, even if those issues are not entirely dispositive*

20   *of any one claim*.  Summary judgment can thus serve to set the issues for trial."  *Id.*

21   at 892 (emphasis added).  *Accord First Nat'l Ins. Co. v. FDIC*, 977 F. Supp. 1051,

22   1055 (S.D. Cal. 1997) ("[e]ven if [the moving party] will not prevail on one of its

23   causes of action, the Court may still grant summary adjudication as to specific issues

24   if it will narrow the issues for trial"); *Bushnell v. VisCorp.*, 1996 WL 506914, at *11

25   (N.D. Cal. Aug. 29, 1996) ("a proper interpretation of Rule 56(b) allows summary

26   adjudication on individual parts of claims brought against a party").

27        It is important that the Court exercise its summary adjudication power in this

28   case because of the application of the ministerial exception to the relationship

38

between CSI and Marc Headley. A central rationale for the ministerial exception is the non-entanglement principle of the Establishment Clause. By granting summary adjudication on the issues in question, the Court will minimize intrusion into "matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law," *Serbian Eastern Orthodox Diocese,* 426 U.S. at 713, which lie at the heart of the exception. *Alcazar*, 598 F.3d at 673 (non-entanglement principle "recognize[s] that the First Amendment strongly circumscribes legislative and judicial intrusion into the internal affairs of a religious organization").

In addition, the Court will insure, as it must, that no trial or judgment will be based upon protected activity. In *NAACP v. Claiborne Hardware, supra,* the Court reversed a judgment for civil conspiracy and an illegal boycott that involved elements of protected (albeit "coercive") speech and alleged threats of violence precisely because the trial court had not limited liability strictly to acts of violence and threats of "imminent" violence and had not excluded from consideration those parts of the boycott activity that were protected under the First Amendment. 458 U.S. at 920-23. The Court warned:

> When such conduct [violence or threats of imminent violence] occurs in the context of constitutionally protected activity, however, precision of regulation is demanded. Specifically, the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages.

*Id*. at 916-17 (inner citations and quotations omitted).

### F. The Actions of Security Guards on the Day Headley Left Golden Era Cannot Convert Headley's Prior Fifteen Years of Service to Golden Era Into "Forced Labor"

Headley presents a colorful account of his "escape" from the Base on the morning of January 4, 2005. According to his book, he drove his motorcycle from the driveway of his off-Base house onto the public road adjoining it, but, because of a random coincidence, his exit was witnessed by two security guards, who then followed him in a truck. Because it was raining, he was forced off the road, skidded

1   and fell, without injury to himself but causing some damage to the cycle.  The

2   guards then verbally attempted to convince him to return to the Base.  At one point,

3   one of the guards grabbed the key to the cycle, but quickly returned it.  No physical

4   force was used.  Headley got back on his motorcycle and continued driving it slowly

5   into San Jacinto, followed for a short time by the security guards.  Police, alerted by

6   a motorist to a possible "altercation," arrived and followed him into town, where he

7   made arrangements to rent a truck, drive to the airport, and fly to his father's home

8   in Kansas City, where his father welcomed him.  (SUF 141.)

9          At the most, Headley's account, if completely accepted on its own terms,

10  shows inappropriate behavior by two security guards leading to a momentary

11  encounter on a public highway falling far short of false imprisonment.  But Headley

12  has not sued for assault, battery, negligence, outrageous conduct or false

13  imprisonment, nor could he given the clear running of the statutes of limitations.

14  Instead, in an effort to get around the statutes, Headley's lawyers have concocted a

15  claim for forced labor.  Their problem, as shown above, is that Headley was not held

16  captive, lived off base, had a cell phone and laptop computer, traveled extensively,

17  visited family and friends, and, by his own admission, never thought he was held

18  against his will.  Nothing that happened on January 4, 2005, changed any of that.

19                              **CONCLUSION**

20         For all the foregoing reasons, the Court should grant the motion for summary

21  judgment and dismiss the complaint in its entirety.

22  DATED: May 7, 2010                    Respectfully Submitted,

23                                        RABINOWITZ, BOUDIN,
                                          STANDARD, KRINSKY &
24                                        LIEBERMAN, P.C.

25                                        PROSKAUER ROSE LLP    _

26                                        By: _____/s/_____

27                                              Eric M. Lieberman
                                          Attorneys for Defendant,
28                                        Church of Scientology International