BERT H. DEIXLER, SBN 70614
bdeixler@proskauer.com
HAROLD M. BRODY, SBN 84927
hbrody@proskauer.com
PROSKAUER ROSE LLP
2049 Century Park East, 32nd Floor
Los Angeles, CA 90067-3206
Telephone:    (310) 557-2900
Facsimile:    (310) 557-2193

ERIC M. LIEBERMAN (pro hac vice)
elieberman@rbskl.com
RABINOWITZ, BOUDIN, STANDARD,
KRINSKY & LIEBERMAN, P.C.
111 Broadway, 11th Floor
New York, NY 10006-1901
Telephone: (212) 254-1111
Facsimile: (212) 674-4614

Attorneys for Defendant,
Church of Scientology International

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC HEADLEY,<br><br>              Plaintiff,<br><br>      v.<br><br>CHURCH OF SCIENTOLOGY INTERNATIONAL, a corporate entity; and DOES 1-20,<br><br>              Defendants. | Case No. CV09-3986 DSF (MANx)<br><br>**NOTICE OF LODGING OF AMENDED STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND SUMMARY ADJUDICATION OF ISSUES**<br><br>Hon. Dale S. Fischer<br><br>Date:  August 2, 2010<br>Time:  1:30 p.m.<br>Courtroom:  840 |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT defendant Church of Scientology International hereby lodges with the Court its Amended Statement of Uncontroverted Facts and Conclusions of Law in Support of Defendant's Motion for Summary Judgment and Summary Adjudication of Issues attached hereto as Exhibit A.

DATED:  July 2, 2010

PROSKAUER ROSE LLP
BERT H. DEIXLER
HAROLD M. BRODY

By:   _____/s/_____
              HAROLD M. BRODY

Attorneys for Defendant
CHURCH OF SCIENTOLOGY
INTERNATIONAL

2

8086/21051-004 Current/18836845v2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT defendant Church of Scientology International hereby lodges with the Court its Amended Statement of Uncontroverted Facts and Conclusions of Law in Support of Defendant's Motion for Summary Judgment and Summary Adjudication attached hereto as Exhibit A.


DATED:  July 2, 2010

PROSKAUER ROSE LLP
BERT H. DEIXLER
HAROLD M. BRODY


By:  _____/s/_____
            HAROLD M. BRODY

Attorneys for Defendant
CHURCH OF SCIENTOLOGY
INTERNATIONAL

2

8086/21051-004 Current/18836845v2

# EXHIBIT A

BERT DEIXLER, SBN 70614
bdeixler@proskauer.com
HAROLD M. BRODY, SBN 84927
hbrody@proskauer.com
PROSKAUER ROSE LLP
2049 Century Park East, 32nd Floor
Los Angeles, CA 90067-3206
Telephone:    (310) 557-2900
Facsimile:    (310) 557-2193

ERIC M. LIEBERMAN, admitted pro hac vice
elieberman@rbskl.com
RABINOWITZ, BOUDIN, STANDARD,
  KRINSKY & LIEBERMAN, P.C.
111 Broadway, 11th Floor
New York, NY  10006
Telephone: (212) 254-1111
Facsimile: (212) 674-4614

*Attorneys for Defendant Church of Scientology International*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC HEADLEY,<br><br>Plaintiff,<br><br>v.<br><br>CHURCH OF SCIENTOLOGY INTERNATIONAL, a corporate entity, and DOES 1-20,<br><br>Defendant. | CASE NO. CV09-3986 DSF (MANx)<br><br>**DEFENDANT'S AMENDED STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND SUMMARY ADJUDICATION OF ISSUES**<br><br>Hon. Dale S. Fischer<br><br>Date:  August 2, 2010<br>Time:  1:30 p.m.<br>Courtroom:  840 |

- 1 -

## I.     STATEMENT OF UNCONTROVERTED FACTS

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1.     The Scientology religion is based upon the research, writings and recorded lectures of its Founder, L. Ron Hubbard concerning Scientology, which collectively constitute its Scripture. | 1.     Declaration of Warren McShane ("McShane Decl."), ¶¶ 5-6, 11; Declaration of Amy Lerner Hill ("Hill Decl."), Exh. A (Claire Headley Depo.) at 49:21-24, 319:13-320:1, 462:8-16. |
| 2.     This Scientology Scripture is the source of all the doctrines, tenets, philosophy, practices, rituals and fundamental policies of the Scientology faith. They encompass more than 300 books and other writings, thousands of written bulletins and policy letters about the religion, over 3,000 recorded lectures and numerous religious instruction films. | 2.     McShane Decl., ¶ 11, Exh. 110 (*What is Scientology?*) at 134-135. |
| 3.     Many of the scriptural writings of Scientology are contained in two multi-volume collections of Mr. Hubbard's writings: *The Technical* [i.e., Religious] *Bulletins of Dianetics and Scientology* ("*The Technical Bulletins*"), which contains materials relating to the practices (known as "technology") of Scientology, and *The Organization Executive Course* ("*The OEC*"). | 3.     McShane Decl., ¶ 11; Supp. Brody Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 49:22-50:7. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 4.    All Scientology churches are managed according to Scientology scripture as written by Mr. Hubbard and collected in *The OEC*, which were developed specifically to further the expansion and dissemination of Scientology. | 4.    McShane Decl., ¶ 11. |
| 5.    The basic tenet of Scientology is that man is an immortal spiritual being, called a "thetan" (from the Greek word for "spirit"), who has lived many lifetimes and has the potential of infinite survival.  Scientologists believe that a thetan has had one continuous life, for many eons.  His various bodies have died, but his life experience never stops. | 5.    Hill Decl., Exh. A (Claire Headley Depo.) at 56:11-24; 57:10-17; McShane Decl., ¶¶ 13-16; Supp. Brody Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 54:1-17. |
| 6.    Scientology doctrine states that the thetan is inherently good, with infinite spiritual capability, however, over the ages, and as a result of becoming enmeshed with the material universe, thetans have lost their spiritual identity and most of their native ability.  The thetan is burdened with negative experiences throughout their history.  Such burdens not only limit the spiritual | 6.    McShane Decl., ¶¶ 14, 17; Supp. Brody Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 58:8-13. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| existence of the individual, but also condemn the world to injustice, war and conflict. Scientology doctrine further states that, only through exploration of his or her past can a thetan overcome the negative experiences that are affecting and reducing his or her inherent spiritual ability. | |
| 7. Scientology posits the existence of the "reactive mind." Scientologists believe that during moments of pain and partial or full unconsciousness, the reactive mind makes a full mental image picture of everything taking place. These are called "engrams." | 7. McShane Decl., ¶¶ 7-8. |
| 8. It is a Scientology belief that the reactive mind retains engrams, including engrams from past lives, but the thetan is not aware of them. Under Scientology principles, these engrams, however, affect one's behavior and are the source of irrationality, fear and psychosomatic illness, and impede spiritual enlightenment. | 8. McShane Decl., ¶ 8. |
| 9. The concepts of engrams and the reactive mind were first set forth in Mr. | 9. McShane Decl., ¶¶ 9-10. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| Hubbard's writings on "Dianetics," which he later defined as "what the soul is doing to the body." Mr. Hubbard wrote that the practices described in *Dianetics* led to the phenomenon of individuals recalling past lives. This was soon followed by the phenomenon of exteriorization from the body and Mr. Hubbard came to the conclusion that the "I" referred to in *Dianetics* was the human spirit. This marked the evolution of Dianetics to Scientology. Today, Dianetics is considered to be the forerunner of and part of Scientology, since the discoveries of Scientology are believed to clarify and amplify the subject of Dianetics. | |
| 10. Scientology seeks to remove the effects of engrams through the practice of auditing. | 10. McShane Decl., ¶¶ 17, 23-25. |
| 11. According to Scientology Scripture, when one has eliminated his reactive mind, he is called "Clear"; beyond that, the path to full spiritual ability and freedom is called "Operating Thetan" or "OT." This path in | 11. McShane Decl., ¶¶ 20-21; Hill Decl., Ex. A (Claire Headley Depo.) at 50:16-51:4, 84:20-86:11, 88:15-89:2; Exh. 10 to Hill Decl. (The Bridge to Total Freedom: Classification, Gradation and Awareness Chart); Supp. Brody Decl., Exh. C |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| Scientology is known as The Bridge to Total Freedom ("The Bridge").  The Bridge to Total Freedom is represented on a chart called the Classification, Gradation and Awareness Chart that shows the different "levels" of Scientology training and processing. Moving up the Bridge to Total Freedom means completing the levels of Scientology training and obtaining higher levels of benefits from such training. | (Stephen Hall June 3, 2010 Depo.) at 67:13-69:17. |
| 12.    Scientologists believe that when enough people have attained the state of "Clear" and above, the entire planet will be cleared and the ultimate Scientology goal of "a civilization without insanity, without criminals and without war, where the able can prosper and honest beings have rights, and where Man is free to rise to greater heights . . . ." will be achieved.  This concept is called "Clearing the Planet." | 12.  McShane Decl., ¶21; Declaration of Harold M. Brody ("Brody Decl."), Exh A (Marc Headley Depo.) at 184:4-7; Supp. Brody Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 62:10-65:14. |
| 13.    Scientologists believe that the expansion and dissemination of the religion is necessary to reach the | 13.  McShane Decl., ¶ 21; Cartwright Decl., ¶ 17; Brody Decl., Exh. A (Marc Headley Depo.) at 184:4-7; Supp. Brody |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| ultimate goal to "Clear the Planet." | Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 84:12-85:5. |
| 14.    Scientologists also believe that the dynamic principle of existence is to "Survive!"  This dynamic principle is compartmented into eight parts, all integral to life.  Scientology refers to these as the "Eight Dynamics."  These are: 1) Self, the effort to survive as an individual; 2) Family; 3) Groups, such as a community, friends, a company, a nation; 4) Mankind; 5) Life forms, including animals and plants; 6) The physical universe, encompassing matter, energy, space and time; 7) The spirit, the urge to survive as spiritual beings; and 8) Infinity, including a supreme being.  A thetan's spiritual advance in Scientology is represented as one's expansion across all of these dynamics, addressing every facet of a thetan's existence as a necessary component to achieving spiritual salvation. | 14.   McShane Decl., ¶¶ 18-19 and Exh. 110 at 153-55 (*What is Scientology?* book); Supp. Brody Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 65:15-66:7. |
| 15.    Scientology's practices include "training" and "auditing." | 15.  McShane Decl., ¶¶ 22-23. |
| 16.    The doctrine and practices of the | 16.  McShane Decl., ¶ 11; Supp. Brody |

