UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

AUG 16 2012

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| CLAIRE HEADLEY,<br><br>Plaintiff - Appellant,<br><br>v.<br><br>CHURCH OF SCIENTOLOGY INTERNATIONAL and RELIGIOUS TECHNOLOGY CENTER, a corporate entity,<br><br>Defendants - Appellees. | No. 10-56266<br><br>D.C. No. 2:09-cv-03987-DSF-MAN<br>U.S. District Court for Central California, Los Angeles<br><br>**MANDATE** |

RECEIVED
CLERK, U.S. DISTRICT COURT

AUG 16 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| MARC HEADLEY,<br><br>Plaintiff - Appellant,<br><br>v.<br><br>CHURCH OF SCIENTOLOGY INTERNATIONAL, a corporate entity,<br><br>Defendant - Appellee. | No. 10-56278<br><br>D.C. No. 2:09-cv-03986-DSF-MAN<br>U.S. District Court for Central California, Los Angeles |

The judgment of this Court, entered July 24, 2012, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:
Molly C. Dwyer
Clerk of Court

Theresa Benitez
Deputy Clerk

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CLAIRE HEADLEY,<br>  *Plaintiff-Appellant,*<br>v.<br>CHURCH OF SCIENTOLOGY INTERNATIONAL; RELIGIOUS TECHNOLOGY CENTER, a corporate entity,<br>  *Defendants-Appellees.* | No. 10-56266<br>D.C. No.<br>2:09-cv-03987-DSF-MAN |
| MARC HEADLEY,<br>  *Plaintiff-Appellant,*<br>v.<br>CHURCH OF SCIENTOLOGY INTERNATIONAL, a corporate entity,<br>  *Defendant-Appellee.* | No. 10-56278<br>D.C. No.<br>2:09-cv-03986-DSF-MAN<br>OPINION |

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
February 9, 2012—Pasadena, California

Filed July 24, 2012

Before: Dorothy W. Nelson, Diarmuid F. O'Scannlain, and
N. Randy Smith, Circuit Judges.

Opinion by Judge O'Scannlain

## COUNSEL

Kathryn Saldana, Metzger Law Group, Long Beach, California, argued the cause and filed the briefs for the plaintiffs-appellants. With her on the briefs was Raphael Metzger, Metzger Law Group, Long Beach, California.

Eric M. Lieberman, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York, NY, argued the cause and filed the brief for the defendants-appellees. With him on the brief were Bert H. Deixler, Kendall, Brill & Klieger LLP, Los Angeles, California; Harold M. Brody and G. Samuel Cleaver, Proskauer Rose LLP, Los Angeles, California; and

Robert E. Mangels and Matthew D. Hinks, Jeffer Mangels Butler & Mitchell LLP, Los Angeles, California.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We consider two former ministers' claims that the Church of Scientology forced them to provide labor in violation of the Trafficking Victims Protection Act.

I

This case centers around the Church of Scientology International (the Church) and its component Sea Organization (or Sea Org). The Church exercises overall ecclesiastical management of the Scientology religion. The Sea Org is an elite religious order of the Church and acts as Scientology's evangelical wing. The Sea Org demands much of its members, renders strict discipline, imposes stringent ethical and lifestyle constraints, and goes to great efforts to retain clergy and to preserve the integrity of the ministry. These features of the Sea Org flow from the teachings and goals of the Scientology religion.

Scientology teaches that man is an immortal spiritual being that, over time, becomes distressed as his mind experiences moments of pain or lowered consciousness. Scientology maintains, however, that man can overcome that distress—he can become "clear"—by using methods developed by Scientology founder L. Ron Hubbard. Scientology aims to disseminate Hubbard's teachings to "clear the planet"—that is, to help enough people to overcome spiritual distress to free the planet of crime, war, and irrationality. That effort is entrusted largely to the Sea Org.