- 7 -

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| Scientology religion are known as Scientology's religious "technology." | Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 49:22-50:7. |
| 17.   Scientology posits that training involves the study of the Scripture of Scientology.  Training is provided through Scientology courses.  Auditing is a unique form of spiritual counseling. Spiritual freedom in Scientology requires the wisdom acquired through Scientology training, along with the application of that wisdom through auditing. | 17.  McShane Decl., ¶¶ 22-23. |
| 18.   Scientology auditing is ministered in confidential one-on-one sessions between a specially trained individual called an auditor and a parishioner. Auditing uses "processes": exact sets of questions asked or directions given by an auditor which, according to Scientology, help a person locate areas of spiritual distress.  There are many different auditing processes. | 18.  McShane Decl., ¶¶ 24-26; Supp. Brody Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 52:10-24. |
| 19.   Auditing is supervised by a trained "Case Supervisor" ("C/S"), who must first be trained as an auditor.  The C/S's role is to see that the auditing is | 19.  McShane Decl., ¶ 30. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| ministered in a correct orthodox manner. | |
| 20. In auditing, an auditor uses the Hubbard Electropsychometer, or "E-Meter," which Scientology posits helps the auditor and parishioner locate areas of spiritual distress. | 20. McShane Decl., ¶ 28; Exh. 110 (*What is Scientology?*) at 165-167 (photo of E-Meter). |
| 21. The Church of Scientology International ("CSI") is a not for profit religious corporation incorporated in the State of California. | 21. Cartwright Decl. ¶ 3. |
| 22. CSI is the "Mother Church" of the Scientology religion, and is dedicated to the advancement and dissemination of the religion. CSI's ecclesiastical authority extends to overseeing the proper administration of all Scientology churches and missions worldwide, disseminating the beliefs and practices of Scientology and providing religious services and training to its own staff members. | 22. Cartwright Decl. ¶¶ 3, 5,11. |
| 23. The United States Internal Revenue Service has recognized CSI as a tax-exempt church under U.S. law. | 23. Cartwright Decl. ¶ 4 & Exh. 115 (1993 CSI Exemption Letter), Exh. 116, (1998 letter reaffirming exemption). |
| 24. All CSI staff belong to the Scientology religious order known as | 24. Cartwright Decl., ¶ 6. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| the Sea Organization, or "Sea Org." | |
| 25. In order to qualify to join the Sea Org, a Scientologist must undertake extensive training and study, pass a fitness examination, and receive certification that he or she is qualified for the rigors of Sea Org life. | 25. McShane Decl. ¶ 51; Brody Decl., Ex. A (Marc Headley Depo.), at 195:1-4; 198:11-199:25; 200:17-20; Exh. 6 (Fitness Board Certificate); Flinn Decl., ¶ 35. |
| 26. Sea Org members sign a symbolic commitment of one billion years of service, reflecting their dedication to service in furtherance of the Scientology religion and the salvation of humanity and their awareness of themselves as immortal spiritual beings. Because of this commitment, it is exclusively from the Sea Org that the senior leadership of all Scientology churches is drawn, including the entire staff of senior management and Advanced Scientology churches. | 26. Brody Decl., Exh. A (Marc Headley Depo.) at 198:11-14, 360:23-361:12; Exh. 36 (Sea Organization Religious Commitment); Cartwright Decl., ¶ 7; Exh. 119 (sample Sea Org Contract); McShane Decl., ¶ 50; Supp. Brody Decl., Exh. B (Jefferson Hawkins June 10, 2010 Depo.) at 175:21-22; Exh. C (Stephen Hall June 3, 2010 Depo.) at 86:6-24. |
| 27. Sea Org members take vows as set forth in The Code of a Sea Org Member. The taking of such vows is repeated at Sea Org ceremonies that take place annually. Among the vows are: "3. I promise to use Dianetics and | 27. Brody Decl., Exh. A (Marc Headley Depo.) at 202:19-204:13, Exh. 4 (Code of a Sea Org Member); McShane Decl., ¶ 53. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| Scientology for the greatest good for the greatest number of dynamics," "8. I promise to take responsibility for the preservation and the continued full and exact use of the technologies of Dianetics and Scientology," and "11. I promise to accept and fulfill to the utmost of my ability the responsibilities entrusted to me whatever they may be and wherever they may carry me in the line of duty." | |
| 28. Sea Org members are assigned by Scientology ecclesiastical leadership to positions with Scientology churches throughout the world, and may be and often are re-assigned to different positions, varying duties and responsibilities, and different churches throughout their service. | 28. McShane Decl., ¶ 54, Brody Decl., Exh. 4 (Code of a Sea Org Member #11). |
| 29. Each Sea Org member who is a staff member of CSI works within CSI as part of that religious commitment. Prior to joining the Sea Org, staff members are advised and recognize in writing that they should not expect to receive material compensation for their | 29. Brody Decl. Exh. A (Marc Headley Depo.) at 265:16-266:6, Exh. 10 (Declaration of Religious Commitment) at 1; Cartwright Decl., ¶¶ 7-8; Supp. Brody Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 83:18-84:9. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| service as a Sea Org staff member, which they periodically reaffirm. | |
| 30.   Sea Org members share tradition and lifestyle.  They wear uniforms when on duty and have a merit-based maritime ranks and rating system and etiquette.  Sea Org members live communally and eat in common dining halls.  All living necessities are provided – berthing, food, uniforms, transportation, medical, dental, etc.  All are expected to devote at least two and a half hours to religious study per day.  Additionally, they generally receive a small weekly allowance for personal incidentals, but are not paid a salary and do not expect one. | 30.   Brody Decl. Exh. A (Marc Headley Depo) at 384:3-6, Ex. 36 (Declaration of Religious Commitment, signed by Headley on May 12, 2000); Cartwright Decl. ¶ 9; Supp. Brody Decl., Exh. B (Jefferson Hawkins June 10, 2010 Depo.) at 175:23-176:19. |
| 31.   The Sea Org requires a level of commitment and has all the attributes "typical of religious orders throughout history.  …  All of these types of religious activities Scientology shares with members of religious orders around the world.  This spiritual communal life allows the Sea Organization to fulfill its high religious mission, the preservation | 31.  Flinn Decl., ¶¶ 35, 37. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| and transmission of the teachings of L. Ron Hubbard and the careful and exact preservation and delivery of the training and auditing (*i.e.*, religious counseling) technology." | |
| 32. Scientology has a system of ethics and justice, which is summarized in the book, *Introduction to Scientology Ethics*. An essential precept of that system is that if one has acted unethically, one cannot achieve spiritual progress, and will act in a manner contrary to the survival of oneself, one's family, one's group and all mankind. In Scientology, such a harmful unethical act is referred to as an "overt." An overt may be a transgression in a past lifetime (known as "whole track"), consistent with Scientology beliefs in the concepts of past lifetimes. Once a person commits an overt act, he or she will often withhold from others the commission of that act. This is called a "withhold." | 32. McShane Decl., ¶¶ 33-45, Exh. 113 (*Introduction to Scientology Ethics*) at 63-66, Exh. 111 (*Auditor's Rights Modified*) at 2, Exh. 112 (Excerpt from *Science of Survival*) at 149-150. |
| 33. Scientology posits that only individuals who are acting according to | 33. McShane Decl., ¶ 38. |

- 13 -

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| proper ethical precepts can advance spiritually, and, indeed, unethical behavior can impede the spiritual progress not only of the individual but also, if the individual is a church staff member, of the church itself. | |
| 34. Sea Org members are expected to comply strictly with Scientology's system of ethics and justice. If a Sea Org member is found to have acted outside the ethical principles, he/she may be subject to ecclesiastical discipline. The form of the discipline varies on a gradient in proportion to the seriousness of the offense, from a verbal warning or rebuke, to temporary loss of privileges, to removal from post and assignment to a post with less responsibility, to manual labor such as gardening, kitchen duty, etc., to expulsion from the group. | 34. McShane Decl., ¶ 56, 56 b. |
| 35. Serious offenses are brought before a Committee of Evidence consisting of other Sea Org members in good standing. A Committee of Evidence is defined as, "A fact finding body composed of impartial persons convened by a | 35. McShane Decl., ¶ 56 d, Exh. 113 (*Introduction to Scientology Ethics*) at 337-47. |

- 14 -

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| Convening Authority which hears evidence from persons it calls before it, arrives at a finding and makes a full report and recommendation to its Convening Authority for his or her action." These ecclesiastical fact finding bodies are governed by exact procedures set forth in Scientology scripture. Such a committee is required to confront the interested party with any evidence received and he may counter it with his own evidence or testimony. There are also specific procedures for recourse if the party disagrees with the committee's findings. | |
| 36.   If a Sea Org member is found to have committed serious ethical violations that justify expulsion, he/she may be offered the option of participation in a program of spiritual rehabilitation, called the Rehabilitation Project Force ("RPF"). (RPF members engage in religious study, auditing and training, and physical labor. After one "graduates" from the RPF, he/she will resume a Sea Org position, often of major responsibility.  No one is | 36.  McShane Decl., ¶ 56 e, Exh. 114 (Crime Additions); Supp. Brody Decl., Exh. F (Bernard Headley June 4, 2010 Depo.) at 27:21-28:14. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| forced to participate in the RPF; if one refuses, he/she simply will be expelled from the Sea Org and from all staff positions, and, depending on the nature of the ethical violation, perhaps the church. | |
| 37.    Neither Marc nor Claire Headley ever participated in the RPF. | 37.  McShane Decl., ¶56 e; Brody Decl., Exh. 10 (Declaration of Religious Commitment). |
| 38.    The Scientology Scriptures provide an accepted procedure, called "Routing Out", by which a Sea Org member may withdraw his/her vows and leave the Sea Org, while still maintaining a relationship with the Scientology churches and religion.  A person who has routed out becomes a "public" Scientology parishioner.  The process involves submission of a "leaving staff" routing form, participation in ethics and justice procedures, including ethics confessionals, and can take several weeks or even months. | 38.  McShane Decl., ¶ 57, Brody Decl., Exh. A (Marc Headley Depo.) at 888:7-19; Supp. Brody Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 152:17-153:4; Exh. D (Warren McShane June 9, 2010 Depo.) at 367:13-23; |
| 39.    While participating in the process of routing out, a Sea Org member is excused from his post, but is expected to continue to contribute by performing | 39.  McShane Decl., ¶ 57; Supp. Brody Decl.,  Exh. A (Michael Norton June 7, 2010 Depo.) at 87:12-88:24. |