Before embarking on that effort, each Sea Org member makes a symbolic one-billion-year commitment to serve the Church. A member may make that commitment only after undergoing extensive training and study, passing a fitness exam, and obtaining a Church-issued certification attesting that the applicant is qualified for Sea Org life. During their training, Sea Org members learn that the ministry will require them to work long hours without material compensation, to live communally, to adhere to strict ethical standards, and to be subject to firm discipline for ethical transgressions. The Church, in turn, agrees to provide Sea Org members with all living necessities and a weekly allowance for incidental items.

The Sea Org's lifestyle constraints include strict policies on outside communications, marriage, and children. Sea Org members' mail is censored and phone calls are monitored as part of ministry discipline and policy. Because Sea Org life may at any moment require a member indefinitely to serve anywhere in the world, the Church prohibits Sea Org members from having children unless they leave the order. A Sea Org member who chooses to have a child must transfer out of the Sea Org (but can still work for the Church). And staff members in Scientology's Religious Technology Center (the Center)—which promotes the orthodox practice of Scientology—are permitted to marry only other Center staff.

Sea Org members learn that strict discipline is central to preserving the integrity of Scientology's ministry. If a member fails to meet Scientology's ethical standards, he may be disciplined with verbal warnings or rebukes, loss of privileges, removal from a post, diminution of responsibilities, manual labor, or expulsion. Sea Org members also participate in religious training and practices, including "confessionals." In a confessional, a member confesses transgressions and may then be absolved or disciplined.

This demanding, ascetic life is not for everyone—and is not even for many of those who go through the Sea Org's exten-

sive training and preparation. Members thus often wish to leave the Sea Org for a more normal life. A member may formally withdraw his vows and leave the ministry through a process called "routing out." Routing out allows a member to remain a Scientologist in good standing. The process involves filling out a form and normally includes participating in Scientology ethics programs. Routing out can take weeks or months. During that time members are excused from their posts but are expected to continue serving the Church by performing chores.

Some Scientologists leave the Sea Org without routing out—a practice known as "blowing"—but the Sea Org discourages members from doing so. When a member leaves without routing out, other members may band together to try to locate that member and attempt to persuade him to return to the Sea Org. Scientologists believe that such an effort—known as a "blow drill"—is integral to their efforts to clear the planet and to help their members (even departed ones) achieve salvation. So important is this to the Church that a blown member may be disciplined if he returns or may be declared a "suppressive person." Being so declared is akin to being excommunicated or shunned, and can cause blown members to lose contact with Scientologist family or friends.

II

Marc and Claire Headley were raised in the Scientology religion and joined the Sea Org in their teens—Marc in 1989, Claire in 1991. They married in 1992. Like others who join the Sea Org, they knew that they would work long, hard hours without material compensation. Despite this and the many other challenges of Sea Org life, Marc and Claire remained in the Sea Org until 2005. They accept that they were ministers during their time with the Sea Org. Throughout their ministerial service they repeatedly showed by word and deed that they enjoyed their work, performed it willingly, and were helping to further the Sea Org's mission to "clear the planet."

A

Marc and Claire served mostly at Gold Base (known also as the Base), the Church's 500-acre international headquarters in Gilman Hot Springs, California. They each worked more than 100 hours a week, while the Church paid their living expenses and provided them each with a $50 weekly stipend. Marc created and produced religious training films and films explaining Scientology to the public. Claire oversaw the Center's internal operations and supervised various aspects of church governance and Scientology practice. She advanced to a senior ecclesiastical position.

In keeping with Church disciplinary policy, the Church censored the Headleys' mail, monitored their phone calls, and required them to obtain permission to access the Internet. In addition to their normal work, Marc and Claire were at times assigned manual labor, sometimes as discipline. This labor was often yard or kitchen work, but some of it was more difficult or unpleasant. In 2004, for example, Marc (along with hundreds of others) was assigned to hand-clean dried human excrement from a large aeration pond. This two-day assignment was levied as discipline for problems in Marc's work. As another example, in a six- to eight-month period in 2002, Claire was denied dining hall privileges, had to subsist on protein bars and water, and lost about thirty pounds.