- 16 -

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| chores, such as gardening, cooking, cleaning, painting, etc. Numerous Sea Org members have chosen to route out due to changes in their life or commitment, while remaining Scientologists in good standing. | |
| 40. If a Sea Org member chooses to leave without routing out, other Sea Org members may attempt to convince or persuade him/her to stay or to return; such efforts are a natural and inevitable outgrowth of the belief among Sea Org members that they are attempting to achieve the salvation of the individual and the clearing of the planet. Such efforts sometimes have included locating the person who left, and attempting to meet and/or discuss with him/her the reasons for leaving and to convince the person to return. If the person insists on leaving or refuses to return, he/she may be subject to ecclesiastical discipline, including, but not necessarily, being declared a "suppressive person", which is the functional equivalent of being shunned | 40. McShane Decl., ¶ 58; Supp. Brody Decl., Exh. A (Michael Norton June 7, 2010 Depo.) at 26:9-23, 34:12-18; Exh. D (Warren McShane June 9, 2010 Depo.) at 367:24-368:6. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| or excommunicated. | |
| 41.   The United States Department of Homeland Security has found "that the Sea Org qualifies as a religious order [under written federal guidelines], and that its members practice a religious vocation," thereby permitting Sea Org members to enter the country under that rubric.  The Inland Revenue Department of the United Kingdom likewise has found that the Sea Org is a religious order and that "members of the Sea Organization are not workers as defined by [applicable British statutes] and that the National Minimum Wage Act does not appear to apply" to Sea Org members. | 41.   Cartwright Decl., ¶ 6; Exhs. 117 (Letter from Department of Homeland Security), 118 (United Kingdom Inland Revenue letter). |
| 42.   Golden Era Productions ("Golden Era"), an unincorporated division within CSI, plays a vital role in the teaching and dissemination of Scientology. Scientology's founder, L. Ron Hubbard established and directly worked with Golden Era with the express purpose of marking his films and lectures about Scientology broadly available to | 42.   Brody Decl., Ex. A (Marc Headley Depo.) at 659:9-18; Hill Decl., Exh. A (Claire Headley Depo.) at 888:14-18; Fraser Decl., ¶ 6; Cartwright Decl. ¶14; Supp. Brody Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 102:18-103:21. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| Scientology Churches, ministers, parishioners and the general public while maintaining strict orthodoxy. As plaintiff's wife, Claire Headley testified, it is "the dissemination org[anization] of Scientology." All products produced by Golden Era are intended to "induc[e] audience admiration, respect and impact that will forward swiftly the dissemination of Dianetics and Scientology". | |
| 43.   Golden Era creates and produces Scientology "religious films," videos, and other media at its facility at the International Base at Gilman Hot Springs, California, that are vital to the training of Scientology "auditors," who administer the central religious practice of auditing, and "course supervisors," who supervise the conduct and progress of the other central religious practice of Scientology training, provided through Scientology courses. Golden Era distributes these films to Scientology churches for training of auditors and course supervisors. | 43.   Fraser Decl. ¶¶ 5-9, 22; Brody Decl., Exh. A (Marc Headley Depo) at 737:2-21, 742:6-743:1; Exh. 60 (Tech Film Program). |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 44. These religious films are part of the Scientology Scripture and their production was a function that Mr. Hubbard himself performed, working with the staff of Golden Era and its predecessors, for several years in the 1970's and 80's. Golden Era produces films that were originally scripted by Mr. Hubbard who, to the devout Scientologist, is the original revealer or source of truth. After the films are produced to Mr. Hubbard's exact directions, they are formally approved by RTC and disseminated as canonical scripture-on-film. They hold equal status to Mr. Hubbard's written words | 44. McShane Decl. ¶11; Fraser Decl. ¶¶ 5-9; Flinn Decl. ¶46. |
| 45. In Headley's words, "L. Ron Hubbard had the concept that certain of his materials could not be duplicated [i.e., fully understood] by someone reading it off of a piece of paper or another person interpreting… what was on the paper and then training that person how to do [it]. So he wanted to produce these films to make it so people could see how he intended it." | 45. Brody Decl., Exh. A (Marc Headley Depo) at 692:12-693:7, Fraser Decl. ¶¶ 5-6. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 46. Golden Era also creates and produces public films and videos that are used to introduce the religion's basic concepts to the general public and to explain and depict different aspects of the Scientology religion. Such films and videos are shown on television monitors and film rooms in large public areas in every scientology church, and at events put on by the Church. These materials are "meant to get people into Scientology. It's meant to get new members, turn people into Scientologists...." These are referred to as Public Films. | 46. Brody Decl., Exh. A (Marc Headley Depo.) at 467: 4-21, 470:17-25, 744:24-745:7, 748:5-9; Exh. 61 (Public Film Program); Fraser Decl. ¶ 10. |
| 47. Headley explained, "They're called public films because they're for the broad public. They're meant to basically convince or enlighten somebody . . . so that they can participate in Scientology activities." | 47. Brody Decl., Exh. A (Marc Headley Depo.) at 748:5-9. |
| 48. Golden Era restores, translates into numerous languages, and reproduces Mr. Hubbard's 3,000 recorded Scriptural lectures about Scientology, first recorded forty to sixty years ago. | 48. Fraser Decl., ¶¶11-12, 27; Brody Decl., Exh. 54 (*The Path to Truth*); Supp. Brody Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 77:18-78:9. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 49. Sea Org members at Golden Era work to preserve Scientology's scriptural materials and mass produce them for Scientologists worldwide. | 49. Fraser Decl., ¶¶12, 27; Brody Decl., Exh. 54. |
| 50. Golden Era produces religious booklets, brochures, posters, still photography and artwork, as well as television, radio and Internet ads and feature-length programs for use in proselytizing the faith. | 50. Fraser Decl. ¶15. |
| 51. Golden Era also designs, creates and installs in Scientology churches, missions, and religious organizations audio visual systems to present to Scientology staff members, parishioners, and possible interested public the various audio and visual materials about Scientology that Golden Era produces. | 51. Brody Decl., Exh. A (Marc Headley Depo.) at 467:15-21, 759:8-15, Fraser Decl. ¶ 16. |
| 52. Among these audio visual systems are film rooms in each Scientology church where Mr. Hubbard's films are played for both parishioners and non-Scientologists. As Headley stated, "They have rooms in every single | 52. Brody Decl., Exh. A (Marc Headley Depo.) at 467:16-19, Fraser Decl., ¶16. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| organization, which I designed, that have the purpose of recruiting new members into Scientology, and they show them those films." | |
| 53.   Golden Era produces films and videos of Scientology meetings, celebrations and "events," which take place several times a year at locations around the world.  These convocations provide an opportunity for Church leaders to share with parishioner news and developments concerning the Church and the religion, and also serve as a source for soliciting contributions to the Church and its affiliated social welfare organizations.  The films and videos of such occasions are then shown in local scientology churches to parishioners who were unable to attend in person. | 53.  Brody Decl., Exh. A (Marc Headley Depo.) at 449:11-450:13, 454:19-25, Fraser Decl., ¶ 18; Supp. Brody Decl., Exh. C (Stephen Hall June 3, 2010 Depo.) at 126:25-129:25. |
| 54.   Golden Era also sometimes produces Public Service Announcements ("PSAs") for public audiences and videos to be shown at Scientology events on behalf of and at no cost to several other affiliated, non- | 54.  Brody Decl., Exh. A (Marc Headley Depo.) at 679:14-23, Fraser Decl., ¶¶ 19, 58. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| profit, tax-exempt organizations, including Youth for Human Rights International, The Way to Happiness Foundation International, Citizens Commission on Human Rights, and Foundation for a Drug Free World. These organizations are sponsored by CSI to carry on social betterment programs that are essential to the mission and purpose of the Scientology religion, as stated in the writings of L. Ron Hubbard. | |
| 55.  Golden Era produces E-Meters, which are religious artifacts used by Scientology ministers in providing auditing. | 55.  Brody Decl., Exh. A (Marc Headley Depo.) at 449:2-10, Fraser Decl., ¶ 20. |
| 56.  Golden Era distributes these materials to Scientology churches around the world.  Some of the materials, such as the lectures by Mr. Hubbard, are made available by the churches for sale to their parishioners. Most are for the internal use and display by the churches themselves.  Golden Era in no way competes with other entities in creating and distributing materials | 56.  Fraser Decl., ¶ 21, Brody Decl., Exh. A (Marc Headley Depo.) at 462:12-24, 662:22-663:11, 742:6-9, 743:17-25, 756:9-757:6, Exh. 60 (Tech Film Program), Exh. 61 (Public Film Program). |