Marc and Claire experienced and observed verbal reprimands and physical abuse while in the Sea Org. A senior Scientology executive physically struck Marc on two occasions and another official punched him on another occasion. A co-worker shoved Claire once. Marc and Claire allege that they saw senior Scientology leaders physically abuse other staff.

As noted above, Sea Org members may not have children while in the ministry. Yet in the mid-1990s Claire twice became pregnant. Each time she had an abortion. She testified

that she was told that she would be placed on manual labor and required to participate in confessionals if she did not have the first abortion. She testified further that she was told that she would face "consequences" if she did not have the second abortion. She says that other Sea Org women who became pregnant were assigned manual labor (such as yard or kitchen work) as co-religionists tried to convince them to have abortions.

In keeping with the Religious Technology Center's restrictive marriage policy, Claire was told in 2004 that she would either have to leave her position with the Center (and take a different position with the Church) or divorce Marc. (Claire worked for the Center but Marc did not.) Claire testified that she "plead[ed] for [her] position" and considered divorcing Marc. But the Center stood by its policy and Claire left the Center (or started the process of leaving the Center) late in 2004.

B

Throughout this period, Marc and Claire had innumerable opportunities to leave the Church. They lived outside of the Base and traveled freely to and from the Base almost daily. Marc traveled extensively throughout the United States and to Europe, left the state to visit his father and other relatives, and traveled throughout Los Angeles to visit family and friends. Claire similarly lived outside the Base, flew on commercial jets, and traveled away from the Base many times to visit family. Each of them had access to vehicles and to phones and the Internet. Marc testified that, in his time with the Sea Org, hundreds of Scientologists had left the Sea Org without even routing out.

Despite the challenges of Sea Org life, Marc and Claire did not leave the Sea Org until 2005. The only time Marc had expressed a desire to leave was in 1990. He was given a routing-out form and was told the risks of leaving. After

HEADLEY v. CHURCH OF SCIENTOLOGY 8403

thinking it over he (as he later put it) realized that he had "made a few friends in high places" and decided to stay. Claire never asked to leave the Sea Org.

C

Marc and Claire contend that they did not leave the Sea Org because they believed that doing so would have been difficult or even risky due to the Base's extensive security, the Sea Org's blow drills, and its approach to members who leave or wish to leave.

Gold Base's security measures made it hard to leave unnoticed. The Base—which has faced security threats and which houses more than $100 million in audiovisual equipment—has security measures that include a perimeter fence, cameras, motion detectors, alarms, observation posts, and guards.

Security guards monitored those thought to be disaffected with Sea Org life or who were suspected of wanting to leave the Sea Org. The Headleys both testified that security or Church personnel were at times posted where they lived to make sure that they did not leave. Security cameras were installed over the Headleys' house in 2001 or 2002. At times the Headleys and other Sea Org members were even restricted to the Base, and Marc and Claire each identify an occasion when they were assigned an escort when traveling away from the Base.

Even though they still had many opportunities to leave, the Headleys contend that the Sea Org would have tried to get them to return. The Sea Org, as we have related, puts a premium on retaining its ministers and encouraging those who leave the ministry to do so through formal processes. To that end, the Sea Org tracks blown members, and has sent dozens of people to locate and to try to persuade members to return. In a few instances, Sea Org members have used physical force or restraint in blow drills (even though the Church directs

| 8404 | HEADLEY v. CHURCH OF SCIENTOLOGY |
|---|---|

them not to do so). In the vast majority of cases in which blown Sea Org members have returned, however, the record shows only that the member was located and persuaded to return—not that the member was physically forced to return. One witness on which the Headleys rely—a former Sea Org member who went on every blow drill from 1996 to 2003—recalled only one instance of even arguable physical force during a blow drill. There, a member was touched on the shoulder and might have been pushed toward a car.