- 24 -

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| about and for the Scientology religion. Indeed, no such competition is possible since the films and other media products about the religion are created by the Church to insure the requisite doctrinal knowledge and control. | |
| 57. Plaintiff Headley was raised as a Scientologist. | 57. Brody Decl., Exh. A (Marc Headley Depo.) at 135:2-6. |
| 58. In 1985, Headley began religious training by taking religious courses at several Scientology churches in the Los Angeles area, in the evenings, weekends and summer vacations. | 58. Brody Decl., Exh. A (Marc Headley Depo.) at 137:20-138:20, 140:25-141:3. |
| 59. Headley also received auditing as a teenager in these churches. | 59. Brody Decl., Exh. A (Marc Headley Depo.) at 182:7-17, Exh. 3 (Life History Form) at 6. |
| 60. In 1989, Headley applied to join the Sea Org and signed a billion year contract. | 60. Brody Decl., Exh. A (Marc Headley Depo) at 179:24-180:3, 180:14-21. |
| 61. Because of his youth, Headley was queried closely to verify his desire to join the Sea Org. The procedure required firm representations regarding his qualifications and history, parental approval, but most of all his own personal commitment. | 61. Brody Decl., Exh. A (M. Headley Depo.) at 182:7-17, 192:16-22, Exh. 3 (Life History Form, at 1-5 & attached handwritten pages). |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 62.  In his application, Headley represented that he had participated in auditing on his own initiative; that he received spiritual benefits from Scientology training and auditing; that none of his family members objected or criticized his decision to join the Sea Org; and that he was joining the Sea Org, "Because [I] want to clear the planet."  Headley was sincere when he answered these questions. | 62.  Brody Decl., Exh. A (Marc Headley Depo.) at 181:22-24, 182:7-17, 194:16-22, Exh. 3 (Life History Form), items 17, 18, 34-37, 48. |
| 63.  In May 1990, Headley was assigned a position at Golden Era. | 63.  Fraser Decl., ¶ 26; Brody Decl., Exh. A (Marc Headley Depo.) at 265:16-266:6, Exh. 10 (Declaration of Religious Commitment). |
| 64.  At the time, Headley wrote, "I joined the Sea Org because I know that this would be the only way that I would be able to fully contribute to clearing this planet. . . ." | 64.  Brody Decl., Ex. A (Marc Headley Depo.) at 248:21-249:2, Exh. 9 (Life History), at 5, item 48. |
| 65.  It is a fundamental goal of Scientologists to "Clear the Planet," meaning disseminate Scientology to enough people around the world through evangelical activities that the aims of Scientology are achieved. | 65.  Brody Decl., Exh. A (Marc Headley Depo.) at 183:18-184:7, McShane Decl., ¶ 21. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 66. Clearing the Planet means to spread Scientology over the world, so that all will experience the benefits of being a Scientology "Clear": a high level of spiritual awareness and ability in the religion. | 66. Brody Decl., Exh. A (Marc Headley Depo.) at 183:18-184:7, McShane Decl., ¶ 21. |
| 67. On May 31, 1990, Headley executed the Sea Org's covenant of religious commitment, which stated: "I am joining staff and becoming a member of a religious order, of my own free will, solely to help forward the religious goals and tenets of the Scientology religion and the Church and not for monetary gain, auditing or training." | 67. Brody Decl., Exh. A (Marc Headley Depo.) at 265:16-266:6; Exh. 10 (Declaration of Religious Commitment). |
| 68. When Headley arrived at Golden Era he understood that he would be paid a stipend of $50 a week, plus room and board and other incidentals. | 68. Brody Decl., Exh. A (Marc Headley Depo.) at 368:15-24. |
| 69. In 2002, Headley executed another covenant of religious commitment to the Sea Org. According to Headley, the covenant "says you were affirming your vows in the Church to help forward the religious goals and tenets of Scientology | 69. Brody Decl., Exh. A (M. Headley Depo.) at 381:2-11, 382:13-17, Exh. 39 (Declaration of Religious Commitment). |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| religion." | |
| 70.   At one time or another during Headley's tenure at Golden Era (1990 to 2005), he was involved in almost every facet of Golden Era's operations.  The main categories were creating films; copying, producing and packaging lectures by L. Ron Hubbard; overseeing the creation of technical (religious) films, films and videos for International Scientology events as well as videos of these events; and manufacturing E-Meters. | 70.  Brody Decl., Ex. A, (M. Headley Depo.) at 449:2-13, 685:25-686:8, Fraser Decl., ¶¶ 27-45. |
| 71.   Headley's greatest involvement was in the creation and production of the religious and public films and videos. | 71.  Brody Decl., Exh. A (Marc Headley Depo.) at 448:24-449:13, 461:10-19, 473:3-5. |
| 72.   When he began working at Golden Era, Headley worked as Pancake Quality Control (or "Pancake QC"). (The name "pancake" is an industry term which derives from the appearance of a very large reel of tape shaped like a pancake, from which numerous individual cassette cartridges are made.) The primary duty of this post was to | 72.  Brody Decl., Exh. A (Marc Headley Depo.) at 634:16-25, 636:12-637:2, 637:14-20, 638:17-20; Fraser Decl., ¶ 27. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| ensure the audio quality of the material on the pancake tape, before it was loaded into cassette blanks. The vast majority of material on the pancakes were lectures that Mr. Hubbard had given regarding Scientology principles and techniques. | |
| 73. The purpose of Headley's work as Pancake Quality Control was to ensure full duplication and use of Mr. Hubbard's technology for others to use. | 73. Brody Decl., Exh. A (Marc Headley Depo.) at 650:6-10, Exh. 54 (*The Path to Truth*); Fraser Decl., ¶ 28. |
| 74. When Headley was the Pancake Quality Control, Golden Era published a brochure called *The Path to Truth*, which in its Introduction states the following:<br><br>The scope of LRH materials is vast. He recorded thousands of taped lectures, and wrote millions of words. He ignored the vested interests, the barriers thrown in his path, and simply persevered to complete his research and make it available to each of us and to the world.<br><br>This is THE BRIDGE, the way for everyone on this planet – whether they know it or not – to reach total freedom and create a new civilization. ... | 74. Fraser Decl., ¶27, 28; Brody Decl., Exh. 54 (*The Path to Truth*). |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| Golden Era Productions was founded by Ron with the express purpose of making his taped lectures, films and E-Meters broadly available while maintaining the highest technical standards. | |
| 75. A photograph of Headley quality checking tapes appears in the brochure. The last paragraph of the introduction of this brochure states:<br><br>The final product of Golden Era Productions' tape production line is you, the listener, clearly hearing every word that Ron said in the lecture as if he was right there in the room with you. Our ultimate product is your full duplication and use of LRH's technology to move up the Bridge to Clear and OT. | 75. Fraser Decl. ¶26; Brody Decl., Exh. 54 (*The Path to Truth*) at 5. |
| 76. Headley worked on such religious lectures as "The Free Being," "Miracles," "The Hope of Man," "The Road to Truth," "The Soul – Good or Evil?", as well as the Professional TRs Course Lectures (TRs stands for Training Routines which are drills that teach auditors communication skills), Academy Levels 0, 2, and 4 (levels of auditor training), Skills of a Theta Being (theta refers to the Scientology belief | 76. Brody Decl., Exh. A (Marc Headley Depo.) at 733:19-734:7; Fraser Decl., ¶29. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| that people are "thetans," or immortal spiritual beings), the State of Man Congress, and Expansion of Havingness. | |
| 77.    As part of his training for this position, Headley was required to study the "Pancake Quality Control Checker Full Hat Checksheet."  The first item on the checksheet is the policy *Keeping Scientology Working, Issue 1.*  This policy is required at the beginning of the course.  It was required reading at the beginning of every course he studied at Golden Era. | 77.  Brody Decl., Exh. A (Marc Headley Depo.) at 650:12-651:3, 652:14-653:21, Exh. 55 (Pancake Quality Control Checker Full Hat Checksheet.) at 2, Fraser Decl., ¶ 30, Exh. 120 (*Keeping Scientology Working*). |
| 78.    In September 1992, while on the Pancake QC post, Headley took another course during his required staff study time, containing a summary of basic Scientology policies, Volume 0 of the Organization Executive Course ("OEC"). | 78.  Fraser Decl., ¶ 31, Exh. 121 (OEC Vol. 0 Checksheet). |
| 79.    A policy letter which Headley studied on the OEC course was *The Theory of Scientology Organizations*. | 79.  Fraser Decl., ¶ 32, Exh. 121 (OEC Vol. 0 Checksheet) at 7, Exh. 122 (*The Theory of Scientology Organizations*). |
| 80.    On the OEC course, Headley attested that he read and understood the | 80.  Fraser Decl., ¶ 33, Exh. 121 (OEC Vol. 0 Checksheet) at 14, Exh. 123 (*A Staff* |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| policy *A Staff Post.* This policy closes with, "A post in this organization is a trust…. If anyone cannot conceive of his post as a trust with this mission, he has no business here." | *Post).* |
| 81.   On the OEC course, Headley also studied HCO Policy Letter *Third Dynamic Tech*, HCO Policy Letter *Code of a Scientologist,* HCO Policy Letter *The Basics of Ethics*, HCO Policy Letter *Auditors*, HCO Policy Letter *O[verts]/W[ithholds] Write-ups.* | 81.   Fraser Decl., ¶ 34, Exh. 121 (OEC Vol. 0 Checksheet) at 6, 10, 24, 26. |
| 82.   Headley also studied the Hubbard Life Orientation Course, which included chapters on "The [Eight] Dynamics of Existence," and "Disclosing Overts and Withholds." | 82.   Fraser Decl., ¶ 35. |
| 83.   Headley took other courses in which he studied numerous writings by Mr. Hubbard, including HCO Bulletin *Training Drills Re-modernized,* *Introduction to Scientology Ethics* and HCO Bulletin *Scientology: Current State of the Subject, and Materials.* | 83.   Fraser Decl., ¶ 35. |
| 84.   Headley was promoted to the position of "Quality Control" in April | 84.   Brody Decl., Exh. A (Marc Headley Depo.) at 686:12-687:4, 873:10-874:6; |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1993, a post which he held until July 1995. When offered this promotion, he "loved the idea." "I was now over all quality control. I would walk all over the base and check different tapes, films, videos and systems." His wife, whom he refers to as "a real strait-laced Sea Org member," was very proud of him and was "happier" now that he had a "respectable position." | Exh. 63 (*Blown for Good*) at 164-65, Fraser Decl., ¶ 36. |
| 85.   As Quality Control, his function included general quality control for all products produced at Golden Era, including Mr. Hubbard's lectures and other audio-cassettes, Scientology training and informational films, as well as videos produced for events in English and other languages. | 85.  Brody Decl., Exh. A (Marc Headley Depo.) at 686:12-687:4, 689:17-19; Fraser Decl., ¶ 36. |
| 86.   As the Quality Control post was located within the Executive Division of Golden Era, Headley was required to take the Gold Executive Basic Course. The intended result for one studying this course was: <br><br> A Gold executive who knows the LRH policies specifically written for Gold as an organization and | 86.  Brody Decl., Exh. A (Marc Headley Depo.) at 696:1-15, 699:13-700:19, Exh. 57 (Gold Executive Basic Course) at 1. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| who can use these as tools to manage his or her section of the org[anizing] board exactly as intended by LRH. | |
| 87. As part of Headley's training for the Quality Control post, he was also required to study the Cine Basics Course. (Cine is short for cinematography.) He studied this course because he would be quality controlling film products produced by Golden Era. | 87. Brody Decl., Exh. A (Marc Headley Depo.) at 688:25-689:19, Exh. 56 (Cine Basics Course). |
| 88. As part of the Cine Basics Course, Headley watched L. Ron Hubbard's Training Routine Instruction Film #4, "The Professional TR Course," (TR stands for Training Routine.) After watching this film, Headley did a writeup stating what he had observed with respect to the following question: "Is this product capable of inducing audience admiration, respect, impact that will forward swiftly the dissemination of Dianetics and Scientology?" As part of this course, Headley also watched E-Meter Instruction Film #2 "The Tone Scale, | 88. Brody Decl., Exh. A (Marc Headley Depo.) at 693:23- 694:16, Exh. 56 (Cine Basics Course) at 5, 13. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| and studied L. Ron Hubbard's *Dianetics '55!* | |
| 89.  One of Headley's functions as Quality Control was to ensure that the products he reviewed were capable of inducing audience admiration, respect and impact that will forward swiftly the dissemination of Dianetics and Scientology. | 89.  Brody Decl., Exh. A (Marc Headley Depo.) at 695:16-25. |
| 90.  From July to November 1995, Headley was posted as the Audible Quality Control, another position relating to the quality control of cassettes being produced by Golden Era. | 90.  Brody Decl., Exh. A (Marc Headley Depo.) at 732:24-733:9, Fraser Decl., ¶ 38. |
| 91.  Between November 1995 through 2002, Headley's primary function was the production of religious films and videos in the Golden Era Cinematography ("Cine") Division. Some of these films are referred to as "tech films", because the religious practices of auditing and training are often referred to as the "technology" or "tech" of Scientology.  During this time, Headley's work was divided about 50-50 between tech films and videos.  He | 91.  Brody Decl., Exh. A (Marc Headley Depo.) at 461:10-19, 473:3-5, Fraser Decl., ¶ 39. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| shot over 200 videos and "tons and tons of films." | |
| 92.   Headley was required to read L. Ron Hubbard's script for each film before shooting it. | 92.  Brody Decl., Exh. A (Marc Headley Depo.) at 478:21-479:1. |
| 93.   From December 1995 to August 1999, Headley was the Shoot Crew Chief at Golden Era, i.e., the person who runs the crews that shoot religious films about Scientology. | 93.  Brody Decl., Exh. A (Marc Headley Depo.) at 352:12-24, 734:19-22, Fraser Decl., ¶ 39. |
| 94.   From August 1999 to August 2002, Headley was the Pre-Production Director and managed the pre-production functions for films and videos. | 94.  Brody Decl., Exh. A (Marc Headley Depo.) at 351:9-20, 734:23-735:1, Fraser Decl., ¶ 39. |
| 95.   While on this post, Headley studied a revised course for Volume 0 of the OEC, which contained additional training drills and practical exercises. After reading "The Code of a Scientologist" he wrote an essay on "what you will do from your post to forward each point of the Code of a Scientologist."  In this essay he wrote:<br><br>What I can do from my post to forward each point of the Code of a Scientologist is to get the films | 95.  Fraser Decl., ¶ 40, Exh. 124 (Revised OEC Checksheet) at 33, Exh. 125 (Essay on the Code). |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| out that we've got to produce. Those films address the exact parts of the code as well as assist in making the code happen for all Scientologists. | |
| 96.   Headley wrote another essay as part of this course, stating in part, "My post is the Pre Production Director…. Some of the purposes [of the post] are getting films out to the public so more people will get on the Bridge, getting A/V products out to different sectors so that they can get LRH Tech into new countries & areas." | 96.  Fraser Decl., ¶ 41, Exh. 124 (Revised OEC checksheet) at 13, Exh. 126 (Essay on purposes). |
| 97.   From August 2002 to November 2003, Headley held the position of Assistant Producer for Films, Video and Slide Shows, during which time he was responsible for the production of training films for auditors, public films about Scientology, videos and slides shows. | 97.  Brody Decl., Exh. A (Marc Headley Depo.) at 735:4-19, Fraser Decl., ¶ 43. |
| 98.   While on this post, in January 2003, Headley wrote a "Tech Films Production Program." Its purpose was "to produce the backlogged tech film properties that are needed for orgs and | 98.  Brody Decl., Exh. A (Marc Headley Depo.) at 737:14-19, Exh. 60 (Tech Film Program). |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| missions and to get the export of these done so that they get properly released and used." | |
| 99.    This was considered an urgent and important program: "It was still urgent and important because it hadn't been done in 30 years and it was, the intention was yes, we need to get this done.  L. Ron Hubbard said to do it 30 years ago and it's still not done.  So yeah, we need to get it done." | 99.  Brody Decl., Exh. A (Marc Headley Depo.) at 742:6-743:1. |
| 100. Around the same time, Headley also wrote a "Public Films Production Program," whose purpose was "to produce the backlogged public film properties that are needed for orgs and missions and to get the export of these done so that they get properly released & used." | 100. Brody Decl., Exh. A (Marc Headley Depo.) at 744:24-745:7, 746:21-747:5, Exh. 61 (Public Film Program). |
| 101. One group of Tech Films deals with auditor Training Routines, or TR's, which show how to conduct an auditing session.  Headley worked on the following films from this category:<br>    - "*TR 1, TRs in Life.*"  In addition to its use in training auditors, this film is | 101. Brody Decl., Exh. A (Marc Headley Depo.) at 465:7-21, 466:23-467:3, 470:3-8, 472:17-19, 473:10-17, 475:22-476:25, 477:1-10, 478:17-479:14, 479:24-480:8, 743:17-744:16, Fraser Decl., ¶ 42. |