Finally, because leaving the Sea Org is considered a transgression, members who returned to Gold Base after blowing were generally restricted to the Base and assigned a job (usually manual labor). Claire testified, moreover, that it was considered a major transgression to want to leave the Sea Org and that those who discussed leaving faced discipline. A senior Sea Org leader told Claire that she had "foregone" her right to leave the Sea Org and that, if she left, she would be brought back.

Yet Marc and Claire each successfully left the ministry, without routing out, the first time either tried to do so. Marc left in January 2005 after being told that he was under investigation for embezzlement and that he could be assigned to manual labor. Claire left soon after that. Though both were followed and approached by co-religionists, neither was harmed, both continued on, and neither returned to the Church.

D

Looking back on his time with the Sea Org, Marc testified thus: "I wasn't saying to myself I'm being held against my will. I think subliminally, I think that I wanted to leave but whether or not I was being held against my will, I don't think I had those thoughts." During his Sea Org service, Marc repeatedly said that he enjoyed his experiences with the

Church, his promotions, and his work. On several occasions, he said, he stayed in the Sea Org only because of Claire.

Claire testified that, throughout her time with the Sea Org, she served the religion, believed that she was furthering its goals, believed in Scientology, and thought that serving in the Sea Org was the right thing to do. She affirmed that she was a committed Sea Org member for many years, came to doubt her commitment, and left successfully the only time she tried to do so. While she was with the Sea Org, Claire said that she enjoyed her work and she spoke well of the ministry. She encouraged her siblings to join the Sea Org. In her deposition, Claire did not contest that she could have left the Sea Org earlier but said that she lacked outside contacts or financial support, did not know where to go, and did not want to lose contact with Marc. She was in contact with the Sea Org for a month or two after she left to see if she could route out and maintain good standing with the Church. She also considered returning to the Sea Org to route out.

III

In 2009 Marc sued the Church—and Claire sued the Church and the Center—under the Trafficking Victims Protection Act. (They also brought federal and state minimum wage claims, but they have abandoned those claims.) Enacted largely "to combat" the "transnational crime" of "trafficking in persons," 22 U.S.C. § 7101(a), (b)(24), the Act makes it a crime "knowingly" to "provide[ ] or obtain[ ] the labor or services of a person by any one of, or by any combination of, the following means":

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

> (2) by means of serious harm or threats of serious harm to that person or another person; [or]

8406         Headley v. Church of Scientology

. . .

> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint . . . .

18 U.S.C. § 1589(a). "Serious harm" means

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

*Id.* § 1589(c)(2). A victim of a section 1589(a) violation may sue the perpetrator for damages. *Id.* § 1595(a).

    Although they alleged isolated instances of physical force, Marc and Claire grounded their forced-labor claims on the theory that the Church and Center psychologically coerced them to provide labor. Specifically, they contended that the Church and Center violated the Act by causing them to believe that they could not leave the ministry or that they would face serious harm in doing so. They cited evidence that it was difficult to leave the Base unnoticed, that the Sea Org tries to get blown members to return, and that the Sea Org disciplines those who wish or try to leave. They also emphasized that Sea Org life was hard—noting evidence about discipline, verbal reprimands, physical abuse, shunning, and the Sea Org's policies regarding marriage and children. These features, they maintained, constituted psychological coercion sufficient to entitle them to recover.

    The defendants contended that the Headleys had not established a genuine issue of material fact on their forced-labor

claims and that, in any event, those claims were barred by the ministerial exception. That doctrine—derived from the First Amendment's religion clauses—provides religious employers with an affirmative defense to a claim by a minister when adjudicating the claim would infringe an employer's religious liberty or would improperly entangle a court in religious matters.

The district court granted summary judgment for the defendants. The court first held that Marc's allegations of three instances of physical force against him in 15 years did not alone raise a triable issue of material fact on his forced-labor claim. The court emphasized that, despite those assaults, the record was clear that Marc was able to leave the Church throughout that time and thus could have avoided providing labor.