- 38 -

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| sometimes played in Scientology churches for "the purpose of recruiting new members into Scientology." <br><br> - "*TR 5, Why TRs*"?  This shows the importance of TRs, even in future lifetimes. <br><br> - "*TR 9, The Auditor's Code.*" This explains the code of conduct for Scientology ministers. <br><br> - "*TR 12, Solo Auditor's Course.*" The solo course is to train a person to be a solo auditor so they can do advanced levels of auditing in Scientology. <br><br> - "TR 13, The Session." This tells about a man who is given an auditing session by a Scientology Chaplain. <br><br> - "*TR 16 Ultimate TRs – Beingness.*"  "TRs stands for Training Routines" which are "drill[s] for auditors to drill -- really the procedure of how to do a session." | |
| 102. Other technical training films teach auditors about the E-Meter.  Headley worked on several films of this type including: <br><br> - "*EM 1, Man the Unfathomable.*" | 102. Brody Decl., Exh. A (Marc Headley Depo.) at 464:6-465:6, 465:22-24, 478:8-16, 744:17-20, Fraser Decl., ¶ 42. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| - "*EM 3, History of the E-meter*". <br> - "*EM 9, E-Meter Reads Film.*" This is a "demonstration of the various manifestations of the E-Meter to train people as to … what they mean." <br> - "*EM 10, PC Indicators*". "PC" stands for preclear, "someone who is being audited in a Scientology auditing session." An "Indicator" is "some manifestation in the preclear that tells [the auditor] whether the session is going right or wrong." | |
| 103. Headley also worked on a number of public films, which are "meant to get new people into Scientology." These include: <br> - "*Orientation.*" This is shown to "literally every Scientologist" to "orient them as to the scope and practice of Scientology generally." According to Headley, "it's main use is to get people into Scientology and tell them what Scientology is about…" <br> - "*Dianetics Evolution of a Science.*" This is shown to people who have "no understanding or knowledge of | 103. Brody Decl., Exh. A (Marc Headley Depo.) at 467:4-21, 468:5-469:2, 470:17-25, 471:10-19, 471:20-472:4. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| Scientology," to get them to "sign up for some kind of service."<br><br>        - "*Dianetics, the Original Thesis.*" This is intended to get new people interested in Dianetics and signed up for services.<br><br>        - "*The Married Couple.*" This is a public film about Scientology marriage counseling. | |
| 104.  Headley worked on the restoration of a 1965 film of an interview with L. Ron Hubbard about Scientology entitled "Introduction to Scientology." Golden Era produced "thousands and thousands of copies" of this video in at least 26 different languages. | 104. Brody Decl., Exh. A (Marc Headley Depo.) at 459:16-21, 460:5-17, 755:12-20. |
| 105.  Headley also worked on "registration films" which are meant to encourage Scientologists to get auditing. There are about 50 such films, including the "Solo Course Registration Film" and "Advice to Persons Getting Audited." | 105. Brody Decl., Exh. A (Marc Headley Depo.) at 469:3-11, 470:3-16. |
| 106.  Headley worked on a slide show entitled "The History of the Sea Org," the purpose of which was to get people to join the Sea Org. According to | 106. Brody Decl., Exh. A (Marc Headley Depo.) at 751:19-24. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| Headley, "It basically says…that the only thing that can save the entire universe is the Sea Organization." | |
| 107. Scientologists celebrate seven holidays of their religion each year: New Years; the anniversary of L. Ron Hubbard's birthday (March 13); the anniversary of the publication of *Dianetics* (May 9); the anniversary of the maiden voyage of the *Freewinds* motor vessel (June 6); the anniversary of the restoration of Church of Scientology Celebrity Centre International (July 25); Auditors Day (the second Sunday in September); and the anniversary of the founding of the International Association of Scientologists (October 7).  There are international celebrations ("events") connected with each of these. | 107. Brody Decl., Exh. A (Marc Headley Depo.) at 449:11-450:13, Fraser Decl., ¶ 18. |
| 108. Headley was involved in the filming, editing, voice-overs, introductions and distribution of the videos of these holiday events.  Videos of these events are distributed to Scientology churches around the world | 108. Brody Decl., Exh. A (Marc Headley Depo.) at 454:19-25, Fraser Decl., ¶ 18. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| to be shown to assembled members. | |
| 109. In November 2003, Headley was promoted to the position of Producer. | 109. Brody Decl., Exh. A (Marc Headley Depo.) at 752:12-15, Fraser Decl., ¶ 43. |
| 110. In his training for the post of Producer, Headley studied policies which identified the "product" of this post: "A Producer who is oriented to Gold being the central dissemination organization of Dianetics and Scientology internationally." | 110. Fraser Decl., ¶ 44, Exh. 127 (Producer Mini Hat Checksheet) at 2. |
| 111. In his training for the post of Producer, was required to write an essay on the following: Consider Scientology's rate of expansion…. Describe what the correct order of magnitude is for Gold's production. | 111. Fraser Decl. ¶44, Exh. 127 (Producer Mini Hat Checksheet) at 2. |
| 112. Headley's second area of major responsibility at Golden Era was on the design, creation, and installation of audio visual systems and film rooms to be used in Scientology churches that play or show Mr. Hubbard's lectures and other materials produced by Golden Era, that enable a parishioner to listen to a sample of a lecture, and that are used in the public areas of churches where | 112. Brody Decl., Exh. A (Marc Headley Depo.) at 430:17-24; 467:4-21, 758:18-23, 759:8-15, 805:17-806:11, Fraser Decl., ¶ 46. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| new people can learn about the Scientology religion. As Headley put it, "to get people into Scientology." | |
| 113. Regarding his work on the design and installation of audio-visual systems, Headley wrote that it was something he "truly loved and had fun while doing it." While on that position, Headley believed that, "It was actually going very well. . . ." He stated, "I had more cumulative experience than anyone at the Base. . . . I was doing well. I was getting stuff done. I was producing high quality systems that were being installed all over the world." | 113. Brody Decl., Exh. A (Marc Headley Depo.) at 430:25-431:7, Exh. 63 (*Blown for Good*) at 265, 283, 286. |
| 114. Headley testified concerning his time at Gold that, "I wasn't saying to myself I'm being held against my will.... whether or not I was being held against my will, I don't think I thought those thoughts" | 114. Brody Decl., Exh. A (Marc Headley Depo.) at 999:18-22. |
| 115. Headley wrote about Claire that "she is the only reason I had stayed there on a number of occasions. If I had not married her, I figure that I would have left at least 4 or 5 times earlier." | 115. Brody Decl., Exh. A (Marc Headley Depo.) at 894:21-895:3, Exh. 63 (*Blown for Good*) at 312. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 116. After Headley arrived at Golden Ear, he lived at Kirby Garden Apartments, an apartment complex on a public street in Hemet, California, 15 minutes by car from Golden Era. | 116. Brody Decl., Exh. A (Marc Headley Depo.) at 289:14-290:20, 311:9-312:21, Exh. 25 (Photo of Kirby Apts.); Fraser Decl., ¶ 60; Supp. Brody Decl., Exh. A (Michael Norton June 7, 2010 Depo.) at 15:8-11; Exh. B (Jefferson Hawkins June 10, 2010 Depo.) at 26:7-9. |
| 117. The building had a swimming pool and lawn chairs where, Headley wrote, he got "a serious tan." | 117. Brody Decl., Exh. 63 (*Blown for Good*) at 110. |
| 118. After living at the Kirby, the Headleys lived at the Vista Garden Apartments which are in San Jacinto, 15 minutes from the Gold base. He travelled to Golden Era on a Church bus or by driving his own or a church vehicle. | 118. Brody Decl., Exh. A (Marc Headley Depo.) at 290:15-20, 313:19-315:1, Exh. 26 (Photo of Vista Garden Apts). |
| 119. Headley often left Golden Era to go into Hemet to shop, go to restaurants and do errands. | 119. Brody Decl., Exh. A (Marc Headley Depo.) at 498:23-499:13, 501:2-7, 506:24-25, 516:16-517:1, 517:12-20, 519:13-520:23. |
| 120. As part of his duties while working at Golden Era, Headley traveled "all over Lost Angeles," to Arizona, New York, Florida and Europe, including living in Copenhagen for three months. | 120. Brody Decl., Exh. A (Marc Headley Depo.) at 352:19-353:15, 354:10-21, 355:4-12, 452:3-15, 513:6-14, 580:23-581:20, 582:24-583:5, 723:12-20, 728:15-729:9, 805:20-806:11; Supp. Brody Decl., |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| He visited about a hundred different Scientology churches around the world in doing so. | Exh. B (Jefferson Hawkins June 10, 2010 Depo.) at 160:12-161:9. |
| 121. During his time at Golden Era, Headley visited friends and family in the Los Angeles area. He also attended public church functions with his wife in Los Angeles. | 121. Brody Decl., Exh. A (Marc Headley Depo.) at 317:6-319:2, 319:15-321:21, 578:18-580:19, 581:21-582:23 Exhs. 27-30 (Photos of the Headleys); Supp. Brody Decl, Exhs. 527-2, 527-5, 527-7, 527-8, 527-9, Exh. E (Marc Headley June 15, 2010 Depo.) at 1216:11-18, 1218:1-12, 1219:10-1220:10. |
| 122. Headley visited and maintained a relationship with his father who lived in Kansas and other non-Scientologist relatives who lived out of state. | 122. Brody Decl., Exh. A (Marc Headley Depo.) at 346:18-24, Exh. 32 (Life History Update) at 4. Supp. Brody Decl., Exhs. 6, 7, Exh. F (Bernard Headley June 4, 2010 Depo.) at 12:6-16:18; 16:19-18:25; 19:11-20:7; 21:14-24:20. |
| 123. In 2000, Headley and his wife (Claire) moved into one of several houses owned by the Church on a public street adjacent to Golden Era, Sublette Road. At the west end of Sublette there was a locked gate onto Golden Era's property. Headley and his wife had the combination to the lock, as did the several other Golden Era staff who lived | 123. Brody Decl., Exh. A (Marc Headley Depo.) at 289:8-21, 292:21-293:6, 296:1-297:4, 298:8-14, 299:18-300:6, 301:8-302:4, 302:12-19, 303:5-12, 304:1-7, 306:3-16, 307:22-308:4, 308:7-23, 309:13-310:5; Exhs. 12-24 (Photos of Sublette Rd.); Hill Decl., Exh. A (Claire Headley Depo.) at 161:2-3; Fraser Decl., ¶ 60. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| in houses on Sublette Road.  Headley typically came and went onto the property through that gate. | |
| 124.  Headley had "at least three or four different motorcycles" when he lived on Sublette Road. | 124. Brody Decl., Exh. A (Marc Headley Depo.) at 290:23-291:10. |
| 125.  While a staff member of Golden Era, Headley owned and drove motorcycles and a jeep (for one year).  He had access to and used several automobiles. | 125. Brody Decl., Exh. A (Marc Headley Depo.) at 290:23-291:10, 314:16-315:1, 497:20-498:1, 501:15-23. |
| 126.  While living in the Sublette Road houses, the Headleys owned a dog.  Headley often came home to feed and exercise his dog.  He would also often go home to eat dinner and then return to work. | 126. Brody Decl., Exh. A (Marc Headley Depo.) at 303:21-305:9, 315:2-16; Supp. Brody Decl, Exhs. 527-6, Exh. E (Marc Headley June 15, 2010 Depo.) at 1218:13-20. |
| 127.  Headley had two bank accounts and a PayPal account.  He had a cell phone and access to his wife's cell phone. He also "had a laptop that [he] always used that had Internet access if [he] needed it [to] . . . orchestrate an escape on the fly depending on the situation." | 127. Brody Decl., Exh. A (Marc Headley Depo.) at 109:17-24, 112:2-5, 276:3-11, 509:13-16, Exh. 63 (*Blown for Good*) at 267; Hill Decl., Exh. A (Claire Headley Depo.) at 135:3-7. |
| 128.  The one and only time Headley | 128. Brody Decl., Exh. A (Marc Headley |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| told Golden Era officers he wanted to leave was in 1990, shortly after his arrival, because he was having difficulty with his work. He spoke to the person in charge of personnel and ethics: "She said what do you want to do?  I said I want to leave.  She gave me – gave me a staff member, leaving staff member, leaving staff routing form.  She went to the desk, gave me the form."  The routing form set forth the procedure for members of the religious order to terminate their status.  It included steps appropriate to the religion, including a confessional, legal documents, and signing exit documents.  Headley states, "There was a whole list of all these things that I would have to do in order to be able to leave.  And I said no, that's it, I'm leaving, I'm not doing all this." Headley testified that the security chief for Gold then told him that if he left without routing out, he risked being declared and losing contact with family members who were Scientologists. | Depo.) at 338:5-14, 339:24-340:14, 885:14-886:13, 887:16-888:20, 889:13-18, 893:25-894:15. |
| 129. Headley took a walk around the | 129. Brody Decl., Exh. A (Marc Headley |