The court then held that Marc's and Claire's claims of psychologically coerced labor were barred by the ministerial exception. The court explained that the other conduct identified to support Marc's and Claire's forced-labor claims—such as Sea Org discipline, working conditions, censorship of communications, and efforts to retain ministers—was doctrinally motivated. Examining that conduct, the court explained, would force the court to analyze the criteria the defendants use to choose ministers, the reasonableness of the defendants' methods of enforcing Church policy, and the means used to encourage ministers to remain with the Church. To determine whether the defendants' "means of persuading members to remain" with the Sea Org fall within the Act, for example, "a trier of fact must inquire into Scientology's policies, practices, and scriptures." Because in its view the ministerial exception precludes that and similar inquiries, the court ruled that the claims were barred.

The Headleys timely appealed from the orders granting summary judgment.

IV

The Headleys contend here that the district court erred in ruling that the ministerial exception bars their forced-labor claims. They insist that adjudicating their claims would neither infringe the defendants' religious liberty nor improperly entangle courts in the church–minister relationship. They maintain further that once the ministerial exception is cast aside, they each have established a genuine issue of material fact on their forced-labor claims.

A

[1] In our view, the text of the Trafficking Victims Protection Act resolves this case. The Act bars an employer from obtaining another's labor "by means of" force, physical restraint, serious harm, threats, or an improper scheme. 18 U.S.C. § 1589(a)(1), (a)(2), (a)(4). That text is a problem for the Headleys because the record contains little evidence that the defendants obtained the Headleys' labor "by means of" serious harm, threats, or other improper methods.

[2] Rather, the record overwhelmingly shows that the Headleys joined and voluntarily worked for the Sea Org because they believed that it was the right thing to do, because they enjoyed it, and because they thought that by working they were honoring the commitment that they each made and to which they adhered. We think it telling that the Headleys protest very little about their actual day-to-day jobs with the Sea Org—for Marc, film creation and production; for Claire, management and supervision. Instead, they focus their attack on the discipline, lifestyle, and familial constraints imposed as part of Sea Org life. But the record does not suggest that the defendants obtained the Headleys' labor "by means of" those features of Sea Org life. To the contrary, the record supports the conclusion that such features caused Marc and Claire to *leave* the Sea Org and thus to stop providing labor. Marc left the Sea Org after he was told that he could be subjected to

HEADLEY V. CHURCH OF SCIENTOLOGY 8409

manual labor and could otherwise face discipline. Claire left after she was unable (in light of a restrictive marriage policy) to *keep* her position in the Religious Technology Center—the very position in which, she now contends, she was long forced to labor.

The Headleys have simply not marshaled enough evidence to satisfy the textual demands of section 1589. That text requires that serious harm befall an employee "if she did not continue to work" or a threat that "compel[s] [her] to *remain*" with the employer. *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) (emphasis added). Here, the record shows that the adverse consequences cited by the Headleys are overwhelmingly not of the type that caused them to continue their work and to remain with the Sea Org.

[3] The one adverse consequence the Headleys could have faced, had they taken any of their many opportunities before 2005 to leave the Sea Org, was to have been declared "suppressive persons" and thus potentially to have lost contact with family, friends, or each other. But that consequence is not "serious harm"—and warning of such a consequence is not a "threat"—under the Trafficking Victims Protection Act. In applying the Act, we must distinguish between "improper threats or coercion and permissible warnings of adverse but legitimate consequences." *United States v. Bradley*, 390 F.3d 145, 151 (1st Cir. 2004), *judgment vacated on other grounds*, 545 U.S. 1101 (2005); *cf. Dann*, 652 F.3d at 1170 (Act aims at *serious* trafficking and threats of *dire* consequences). This case involves the latter. A church is entitled to stop associating with someone who abandons it. *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir. 1987) (holding that the free exercise clause protects the practice of shunning, explaining that when "[t]he members of [a] [c]hurch" "no longer want to associate with" someone who has "abandon[ed]" them, those members "are free" under the First Amendment "to make that choice"). A church may also warn that it will stop associating with members who do not

8410      Headley v. Church of Scientology

act in accordance with church doctrine. The former is a legitimate consequence, the latter a legitimate warning. *Cf. Bradley*, 390 F.3d at 151. Neither supports a forced-labor claim.