- 48 -

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| Base and debated to himself whether to route out, leave without routing out, or stay.  Greg Wilhere, a senior ecclesiastical official, approached him and hypothesized that his problems at work might be related to poor vision, and suggested he see an eye doctor. Headley took up the suggestion and drove a moped into Hemet to do so.  He was alone.  He stopped at a gas station. He writes, "I pumped the gas. Decisions. Decisions.  I had made it this far.  Should I go to the optometrist? Should I make a run for it? Should I just drive back? … I decided to get the eye exam."  Headley concluded, "I had managed not only to weasel out of getting in trouble, but had also made a few friends in high places … I had graduated from being the 'new guy' to knowing that I could get away with a bit more if I played my cards right." | Depo.) at 889:21-890:1, 891:3-7, Exh. 63 at 127, 131-32, 134. |
| 130. Between the time of this incident in 1990 and January 2005 when he left "for good," Headley never again asked or told anyone that he wanted to route | 130. Brody Decl., Exh. A (Marc Headley Depo.) at 894:6-15. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| out or otherwise leave Golden Era. | |
| 131. Headley had run into problems regarding his job performance on and off over the years.  In late 2000 or early 2001, he was criticized for perceived errors and negligence in shooting a film.  Following this, Claire sent him a letter stating that he had been "involved in out-ethics and non-production on the 3rd dynamic [the group, in context, the Sea Org and Golden Era], [and had] become a distraction" both to Golden Era and to her, and demanded that he "once and for all change [his] ways…"  Marc wrote back: "I agree!" | 131. Hill Decl., Exh. A (Claire Headley Depo.) at 867:6-12, 867:16-868:3, 864:12-20, Exh. 66 to Claire Headley Depo. (Letter to Marc Headley) at 1, 3. |
| 132. In March 2004, Headley was demoted for poor job performance and "financial irregularities", and subjected to disciplinary action (manual labor).  After two days of this labor, "I was basically given a second chance to redeem myself." | 132. Brody Decl., Exh. A (Marc Headley Depo.) at 431:11-17, 752:12-15, 912:8-15, Exh. 50 (Fitness Board Certificate). |
| 133. Headley was demoted for several months to a lower level position, but in October 2004 he was promoted again to the post of A/V Systems Officer, where | 133. Brody Decl., Exh. A (Marc Headley Depo.) at 430:17-431:7, Exh. 63 (*Blown for Good*) at 286. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| he believed he was doing "very well" and "getting stuff done." | |
| 134. In November 2004, Headley received a Fitness Board review of his performance. This Board found that, "Marc has repeated non-compliances to get [sic] systems properly planned, designed, manufactured and approved for international export to orgs …." Reciting several examples, the Fitness Board found Headley to have an ethics record that was "unacceptable," with a history of "being irresponsible in other executive positions". The Fitness Board took Headley's past production of Tech and Public films into account, as well as the remorse he expressed for his current malfeasance, and issued him a three-month probational fitness certificate. One condition of the "probation" was for Headley to "handle the planning and production of all org systems." | 134. Brody Decl., Exh. 50 (Fitness Board Certificate). |
| 135. In late 2004, Headley sold off surplus Golden Era equipment on eBay, claiming it was to fund new purchases, but used his personal PayPal account to | 135. Brody Decl., Exh. A (Marc Headley Depo.) at 276:8-15, 279:15-:25, Fraser Decl., ¶ 49. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| collect the receipts, resulting in accusations that he had engaged in peculations. | |
| 136. Headley and his wife went to the Church's New Year's event December 28, 2004 at the Shrine Auditorium. After the event they posed for photos, left by themselves to see Claire's family in La Crescenta and then drove back alone several hours to their house on Sublette Road. When they returned to their house, they watched a movie. | 136. Brody Decl., Exh. A (Marc Headley Depo.) at 317:6-321:21, Exhs. 27-30 (Photographs), Exh. 63 (*Blown for Good*) at 291, 295. |
| 137. After the New Year, Headley's superior told him he was being investigated for possible embezzlement, but asked him first to fix a few points on the Systems plan he had previously written. Headley writes, "Half of me wanted to tell her to go fly a kite, but the other half of me had a plan [to leave]." | 137. Brody Decl., Exh. 63 (*Blown for Good*) at 301-302. |
| 138. The night before he left the Sea Org, Headley walked out the gate at Sublette Road and went to his house, as he normally did every night. The next morning, January 4, 2005 he left on his motorcycle and never came back. | 138. Brody Decl., Exh. A (Marc Headley Depo.) at 439:3-11. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 139. Headley spoke to his wife by phone on January 10, when she was still at the Int Base.  Claire tried to convince him to return.  Marc told her several times that "the only reason he stuck around was because of me." | 139. Brody Decl., Exh. A (Marc Headley Depo.) at 441:1-4, 441:17-442:5, 894:21-895:3, 900:10-21, Exh.63 (*Blown for Good*) at 320, Hill Decl., Exh. A (Claire Headley Depo.) at 537:16-538:1, Claire Headley Depo. Exh. 49 (Debrief of Phone Call). |
| 140. During this call, Marc also told Claire that "[h]e couldn't take being a shit-head anymore."  "He has constantly been fighting to get the [A/V] systems done with no finance and no personnel."  As the one responsible for these systems, he believed he was being made the fall guy when they did not get done.  To this Claire responded that, "he was doing something of value and ... needed to come back and complete the project he was working on." | 140. Hill Decl., Exh. A (Claire Headley Depo.) at 537:16-538:1, Claire Headley Depo. Exh. 49 (Debrief of Phone Call). |
| 141. According to Headley's book, on January 5, 2005, he drove his motorcycle from the driveway of his off-Base house onto the public road adjoining it, but, because of a random coincidence, his exit was witnessed by two security guards, who then followed | 141. Brody Decl., Exh. 63 (*Blown for Good*) at 17-22, Fraser Decl., ¶ 59; Supp. Brody Decl., Exh. F (Bernard Headley June 4, 2010 Depo.) at 36:23-37:8, 38:2-40:9, 40:17-41:2. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| him in a truck.  Because it was raining, Headley was unable to drive away quickly, and he alleges he was forced off the road, skidded and fell off his bike, without injury to himself but causing some damage to the cycle.  The security guards then verbally attempted to convince him to return to the Base.  At one point, one of the guards grabbed the key to the cycle, but then returned it.  No physical force was used by anyone.  Headley got back on his motorcycle and continued driving it slowly into San Jacinto, followed for a short time by the security guards.  Police, alerted by a passing motorist to a possible "altercation," arrived and followed him into town, where he made arrangements to rent a truck, drive to the airport, and fly to his father's home in Kansas City, where his father welcomed him. | |
| 142. Headley claims that, in addition to the religious media he helped create at Golden Era, in the early 1990s he worked on the creation of audio-books based upon works of fiction written by | 142. Brody Decl., Exh. A (Marc Headley Depo.) at 458:14-22, 780:7-14. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| L. Ron Hubbard, although he states that such activity ceased after that. | |
| 143. The creation and distribution of such materials was an intermittent and extremely minor part of the activities of Golden Era and of Mr. Headley.  Such fictional materials were limited exclusively to a small portion of Golden Era's production of audio cassettes, and did not extend to Golden Era's other activities – producing religious films, videos, translated religious materials, religious magazines and promotional material, audio/visual systems used exclusively in Scientology Churches, as well as six annual live events which are then distributed on DVD to all churches internationally. | 143. Fraser Decl., ¶ 50. |
| 144.  As Headley concedes, the most accurate information regarding the quantities and titles of the fiction audio-cassettes produced by Golden Era is contained in its production logs and other records. | 144. Brody Decl., Exh. A (Marc Headley Depo.) at 668:21-669:6, 669:23-670:3. |
| 145. Golden Era's records show that during the years that Headley was on | 145. Fraser Decl., ¶ 50, 52. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| staff at Gold, between 3 and 7 religious workers – on average, less than 1.5 % of Gold's total staff – were involved in the creation of audiocassettes of any kind, and that only about 3.65% of the audio cassettes consisted of fictional works. The remaining 96.35% of the cassettes consisted of religious materials, primarily Scientology lectures by L. Ron Hubbard, including translations of these lectures in up to 16 languages. | |
| 146. Headley worked exclusively on the quality control of audio cassettes from 1990 until early 1993. During that time, however, Golden Era's records show that it produced no fiction works; thus all Headley's labor during this time period was performed on quality control of religious lectures and other religious cassettes. | 146. Fraser Decl., ¶¶ 50, 54. |
| 147. From late 1993 until early 1995, Headley held the post of Quality Control Gold; his responsibilities were to insure quality control of all of Golden Era's creation of audio/visual materials | 147. Brody Decl., Exh. A (Marc Headley Depo.) at 686:12-687:4, 689:17-19; Fraser Decl., ¶¶ 36, 52-54. |