[4] We emphasize that the Headleys had innumerable opportunities to leave the defendants. They lived outside of the Base and had access to vehicles, phones, and the Internet. They traveled away from the Base often. The security that they decry afforded them a multitude of opportunities to leave, as hundreds of other Sea Org members had done—whatever their commitments and whatever they may have been told regarding the permissibility of leaving. For example, although Marc had an escort on a trip to New York, his testimony makes clear that he could have just left despite his escort; and Claire left the Sea Org during a trip to an optometrist—despite the escort that was accompanying her. They did not take any of their many opportunities to leave until 2005 and chose instead to stay with the defendants and to continue providing their ministerial services. They have not established a genuine issue of fact regarding whether they were victims of forced-labor violations.

B

[5] The district court rested its rulings on the ministerial exception. The district court was right to recognize that courts may not scrutinize many aspects of the minister–church relationship. *See, e.g., Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 702 (2012) (decision to fire a minister); *Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 598 F.3d 668, 672-73 (9th Cir. 2010), *adopted as relevant on rehearing en banc*, 627 F.3d 1288, 1290 (9th Cir. 2010) (en banc) (ministerial pay); *Werft v. Desert Sw. Annual Conference of the United Methodist Church*, 377 F.3d 1099, 1103 (9th Cir. 2004) (per curiam) (certain working conditions); *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 969 (9th Cir. 2004) (suspensions, removal of certain duties, terminations, or refusal to circulate

HEADLEY v. CHURCH OF SCIENTOLOGY 8411

forms that are necessary to authorize further pastoral employment). Here, moreover, the defendants maintain that the vast majority of the conduct on which the Headleys' claims rest—stringent lifestyle constraints, assignment to manual labor, strict discipline, the requirement to leave the ministry only by routing out, efforts to retain ministers, and the practice of declaring some departed members "suppressive persons"—is religiously motivated or otherwise protected. But because the Headleys have not established a genuine issue of material fact regarding whether the defendants obtained their labor "by means of" improper conduct, we need not reach the question of whether the ministerial exception would bar a claim under the Act. And because we need not reach any constitutional issues, we also need not decide whether the Act would have to be given a limiting construction to avoid constitutional problems. *Cf. NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 507 (1979).

Likewise, we do not decide how the Headleys might have fared under a different statute or on other legal theories. The Headleys abandoned claims under federal and state minimum wage laws. And although the Headleys marshaled evidence of potentially tortious conduct, they did not bring claims for assault, battery, false imprisonment, intentional infliction of emotional distress, or any of a number of other theories that might have better fit the evidence. The Headleys thus wagered all on a statute enacted "to combat" the "transnational crime" of "trafficking in persons"—particularly defenseless, vulnerable immigrant women and children. 22 U.S.C. § 7101(a), (b)(24); *see id.* § 7101(b)(1), (2), (4), (17), (22). Whatever bad acts the defendants (or others) may have committed, the record does not allow the conclusion that the Church or the Center violated the Trafficking Victims Protection Act.[1]

---

[1]On summary judgment the district court struck, as not based upon reliable principles or methods, the declaration of Dr. Robert Levine, an expert in the psychology of persuasion and mind control. Dr. Levine offered a purported expert opinion about the psychological coercion that the Head-

AFFIRMED.

leys allegedly endured while with the Church and the Center. The Headleys contend that this ruling was an abuse of discretion. We disagree. Dr. Levine based his opinion on his review of the Headleys' deposition transcripts and related exhibits. He never spoke with the Headleys in forming his opinion. The Headleys cite no authority that reading only deposition transcripts is considered a reliable method in the field of the psychology of persuasion and mind control. The district court had discretion to strike the declaration. *See* Fed. R. Evid. 702(c).