- 56 -

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| (not just audio cassettes). Thus, during this time, whatever work Marc Headley performed reviewing the production of fiction works was a *de minimus* part of his work. | |
| 148. From July to November, 1995, Headley held the post of Audible QC Gold, involving the quality control of cassettes. Gold has specific work logs for this post during this time period. The logs show that only 1.3% of the cassettes Headley reviewed during this time consisted of fictional audiobooks. | 148. Fraser Decl., ¶ 54. |
| 149. In December 1995 Headley transferred to the film division of Golden Era; never again did his positions have anything to do with the creation of fiction audio cassettes. | 149. Fraser Decl., ¶ 54. |
| 150. Headley also claims to have worked on the creation of promotional videos materials relating to the release of certain Hubbard fictional works. Golden Era produced several videos announcing the release of a few of Mr. Hubbard's fiction books-on-tape, to be shown as a small portion of overall | 150. Fraser Decl., ¶¶ 55-56. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| programs at Scientology events and convocations.  Such videos were a minuscule proportion of the videos Golden Era produced, under 0.5%, were shown exclusively to Scientologists at church events and convocations. | |
| 151. As explained by Catherine Fraser, the reason for producing these audio-books was that by promoting Mr. Hubbard's fictional works (on a cost plus overhead basis), listeners and viewers would become interested in exploring his writings about Scientology. Mr. Hubbard's prior renown as a fiction writer had helped significantly in the early dissemination of Dianetics and Scientology. | 151. Fraser Decl., ¶ 51. |
| 152. Headley acknowledges that such materials were produced to help disseminate Scientology:<br><br>Q.  So all products are to induce audience admiration, respect and impact that will forward swiftly the dissemination of Dianetics and Scientology?<br><br>A.  Exactly.  That includes fiction books, that includes radio advertisements, that includes | 152. Brody Decl., Exh. A (Marc Headley Depo.) at 659:21-660:2. |

| STATEMENT OF UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| promotional videos. | |
| 153. In 1999, when Headley was Pre-Production Director, Golden Era produced an informational video about the making of the film *Battlefield Earth*, based on the book by Mr. Hubbard. | 153. Fraser Decl., ¶ 57. |
| 154. The "Battlefield Earth" video consisted of interviews with Jonathan Krane, the co-producer, and John Travolta, the star of the film, and others, and was made solely to be shown at an annual Church event because Scientologists would be interested in one of Mr. Hubbard's fiction works being made into a film. | 154. Fraser Decl., ¶ 57. |
| 155. The video about the production of *Battlefield Earth* was shown exclusively to that Scientology audience, was not sold to anyone, and was not shown to the public. | 155. Fraser Decl., ¶ 57. |
| 156. The effort spent by Golden Era on producing the *Battlefield Earth* video was a miniscule portion of Golden Era's activities. | 156. Fraser Decl., ¶ 57. |
| 157. Golden Era was not paid and received no income for this video. | 157. Fraser Decl., ¶ 57. |

## II.    CONCLUSIONS OF LAW

1.    "The interplay between the First Amendment's Free Exercise and Establishment Clauses creates an exception to an otherwise fully applicable statute if the statute would interfere with a religious organization's employment decisions regarding its ministers." *Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 598 F.3d 668, 670 (9th Cir. 2010).

2.    This constitutionally-compelled rule, known as the "ministerial exception," "applies as a matter of law across statutes, both state and federal, that would interfere with the church-minister relationship." *Id.* at 673. The ministerial exception applies "not only to the selection of ministers but more broadly to employment decisions regarding ... ministers" and "encompasses *all tangible employment actions*", including but not limited to "the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church." *Id.* at 672, 674 (emphasis added).    To determine whether an employee is a minister under the ministerial exception, the court "use[s] a functional approach . . ., which examines the function of the position rather than relying solely on ordination or 'categorical notions of who is or who is not a minister.'" *Id.* at 675 (quoting *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 958 n.3 (9th Cir. 2004)). It applies broadly to those who perform services for a religious institution, were chosen for their position based upon some "religious criteria" and who "perform[] some religious duties and responsibilities." 598 F.3d at 675-76.  In terms repeatedly invoked *in haec verba* by numerous courts, the ministerial exception encompasses the functions, *inter alia,* "*of teaching, spreading the faith, . . .,*" or that are "*important to the spiritual and pastoral mission of the church.*" *Rayburn v. Gen. Conference of Seventh-day Adventists*, 772 F.2d 1164, 1168-69 (4th Cir. 1985) (emphasis added). *Accord, Hope Int'l Univ.*, 119 Cal. App. 4th at 734 (same language) (quoting *Rayburn*).

3. It is summarily adjudicated that Plaintiff is subject to the ministerial exception. He was employed by Defendant Church of Scientology International ("CSI"), which is a religious institution. He was chosen for his position largely on religious criteria. He performed religious duties and responsibilities. Plaintiff was able to hold the positions that he had with Defendant based largely on religious criteria and training, namely his commitment to 1,000,000,000 years of service to Scientology and the lifestyle constraints that come with being a member of CSI's religious order, the Sea Org, and his study and mastering of religious policies and scriptures which were a requirement for each of the positions plaintiff held. Plaintiff performed various religious duties and responsibilities, including the creation and production of religious films scripted by L. Ron Hubbard, the founder of Scientology, for the training and teaching of Scientology ministers in the central religious processes of auditing and training. Just as the performance of "auditing" is a religious duty and responsibility, as this Court held in the Claire Headley case, *a fortiori* so is the creation of films and materials used to "teach[]" auditors how to perform those religious duties. *See* Conclusion No. 2, *ante*; *Rayburn*, 772 F.2d at 1168-69 ("teaching" the religion is a religious function covered by the ministerial exception); *Hope Int'l Univ. v. Superior Court*, 119 Cal. App. 4th 719, 734 (2004).

4. Plaintiff also performed religious duties and responsibilities in the creation and production of Scientology public films and videos to further the missionary evangelization of the Scientology religion. In Plaintiff's words, "They're called public films because they're for the broad public. They're meant to basically convince or enlighten somebody . . . so that they can participate in Scientology activities." The performance of such functions and responsibilities of spreading the religion and its message are of a fundamental religious nature. As the Supreme Court explicitly has held, in words of definitive significance to the application of the

ministerial exception in this case:

> '[H]and distribution of religious tracts is an age-old form of missionary evangelism – as old as the history of printing presses. It has been a potent force in various religious movements down through the years. . . . This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and *preaching from the pulpits.* It has the same claim to protection as the more orthodox and conventional exercises of religion.'

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton,* 536 U.S. 150, 161 (2002) (emphasis added) (quoting *Murdock v. Pennsylvania,* 319 U.S. 105, 108-09 (1943)).

5. As this Court and the Ninth Circuit have held, the ministerial exception bars application of federal and state minimum wage laws to a church's "employment" of a minister. As a consequence, summary judgment is granted dismissing Plaintiff's First and Second Claims for Relief.

6. Defendant also is entitled to summary judgment on the First and Second Claims for the alternate reason that Plaintiff was not covered by the state and federal minimum wage laws.

7. The Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.,* "reaches only the 'ordinary commercial activities' of religious organizations, 29 CFR § 779.214 (1984), and only those who engage in those activities in expectation of compensation." *Tony & Susan Alamo Found. v. Sec'y of Labor,* 471 U.S. 290, 302 (1985). The scope of California labor law is co-extensive with the FLSA's coverage for similarly-situated employees, *see Bureerong v. Uvawas,* 922 F. Supp. 1450, 1470 (C.D. Cal. 1996), and must be construed narrowly to avoid conflict with the First Amendment and the ministerial exception. *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 500, 507 (1979).

- 62 -

8.   Under these principles, a church-run business would be subject to state and federal wage-hour laws only if it engaged in commercial activities in competition with ordinary businesses and then only with respect to those commercial, competitive activities.

9.   Defendant has established beyond controversy that Golden Era's business activities do not constitute "ordinary commercial activities." The uncontroverted facts establish that there is no other business enterprise that competes with Golden Era in the marketplace. Moreover, the uncontroverted facts establish that Golden Era does not compete with other entities in disseminating multimedia products about CSI.

10.   Plaintiff was not a covered employee subject to minimum wage laws for the additional and independent reason that he was a member of a religious order, the Sea Org. Congress, the Department of Labor and the federal courts agree that members of religious orders are not considered covered employees under the FLSA. *See* Wage and Hour Division, U.S. Dep't of Labor, *Field Operations Handbook* § 10b03(b) ("members of religious orders who serve pursuant to their religious obligations . . . shall not be considered to be 'employees'"); *Shaliehsabou v. Hebrew Home of Greater Washington*, 363 F.3d 299, 305 (4th Cir. 2004) (religious order exception mandated by statute); *Schleicher v. Salvation Army*, 518 F.3d 472, 476 (7th Cir. 2008) (members of religious orders not covered). The uncontroverted evidence demonstrates that the Sea Org. is a recognized, bona fide religious order. See IRS Rev. Proc. 91-20, 1991-10 IRB 26; 70A Am. Jur. 2d *Social Security and Medicare* § 613 (2009) (adopting IRS definition).

11.   Summary judgment also is granted dismissing plaintiff's Third Claim under the Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), 18 U.S.C. § 1589. Given Plaintiff's admission that he never considered himself held against his will; and given his numerous, continuing and bountiful opportunities to communicate with the world, to live off the premises of Golden Era, to travel

domestically and internationally, and to visit friends and relatives, Plaintiff's claim cannot be supported on the basis that he was subject to forced labor based upon physical restraint. Plaintiff's claims that he was subjected to forced labor based upon the alleged emotional and psychological distress and restraint arising from the lifestyle restraints of a Sea Org member; upon what he considered to be arbitrary and harsh church discipline; and upon his choice not to depart the Sea Org and Golden Era because he believed that he if he left unilaterally without following the Sea Org's prescribed "routing out" method for departure he would effectively be excommunicated and no longer able to communicate with his wife, friends and family, cannot be the basis for an action by a minister against his church under TVPA or otherwise, because of the application of the First Amendment, the ministerial exception, and the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb et seq., as more fully set forth below.

12. First, the ministerial exception generally precludes application of the TVPA to the employment relationship between a church and its ministers, and in particular, between Headley and CSI. To determine whether Headley can maintain his TVPA claim, the Court would need to inquire into the means by which CSI acquired and kept Headley's services, one of its ministers. That, however, is precisely what the Court *cannot* do under the ministerial exception and the Free Exercise and Establishment Clauses of the Constitution. *Alcazar,* 598 F.3d at 671-72 ("The Religion Clauses . . . require a 'ministerial exception' to employment statutes if the statute's application would interfere with a religious institution's employment decisions concerning its ministers.") "Because the ministerial exception is constitutionally compelled, it applies as a matter of law *across* statutes, both state and federal, that would interfere with the church-minister relationship." 598 F.3d at 673 (emphasis added).

13.     While government may criminalize or create civil remedies for kidnapping, aggravated battery, or false imprisonment even by churches of their ministers, it may not do so by means of a broad statute whose primary purpose and focus is to regulate labor, that reaches conduct not constituting forcible restraint or violence, and by applying it to the labor relationship between a church and its ministers. "The [ministerial] exception was created because government interference with the church- minister relationship *inherently* burdens religion." *Alcazar,* 598 F.3d at 673 (court's emphasis).

14.     The statutory remedies for a § 1595 violation demonstrate why the statute must be construed as subject to and limited by the ministerial exception.  18 U.S.C. § 1593 states that a person who proves a § 1595 claim will be entitled to restitution and "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." 18 U.S.C. § 1593(b)(3).  The ministerial exception makes Defendants immune from exactly this kind of judicial interference with ministerial relations, however.  The courts cannot dictate to churches what they should pay their ministers, under § 1593, the FLSA, or otherwise.  Plaintiff is simply trying to impose an unconstitutional wage regulation on CSI through the "back door" of the TVPA.

15.     To interpret the TVPA constitutionally, it must be construed not to apply when the "labor or services" in question are comprised of ministerial activities for a church.  Otherwise, courts will be in the untenable, and unconstitutional, position of constantly questioning the means by which religious institutions acquire and keep their ministers' and religious personnel's' services.  This would require the Court to examine religious practices which, as discussed further below, are protected from state interference and would result in both substantive and procedural entanglement in churches' affairs, contrary to the Establishment Clause. *See, e.g., Alcazar,* 598 F.3d at 672-73.  If the Court were to attempt to apply TVPA to the process by which

Headley's relationship to Golden Era was terminated, it inevitably would become entangled in matters of religious practice, in violation of the ministerial exception. *Higgins v. Maher*, 210 Cal. App. 3d 1168, 1170 (1989)

16.     At minimum, the TVPA cannot be applied to a church's relationship with its ministers in the absence of actual physical force or restraint or the threat of the imminent and likely use of such force.  A compelling analogy is to the realm of political speech, also protected by the First Amendment.  The Supreme Court has recognized that speech (like religious doctrine and practice) can and often is intended to have a psychologically coercive effect. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911 (1982) ("The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment") (quoting *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)). *See Gitlow v. New York*, 268 U.S. 652, 673 (1925) ("Every idea is an incitement") (Holmes, J., dissenting).  Nevertheless, such speech, even "advocacy of the use of force or of law violation," is protected except and only to extent that it "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Claiborne Hardware*, 458 U.S. at 927-28 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1968)).  So, too, a church's application of religious doctrine and practice to its ministers must be protected in the absence of actual physical restraint or the threat of imminent restraint.  Defendants' actions with respect to Headley cannot meet that constitutionally mandated standard.

17.     Even if the TVPA could be applied to narrow circumstances of actual or threatened physical restraint or harm, Plaintiff's claim still fails as a matter of law. Plaintiff has testified that he did not take advantage of his numerous opportunities to leave Golden Era by his own unilateral action because he feared he would be "declared" a "suppressive person" (effectively excommunicated) if he attempted to leave the Sea Org.  However, a church's implementation of a policy requiring its members to "shun" an excised former member or excommunicating that member

from the religious community may not be a basis to impose civil liability upon the church or its officials. *See, e.g., Paul v. Watchtower Bible & Tract Soc'y of New York, Inc.*, 819 F.2d 875, 883 (9th Cir. 1987).

18.    By the same token, Plaintiff's claim that he did not leave because of the restricted lifestyle of Sea Org members fail to establish a claim under TVPA when made in the context present here:  a minister complaining about the conditions of his "employment" by his church. Headley's claims that the defendant churches imposed psychological and emotional barriers that prevented him from leaving his allegedly forced labor, by, *inter alia,* restricting his access to the outside world; requiring him to perform lowly tasks and physical labor; subjecting him to a highly structured work environment; depriving him of sufficient sleep; and requiring he undergo confessions of transgressions for which he was subject to disciplinary action, all "encompass[] *tangible employment actions*", including but not limited to "the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church." *Alcazar,* 598 F.3d at 672, 674 (emphasis added).  While TVPA's provision that labor can be "forced" by the use of certain forms of psychological or emotional coercion as well as by physical force is perfectly rational and constitutional in a secular context, such an application in the religious context of the lifestyle constraints that come with being a member of a religious order cannot be made under the First Amendment or the ministerial exception.

19.    Indeed, actions that may be actionable as torts in the secular context cannot be the basis for a lawsuit in the context of the church/minister relationship.  In *Higgins v. Mayer*, a Catholic priest brought numerous tort claims against his Bishop and the Church for his removal from his position, subsequent mandated psychiatric treatment, which included drugs and shock therapy, and public revelation of alleged private defamatory information.  The court found that the complaint adequately

- 67 -

alleged "torts of invasion of privacy, defamation, and the intentional and negligent infliction of emotional distress," and therefore would be actionable in a secular context. 210 Cal.App.3d at 1175. The court, however, dismissed the complaint because, even if defendants had engaged in the alleged tortious conduct, "the acts so taken were part and parcel of the Bishop's administration of his ecclesiastical functions," and thus were protected activity under the ministerial exception. *Id.* at 1175-76. Further:

> the torts recited are simply too close to the peculiarly religious aspects of the transaction to be segregated and treated separately — as simple civil wrongs. The making of accusations of misconduct; the discussion of same within the order; the recommendation of psychological or medical treatment; the infliction, whether *intentionally* or *negligently*, of emotional distress — these are all activities and results which will often, if not usually, attend the difficult process by which priestly faculties are terminated.

*Id.* at 1176 (emphasis added). *Accord, Gunn v. Mariners Church,* 167 Cal. App. 4th 206, 217 (2008) (following *Higgins* and affirming summary judgment dismissing claims of dismissed church musical director for defamation and invasion of privacy against church: "the ministerial exception applies to preclude further judicial review *regardless of the otherwise tortious nature of the statements*") (emphasis added).

20. The Ninth Circuit also has recognized that claims for emotional distress arising out of participation in a church (even by a mere member, let alone a minister) are not actionable, even where they would be actionable in a secular context:

> Intangible or emotional harms cannot ordinarily serve as a basis for maintaining a tort cause of action against a church for its practices — or against its members....Offense to someone' sensibilities resulting from religious conduct is simply not actionable in tort....Without society's tolerance of offenses to sensibility, the protection of religious differences mandated by the first amendment would be meaningless.

- 68 -

*Paul*, 819 F.2d at 883 (citations and footnote omitted). *Accord Van Schaick v. Church of Scientology of Cal.*, 535 F. Supp. 1125, 1139 (D. Mass.1982); *Orlando v. Alamo*, 646 F.2d 1288, 1290 (8th Cir. 1981).

21. The appropriateness of a church's disciplinary actions taken against a member, particularly a minister, has consistently been held to be beyond the cognizance of the civil courts. *See, e.g., Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 717 (1976); *Higgins*, 210 Cal. App. 3d at 1175; *Paul*, 819 F.2d at 883. In this case, it is impossible to separate out any claim that Plaintiff was subjected to forced labor by psychological or emotional distress from Plaintiff's commitment to the Sea Org for over 15 years and the difficult process by which Plaintiff relinquished his position within the Church. Courts may not constitutionally review the propriety of a religious order's lifestyle and the discipline imposed on the order's members to insure their obedience to its precepts, nor may it review the order members' acceptance of that discipline.

22. The Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*, also bars Plaintiff's TVPA claim. RFRA precludes state action coercing religious adherents "to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008). RFRA, moreover, amends all federal law, whether enacted before or after RFRA itself unless a statute specifically excludes its application, which the TVPA notably does not do. 42 U.S.C. § 2000bb-3(a), (b).

23. A person whose religious practices are burdened in violation of RFRA "may assert that violation as a claim or defense in a judicial proceeding[.]" *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006). As the undisputed evidence establishes that Plaintiff was not physically restrained or imprisoned and had numerous opportunities to leave, application of the

TVPA to CSI's imposition of ecclesiastical rules and discipline with respect to its ministers and Sea Org members would violate the Free Exercise Clause. Hence, Plaintiff's claim is barred by RFRA.

24. The events that occurred on January 4, 2005, the day Plaintiff departed Defendant do not alter any of the above or convert his prior 15 years of service to Golden Era into forced labor.

25. Accordingly, the Court grants Defendant's motion for summary judgment dismissing the Third Claim for forced labor under TVPA.

26. In addition, and/or alternatively, the Court summarily adjudicates that Plaintiff's claims that he was subjected to forced labor because of the lifestyle restrictions of the Sea Org, or Defendant's ecclesiastical rule, governance or discipline, including claims that the defendant churches imposed psychological and emotional barriers that prevented him from leaving his allegedly forced labor, by, *inter alia,* restricting his access to the outside world; requiring him to perform lowly tasks and physical labor; subjecting him to a highly structured work environment; depriving him of sufficient sleep; requiring he undergo confessions of transgressions for which he was subject to disciplinary action; mandating a formal procedure, called "routing out" for Sea Org members who wish to revoke their vows of service and leave the Sea Org; imposing disciplinary penalties, including the equivalent of excommunication, upon Sea Org members who unilaterally leave their positions without participating in the routing out process, all "encompass[] *tangible employment actions*", including but not limited to "the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church", and may not be the basis of a TVPA, or any other claim, against Defendant. *Alcazar,* 598 F.3d at 672, 674.

27.     The Court further summarily adjudicates that only acts by which a minister is subjected to physical force and restraint, or the threat of imminent and likely use of such force and restraint, can be the subject of state interference, through a forced labor statute or otherwise.


DATED:  July 2, 2010                    PROSKAUER ROSE LLP
                                        BERT DEIXLER
                                        HAROLD M. BRODY

                                        BY: _____/s/_____
                                        HAROLD M. BRODY

                                        -and-

                                        RABINOWITZ, BOUDIN, STANDARD,
                                        KRINSKY & LIEBERMAN, P.C.

                                        BY: _____/s/_____
                                             ERIC M. LIEBERMAN
                                        Attorneys for Defendant
                                        CHURCH OF SCIENTOLOGY
                                        INTERNATIONAL